UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

STATE STREET GLOBAL ADVISORS    :
TRUST COMPANY,    :
   :
                 Plaintiff,   :
   :
      -against-              :                1:19-cv-01719-GHW
   :
KRISTIN VISBAL,    :         MEMORANDUM ORDER AND
   :                    OPINION
                 Defendant.   :

------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

Fearless Girl—a bronze statue that became a viral sensation after it was placed at Bowling Green in New York City—stands at the center of the dispute in this case. In 2017, State Street Global Advisors ("SSGA") commissioned sculptor Kristen Visbal to create an original statue for International Women's Day. After it was unveiled, that statue became known as "Fearless Girl" and received wide media attention. SSGA and Visbal then executed a set of contracts that governed the use of the Fearless Girl copyright and trademark. When SSGA learned that Visbal sought to sell replicas of the statue to buyers in Australia and Germany in ways that allegedly violated the terms of these contracts, SSGA commenced this litigation. Visbal has subsequently counterclaimed against SSGA, alleging a breach of those same contracts.

There are two motions pending before the Court. First, SSGA moves to amend its complaint. Dkt No. 82. Because SSGA's direct copyright infringement and trademark infringement claims are not futile and would not unduly prejudice Visbal, SSGA's motion to amend is GRANTED as to these claims. However, Plaintiff's claims for secondary copyright liability are extraterritorial as alleged. Consequently, Plaintiff's motion to amend is futile as to these claims and Plaintiff's motion to amend is DENIED in part. Second, SSGA moves to dismiss a subset of Visbal's counterclaims and to strike a subset of Visbal's affirmative defenses. Dkt No. 120. Because

Visbal has not adequately alleged the elements of tortious interference with contract, fraud in the inducement, copyright infringement, or contributory copyright infringement, SSGA's partial motion to dismiss and partial motion to strike is GRANTED.

# I. PLAINTIFF'S MOTION TO AMEND

## A. BACKGROUND

### 1. Facts[1]

The proposed Second Amended Complaint ("SAC") alleges that "SSGA conceived and launched its Fearless Girl campaign"—"a global campaign through which SSGA initiates corporate change to support gender diversity and woman leadership on corporate boards"—to "demand[] support of corporate gender diversity." SAC, Dkt No. 83-4, ¶¶ 5, 7. Plaintiff "unveiled Fearless Girl" on March 8, 2017 to promote a fund it manages that is "designed to measure the performance of U.S. large, successful companies that are 'gender diverse[.]'" Id. ¶¶ 2, 25-26. Fearless Girl was installed at Bowling Green in New York City and was originally slated to stand for one month. Id. ¶ 27. However, given the statue's popularity, it remained at Bowling Green until December 10, 2018 when it was moved to a new location outside the New York Stock Exchange ("NYSE"). Id.

"SSGA owns U.S. Trademark Registration No. 5,728,466 (the '466 Registration') for FEARLESS GIRL in connection with 'promoting public interest in and awareness of gender and diversity issues, and issues pertaining to the governance of corporations and other institutions' . . . and 'funds investment; financial management services; financial investment advisory services; financial administration of donor-advised funds for charitable purposes; accepting and administering monetary charitable contributions; and financial information' . . . [i]n addition to its common law

---

[1] Unless otherwise noted, the facts are taken from the proposed Second Amended Complaint. "[A] court must accept the facts alleged by the party seeking amendment as true and construe them in the light most favorable to that party." *Chukwueze v. NYCERS*, 10 CIV. 8133 JMF, 2013 WL 5878174, at *1 (S.D.N.Y. Nov. 1, 2013) (citing *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005) (per curiam)). Therefore, the Court assumes the truth of the well-pleaded facts in Plaintiff's motion to amend.

rights in the FEARLESS GIRL mark[.]" *Id.* ¶ 34 (brackets omitted). "SSGA also owns pending U.S. Trademark Application Serial No. 87/570,401 (the '401 Application') for FEARLESS GIRL in connection with 'providing recognition and incentives by the way of awards to demonstrate excellence in the field of gender and diversity issues[.]'" *Id.* ¶ 35 (brackets omitted). Defendant has also "obtained a copyright registration for the three-dimensional Fearless Girl sculpture from the U.S. Copyright Office, Registration No. VAu001281157, effective March 16, 2017." *Id.* ¶ 41.

In 2017, Plaintiff and Defendant entered into three contracts: a Master Agreement, Dkt No. 16-2, at 2-12, a Copyright License Agreement, Dkt No. 16-2, at 16-19, and a Trademark License Agreement, Dkt No. 16-2, at 23-30 (collectively, the "Agreements"), "concerning the promotion and use of Fearless Girl." SAC ¶¶ 22, 36. [2] According to the SAC, "under the Agreements, SSGA owns exclusive rights to use the Fearless Girl artwork in connection with financial services and with gender diversity issues in corporate governance." *Id.* ¶ 37. Defendant "cannot sell, license, or distribute copies of the Fearless Girl artwork (i) for any commercial and/or corporate purpose with very limited exceptions, (ii) to any third party to use in connection with gender diversity issues in corporate governance or in the financial services sector, or (iii) to any political party, politician, activist, or activist group with very limited exceptions." *Id.* (citing Agreements at 16 (Copyright License Agreement § 1); *id.* at 5 (Master Agreement § 7(c))).

### a. The Australian and German Sales

The SAC alleges that Defendant sold a Fearless Girl replica to three Australian firms (the "Australian Sale"). Plaintiff alleges that it learned from "news sources" that Fearless Girl was "being brought to Melbourne[, Australia] by lawyers Maurice Blackburn and industry super funds HESTA and Cbus, as a symbol of the fight for gender equality." *Id.* ¶ 48 (quotation omitted). The SAC alleges that "Maurice Blackburn is a large Australian law firm whose specialties include personal

---

[2] Citations to ECF documents in this opinion refer to the ECF pagination.

injury, class actions, superannuation, insurance, and financial services." *Id.* ¶ 49. HESTA is the "Health Employees Superannuation Trust Australia, which is a super fund managed by H.E.S.T. Australia Limited." *Id.* ¶ 50 (quotation omitted). Cbus is the "Construction and Building Unions Superannuation, and is one of Australia's largest super funds." *Id.* ¶ 51. "These Australian firms promoted Fearless Girl in corporate press releases that" allegedly "suggested that it was SSGA's statue that was arriving in Australia, rather than" a replica. *Id.* ¶ 52. The SAC alleges that "Maurice Blackburn's Instagram account, which depicts the company's trademarks, slogans, and branding, boasted a photograph of the unauthorized Fearless Girl replica and made prominent use of SSGA's FEARLESS GIRL trademark alongside its own[.]" *Id.* ¶ 53. Plaintiff alleges that "[u]pon information and belief, Visbal, or an individual acting on Visbal's behalf, took the photograph of the Fearless Girl replica" that was displayed on Maurice Blackburn's Instagram Account "while [the replica] was in the U.S. and supplied it to Maurice Blackburn prior to sending the replica from the U.S. to Australia." *Id.* ¶ 54.

Plaintiff alleges that "[a]fter SSGA filed this lawsuit, Visbal participated in a promotional event hosted by Maurice Blackburn, HESTA, and Cbus at Federation Square in Melbourne, Australia, to unveil the unauthorized Fearless Girl replica she sold and shipped from the U.S." *Id.* ¶ 60. This replica allegedly "d[id] not give attribution to SSGA, as required under Section 1(d) of the Master Agreement." *Id.* ¶ 61. The SAC alleges that "Visbal delivered two speeches as part of the unveiling event" during which she "commended and promoted Maurice Blackburn, Cbus and HESTA and spoke about gender diversity issues in corporate governance and in the financial services sector[.]" *Id.* ¶ 63. Plaintiff further alleges that "[a]fter Visbal's and the Australian firms' unveiling ceremony, the Australian firms continued to publicize the unauthorized replica in connection with gender equality in the workplace and alongside prominent displays of their corporate branding[.]" *Id.* ¶ 64.

The SAC also alleges that Defendant sold, or planned to sell, a replica to "an unknown German buyer or buyers [(the 'German Sale'] . . . and that there would be an event to unveil the replica in Germany, likely at or around the same time as the event in Australia." *Id.* ¶ 73. However, no unveiling has occurred in Germany. *See* Section I.B, *infra* (describing the preliminary injunction entered by the Court to block both the sale to the undisclosed German buyer to the extent that it had not already been completed and the public unveiling in Germany).

### b. Defendant's Website

Plaintiff alleges that Defendant has created a website "to sell smaller-size statuette replicas to prospective buyers[.]" *Id.* ¶ 80. The SAC alleges that Defendant "has used and is using an automated sales form and/or web-based sales system on her website to accept orders for a Fearless Girl statuette from any buyer who completes the sales form, provides a valid address, and pays the purchase price." *Id.* (emphasis omitted). This website allegedly "includes no safeguard to reasonably ensure that replicas of Fearless Girl do not end up in the wrong hands and are not used for a purpose prohibited by the parties' Agreements." *Id.* (emphasis omitted). The SAC alleges that, via her website, "Visbal sold a statuette to an employee of the financial institution Edward Jones who, upon information and belief, was acting on behalf of Edward Jones for use at a corporate-sponsored event[.]" *Id.* ¶ 87. Thus, Plaintiff alleges that Defendant "displayed two-dimensional images of the Fearless Girl artwork on social media" and "displayed a three-dimensional statuette of the Fearless Girl artwork at a conference all in connection with gender diversity issues in corporate governance and in the financial services sector." *Id.* ¶ 90.[3]

The SAC also alleges that "Section 11(e) of the Master Agreement prohibits Visbal from registering a domain name that incorporates the FEARLESS GIRL mark, with the sole exception being that Visbal may create a website for direct sales of Fearless Girl replicas using the domain

---

[3] The Court refers to two- and three-dimensional representations of Fearless Girl as the "Artwork."

'fearlessgirlsculpture.com' and may use the domain 'fearlessgirl.us' to redirect to the 'fearlessgirlsculpture.com' website." *Id.* ¶ 94 (emphasis omitted). According to the SAC, "Visbal is using 'fearlessgirl.us' beyond this narrow exception by using 'fearlessgirl.us' as her primary website to sell Fearless Girl statuettes rather than as a redirect page, and by using 'fearlessgirlsculpture.com' to redirect to her website at www.fearlessgirl.us." *Id.* ¶ 95.

Plaintiff alleges that Defendant is "using the 'fearlessgirl.us' domain—which contains SSGA's entire FEARLESS GIRL mark—in connection with educational services, and the promotion of public interest in gender and diversity issues in corporate governance, including in the financial services sector[.]" *Id.* ¶ 96. "For example, Visbal's webpage at https://www.fearlessgirl.us/the-facts/ cites to the same or similar gender diversity studies that are discussed by SSGA in promotional material for its Fearless Girl campaign, e.g., at https://www.ssga.com/about-us/reinventing-shareholder-activism-stewardship.html." *Id.* Hence, the SAC alleges that "Visbal is not using the FEARLESS GIRL name solely to refer to SSGA's statue, but is instead using FEARLESS GIRL to promote and advertise herself and her replica sales, and to advertise and reinforce the connection between Fearless Girl and financial services and gender diversity issues in corporate governance[.]" *Id.* (emphasis omitted).[4]

### 2. Procedural History

On February 14, 2019, Plaintiff filed a complaint in New York Supreme Court. *See* Notice of Removal, Dkt No. 1, at 1. On February 24, 2019, Plaintiff filed an amended complaint alleging breach of contract and violation of the parties' Agreements. *See id.* at 1, 21-26. On February 25, 2019, Defendant removed the case from New York state court to federal court. *Id.* at 1.

---

[4] The SAC also alleges that Defendant has breached the Agreements in connection with sales of replicas in Oslo, Norway and Los Angeles, California. *See* SAC ¶¶ 99-111.

Shortly thereafter, Plaintiff applied for the entry of a temporary restraining order to enjoin Defendant from completing the German Sale or, if a Fearless Girl replica had already been sent to Germany, "order[ing Defendant] to obtain and retain possession and 'actual instructive' control over such German replica" so that it was not unveiled. Transcript of Proceedings Held on February 25, 2019 ("February 25 Hearing Transcript"), Dkt No. 29, at 51; *see also* Order of March 5, 2019, Dkt No. 25, at 1. Plaintiff also requested that the Court "enjoin defendant from promoting her unauthorized (a) Australian replica and (b) German replica, because such replica is being used to promote one or more third parties and/or was given to a corporate entity or a financial institution in breach of a master agreement; (4) order defendant to place the required attribution statement to SSGA on the replica in (a) Australia and (b) Germany; and (5) enjoin defendant from using an automated sales form to sell replicas, including, but not limited to, enjoining use of the automated sales form located at the www.fearlessgirl.us website." February 25 Hearing Transcript at 52.

The Court denied Plaintiff's motion. *Id.* at 56. The Court's ruling was based in part on factual proffers by defense counsel during the February 25 hearing. *Id.* at 52. Defense counsel proffered that "there is no imminent sale of the Fearless Girl statue to any buyer or buyers in Germany" because "that sale was consummated, according to counsel, a year ago or so, and there is no imminent announcement or unveiling of that sculpture." *Id.* Defense counsel also proffered that Defendant "will, in connection with her conversation or speech regarding the Australian sculpture, not be promoting the corporate entity, or financial institution, or the law firm which worked together, apparently, to fund its acquisition." *Id.* In addition, defense counsel proffered that "the sales terms that have been presented in connection with" the automated sales form "adequately address[ed] the concerns" raised by Plaintiff. *Id.* at 54. Based on those proffers, the Court concluded that Plaintiff had not established that it would suffer irreparable harm in the absence of a

temporary restraining order with respect to the German or Australian sales or the automated sales form on Defendant's website.  *Id.* at 56-57.[5]

On February 27, 2019, Plaintiff submitted a letter "inform[ing] the Court that Defendant had made numerous statements in speeches at the Fearless Girl unveiling ceremony in Australia that contradicted her counsel's representations and, further, that undermined the Court's basis for concluding that Plaintiff had not made a sufficient showing of irreparable harm in its previous application for a temporary restraining order."  Order of March 7, 2019 (the "Preliminary Injunction"), Dkt No. 27, at 1; *see also* Plaintiff's February 27, 2019 Letter, Dkt No. 7; Transcript of Proceedings Held on March 5, 2019, Dkt No. 39.  Therefore, the Court entered a preliminary injunction enjoining Defendant from completing the sale of a Fearless Girl replica to "her undisclosed buyer or buyers in Germany, to the extent that such delivery, sale, or transfer has not already taken place; . . . from promoting a German replica; and . . . from using an automated sales form to sell replicas[.]"  Preliminary Injunction at 3.

On April 22, 2019, Defendant filed a letter requesting that the Court vacate the preliminary injunction.  Dkt No. 54.  The Court concluded that its language enjoining Defendant from using an automated sales form had been overbroad and issued an order amending and restating its Preliminary Injunction.  Order of May 23, 2019 (the "Amended Preliminary Injunction"), Dkt No. 79.  The restated preliminary injunction enjoined Defendant "from making automated sales of replicas."  *Id.* at 3.

Plaintiff now seeks leave to file a second amended complaint to add claims for copyright infringement, trademark infringement, unfair competition, and false designation of origin.  *See* SAC ¶¶ 161-69 (direct copyright infringement); *id.* ¶¶ 170-78 (inducement of copyright infringement); *id.*

---

[5] The Court also concluded that Plaintiff had not established a substantial likelihood of success on the merits with respect to whether Defendant should be required to place an attribution statement on the Australian replica.  *Id.* at 57.

¶¶ 179-87 (contributory copyright infringement); *id.* ¶¶ 188-96 (vicarious copyright infringement); *id.*

¶¶ 197-203 (trademark infringement); *id.* ¶¶ 204-07 (unfair competition and false designation of

origin). On May 24, 2019, Plaintiff filed a motion for leave to file a second amended complaint and

an accompanying memorandum law. *See* Motion for Leave to File Second Amended Complaint,

Dkt No. 82; Memorandum of Law in Support of Motion for Leave to File Second Amended

Complaint ("Mem."), Dkt No. 83. Defendant subsequently filed an opposition to Plaintiff's motion,

Memorandum of Law in Opposition to Motion for Leave to File Second Amended Complaint

("Opp."), Dkt No. 92, and Plaintiff filed a reply, Reply Memorandum of Law in Support of Motion

for Leave to File Second Amended Complaint ("Rep."), Dkt No. 93.

### B. LEGAL STANDARD

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, a party may amend a pleading

once as a matter of right within 21 days of serving it or, "if the pleading is one to which a responsive

pleading is required, 21 days after service of a responsive pleading or 21 days after service of a

motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). After that point,

"a party may amend its pleading only with the opposing party's written consent or the court's leave."

Fed. R. Civ. P. 15(a)(2). However, "[t]he court should freely give leave when justice so requires." *Id.*

"Reasons for a proper denial of leave to amend include undue delay, bad faith, futility of

amendment, and perhaps most important, the resulting prejudice to the opposing party." *AEP*

*Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citation omitted);

*see also id.* ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of

a showing by the nonmovant of prejudice or bad faith."). "Mere delay . . . absent a showing of bad

faith or undue prejudice does not provide a basis for a district court to deny the right to amend."

*Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quotation omitted).

An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). Rule 12(b)(6) permits a litigant to file a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations [in the complaint] as true and draw[] all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)). To avoid dismissal, a complaint must allege "sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

Courts follow a "two-pronged approach" in determining plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (alterations omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Deciding whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While the court must accept material allegations in a complaint as true, the court need not accept conclusory allegations. *See Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

Although a court is normally limited to the contents of the complaint in considering a motion to dismiss pursuant to Rule 12(b)(6), a court may permissibly consider documents other than the complaint in certain circumstances, such as when they are either attached to the complaint or incorporated into it by reference and integral to its allegations. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *see also Ackerman v. Local Union 363, Int'l Bhd. of Elec. Workers*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006) ("The classic examples of documents that may be considered on a motion to dismiss even though the plaintiff does not physically attach them to the complaint are the contracts that underlie the claims in suit[.]"). A district court may also "rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

## C. DISCUSSION

### 1. Futility

#### a. Copyright Infringement

Plaintiff's proposed direct copyright infringement claim is not futile. However, because it is extraterritorial, Plaintiff's claims for secondary copyright liability—as alleged—could not withstand a motion to dismiss. Defendant argues that Plaintiff's direct copyright infringement claim "misstates the scope of the license" granted to it in the Copyright License Agreement. Opp. at 11. Thus, Defendant argues that Plaintiff has not sufficiently alleged a "claim for copyright infringement" because Plaintiff's claim is premised on its allegedly erroneous construction of the Copyright License Agreement. *Id.* at 10. Defendant also argues that Plaintiff's copyright infringement claims are not "properly before this Court" because "the Copyright Act is not extraterritorial" and Plaintiff's claims are premised on acts that occurred outside of the United States. *Id.* at 12.

#### i. Scope of the Copyright License Agreement

Plaintiff has adequately alleged a copyright infringement claim.[6] "To state a claim for copyright infringement, a plaintiff must allege both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Spinelli v. NFL*, 903 F.3d 185, 197 (2d Cir. 2018) (quotation omitted). "A valid license to use the copyrighted work immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." *Id.* (quotation omitted). "[W]here only the scope of the license is at issue, it is the copyright owner's burden to show that the defendant's use of a work was unauthorized." *Id.* (quotation omitted).

In this case, Defendant has copyrighted the Artwork. *See* Agreements at 16 (Copyright License Agreement § 1(a)). However, the Copyright License Agreement grants Plaintiff the "exclusive right" to use the Artwork "in connection with (A) gender diversity issues in corporate governance and in the financial services sector, and (B) SSGA and the products and services SSGA offers and/or will offer at any time[.]" *Id.*[7] The scope of Plaintiff's license is the primary dispute between the parties with respect to whether Plaintiff's copyright claims are futile. The factual predicate for Plaintiff's direct copyright infringement claim is that Defendant "distributed a copy of the Fearless Girl artwork in the form of a statuette to an employee of the financial institution Edward Jones who, upon information and belief, was acting on behalf of Edward Jones to be used

---

[6] *See* 17 U.S.C. § 106; *id.* § 501.
[7] The full text of § 1(a) of the Copyright License Agreement states:

"Artist hereby grants to SSGA a royalty-free, irrevocable, assignable, worldwide, unencumbered and exclusive right, license, and privilege to, in connection with (A) gender diversity issues in corporate governance and in the financial services sector, and (B) SSGA and the products and services SSGA offers and/or will offer at any time after the Effective Date:  (i) create, use, display, and distribute two-dimensional copies of the Artwork and Statue, in any medium now known or hereafter developed; (ii) create, use, display, and distribute three-dimensional copies of the Artwork and Statue, in any non-physical medium now known or hereafter developed, including, but not limited to holograms and virtual reality; and (iii) display and distribute three-dimensional, physical copies of the Artwork in the form of statuettes and/or mini replicas, that are sanctioned by the Artist.  For the avoidance of doubt, the Parties agree that Artist is free to discuss issues involving Gender Diversity Goals in connection with the Artwork, provided that Artwork is not used to promote any third party, and that copies of the Artwork are not given to a corporate entity or financial institution, pursuant to the terms of the Master Agreement between the Parties entered into as of the date hereof."

in connection with gender diversity issues in corporate governance and in the financial services sector." SAC ¶ 165-66. Plaintiff argues that this distribution violated its exclusive right outlined in subsection A of section 1(a) of the Copyright License Agreement.

Defendant argues that Plaintiff "misstates the scope of the license in its proposed Second Amended Complaint by omitting" subsection B of section 1(a) of the Copyright License Agreement. Opp. at 11 (citing SAC ¶ 162). Defendant argues that section 1(a) of the Copyright License Agreement does not grant Plaintiff a license for uses that are *either* "in connection with (A) gender diversity issues in corporate governance and in the financial services sector" *or* in connection with "(B) SSGA and the products and services SSGA offers[.]" Rather, on Defendant's view, the license extends only to uses that *both* relate to gender diversity issues in corporate governance and in the financial services sector *and* SSGA and the products and services SSGA offers. Therefore, Defendant argues that Plaintiff has not adequately alleged a copyright infringement claim because it has not alleged that Defendant's use was related to Plaintiff and the products and services it offers.

Defendant argues that this interpretation is supported by section 1(a)'s use of the word "and," rather than "or," between subsections (A) and (B) because this word choice implies that the license covers only uses that relate to both subsections. *See* Opp. at 11 (citing 1A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 21:14 (7th ed. Nov. 2018 rev.)). Defendant also argues that its construction is supported by section 7(c)(ii) of the Master Agreement, which allows Defendant to "sell, license, or distribute copies of the Artwork in any medium or size to any third party to use in connection with gender diversity issues in corporate governance or in the financial services sector" if Defendant and Plaintiff consent to such use. Agreements at 6 (Master Agreement § 7(c)(ii)).

Defendant's proposed interpretation of the Copyright License Agreement is not persuasive. Section 1(a) of the Copyright License Agreement granted Plaintiff a license in the circumstances

described in each of subsections (A) and (B) individually; it does not require that both conditions must be satisfied for a use to be covered by the license.  The most natural reading of section 1(a) in context is that subsections (A) and (B) are parts of a list of circumstances in which Plaintiff has granted Defendant a license to use the Artwork.  Although the contract might have used "or" in this context, this does not mean that the Copyright License Agreement's use of "and" implies that both subsections must be satisfied.  *See* Kenneth A. Adams & Alan S. Kaye, *Revisiting the Ambiguity of "And" and "Or" in Legal Drafting*, 80 St. John's L. Rev. 1167, 1195 (2007) ("Although and expresses conjunction and or expresses disjunction, they can serve to convey the same meaning[.]") (footnote omitted).

Section 7(c)(ii) of the Master Agreement confirms this reading.  Defendant argues that "[i]t defies common sense to give SSGA an exclusive right to distribute and display [the Artwork] 'in connection with (A) gender diversity issues in corporate governance and in the financial services sector'" in section 1(a) of the Copyright License Agreement while also allowing Defendant "to exercise this right in certain circumstances" under section 7(c)(ii) of the Master Agreement because Plaintiff's right would "not then be exclusive."  Opp. at 6 (quoting Copyright License Agreement § 1(a); other citations omitted).  However, Defendant's argument overlooks the fact that section 7(c)(ii) requires the consent of *both* parties for Defendant to use the Artwork "in connection with gender diversity issues in corporate governance or in the financial services sector."  Therefore, the most persuasive construction of section 1(a) and section 7(c)(ii) is that Plaintiff has an exclusive license under section 1(a), which it can choose to waive under section 7(c)(ii).  The fact that Plaintiff may choose to allow Defendant to use the Artwork in otherwise prohibited circumstances does not establish that Plaintiff's right is not exclusive.

Moreover, as Plaintiff correctly notes, Defendant's interpretation would render section 7(c)(ii) of the Master Agreement unnecessary.  If it were true that Defendant could use the Artwork

"in connection with (A) gender diversity issues in corporate governance and in the financial services sector" so long as it did not also relate to "(B) SSGA and the products and services SSGA offers" under section 1(a), then it would be unnecessary for Defendant to obtain Plaintiff's permission for a use that related only to gender diversity issues. That is because "there would be no need for Visbal to obtain SSGA's prior written approval for a use in connection with only gender diversity issues in corporate governance or in the financial services sector, because such a use would not overlap with SSGA's exclusive license[.]" Rep. at 4. Yet section 7(c)(ii) provides for a process by which Defendant can obtain permission for just such a use. Under New York law, contracts are construed to "give[] a reasonable and effective meaning to all terms" and not to leave "a part unreasonable or of no effect." *Encyclopedia Brown Prods. v. Home Box Office, Inc.*, No. 91 CIV. 4092 (PKL), 1998 WL 734355, at *9 (S.D.N.Y. Oct. 15, 1998) (quotation omitted). As Defendant's interpretation does not give effect to section 7(c)(ii) of the Master Agreement, the Court concludes that her proposed construction of the Agreements is unpersuasive.

Accordingly, Plaintiff has adequately alleged that it has an exclusive license with respect to uses of the Artwork in connection with gender diversity issues in corporate governance and in the financial services sector, and that Defendant violated that license by distributing a statute to an Edward Jones employee.

### ii. Extraterritoriality

Plaintiff's proposed indirect copyright claims, as alleged, are impermissibly extraterritorial. Plaintiff seeks leave to amend to bring three claims for "secondary copyright infringement"— namely, inducement of copyright infringement, contributory copyright infringement, and vicarious copyright infringement. *Arista Records LLC v. USENET.com*, 633 F. Supp. 2d 124, 149 (S.D.N.Y. 2009); *see* SAC ¶¶ 170-178 (inducement of copyright infringement); ¶¶ 179-187 (contributory copyright infringement); ¶¶ 188-196 (vicarious copyright infringement). "For all three theories of

secondary copyright infringement, there must be the direct infringement of a third party." *Arista Records LLC*, 633 F. Supp. 2d at 179 (citing *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998)).

Here, Plaintiff alleges that the direct infringers were three Australian firms: Maurice Blackburn, HESTA, and Cbus (the "Australian firms"). The SAC alleges that the Australian firms "display[ed] two-dimensional copies of the Fearless Girl replica purchased from Visbal on their social media accounts and on websites on the Internet that are accessible, viewable, and downloadable by users located in the United States[.]" SAC ¶ 172. According to the SAC, Maurice Blackburn "is a large Australian law firm." *Id.* ¶ 49. HESTA is an Australian "superannuation fund"—that is, a pension fund; Cbus is also an Australian superannuation fund. *Id.* ¶¶ 50-51. The complaint does not allege that any of the Australian firms do business in the United States or that they have any other connection to, or interest in, the United States.

The three Australian firms bought a sculpture of Fearless Girl from Visbal in a sale that Plaintiff alleges to have been prohibited by the Master Agreement. As pertinent to the proposed secondary copyright infringement claims, the SAC alleges that Maurice Blackburn posted a photograph of Fearless Girl on the company's Instagram account, *id.* ¶ 53, that the Australian Firm's social media accounts contained photographs of Fearless Girl, *id.*, and that the promotional materials curated by the Australian Firms for the unveiling of their version of Fearless Girl contained images of the sculpture, *id.* ¶ 62. The SAC alleges no connection between the Australian Firms' use of the Fearless Girl image and the United States other than the fact that the images posted to their social media pages are accessible from the United States. *See id.* ¶ 172 ("The Australian firms' display of these two-dimensional copies of the Fearless Girl replica purchased from Visbal on their social media accounts and on websites on the Internet that are accessible, viewable, and downloadable by users located in the United States constitute a violation of U.S. copyright

16

law.")  The SAC does not allege that the images posted by the Australian firms used servers located in the United States—and in 2020, when large internet service companies locate servers across the globe, such an inference by the Court is not reasonable.  Thus, the proposed amendment raises a clear question—does United States copyright law apply whenever a foreign person posts a copyrighted image to the internet abroad, even if there is no connection to the United States other than the fact that the image is accessible here?  The Court believes that the answer to this question should be no.

United States copyright laws do not apply extraterritorially.  "[I]t is a long-standing principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *EEOC v. Arabian American Oil Co. (Aramco)*, 499 U.S. 244, 248 (1991) (quotation omitted).  "Because courts must 'assume that Congress legislates against the backdrop of the presumption against extraterritoriality,' unless 'there is "the affirmative intention of the Congress clearly expressed" congressional enactments must be presumed to be 'primarily concerned with domestic conditions.'"  *Subafilms, Ltd. v. Mgm-Pathe Communs. Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994) (en banc) (first quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949) and then quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957)).  Accordingly, "[i]t is well established that copyright laws generally do not have extraterritorial application."  *Craig v. UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 331 (S.D.N.Y. 2019) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988)); *see also SubaFilms*, 24 F.3d at 1095-96 ("The 'undisputed axiom' that the United States' copyright laws have no application to extraterritorial infringement predates the 1909 [Copyright] Act and, as discussed above, the principle of territoriality consistently has been reaffirmed.") (quoting 3 David Nimmer & Melville B. Nimmer, *Nimmer on Copyright* § 12.04[A][2][b], at 12-81 (1993) and citing *United Dictionary Co. v. G. & C. Merriam Co.*, 208 U.S. 260,

264-66 (1908) (Holmes, J.); *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 662 (2d Cir. 1955)).

The adoption of a rule that would give rise to a copyright claim against a foreign actor solely on the basis of the fact that a U.S. copyrighted image was posted on the internet—and was therefore "accessible" within the United States would undermine the extraterritorial limitations on U.S. copyright law. *See* 7 Patry on Copyright § 25:86.20. The Court is aware of only one case which appears to have found that U.S. copyright laws apply to images posted abroad solely because they were accessible on the internet—*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 225 (S.D.N.Y. 2002) (Lynch, J.) (holding that a claim was not impermissibly extraterritorial where a plaintiff "likely . . . discovered infringing material on the Miller Features web site" and "counsel for United Media now explicitly represents that the allegedly infringing material was accessible from computers within the United States and that it is prepared to prove that the defendants' alleged copyright infringement had an effect within the United States"). That decision, however, cites no case law or other precedent in support of its broad conclusion, and does not, even glancingly, consider its sweeping extraterritorial application of the United States copyright law. As a result, *United Feature* has limited persuasive authority.

Decisions by other courts considering the publication of images copyrighted in the United States on the internet abroad have required some additional link between the foreign publication on the internet and the United States—some "plus" factor beyond the mere accessibility of the copyrighted property on the internet. Those "plus" factors have included (1) the direction of copyrighted material into the United States, *Spanski Enters. v. Telewizja Polska, S.A.*, 883 F.3d 904, 916 (D.C. Cir. 2018) (holding that "a foreign broadcaster that . . . directs infringing performances into the United States from abroad commits a domestic violation of the Copyright Act"), (2) when foreign "acts are intended to, and do, have an effect within the United States," *GB Marketing USA*

*Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 773 (W.D.N.Y. 1991), and (3) the

uploading of copyrighted materials to servers located in the United States, *Shropshire v. Canning*, 809

F. Supp. 2d 1139, 1146 (N.D. Cal. 2011) ("[A]ccording to the allegations in the SAC, Defendant's

direct action led to the creation of a copy of the Grandma video on YouTube's servers in California,

and to the subsequent viewing of the video by potentially thousands in the United States.");

*Crunchyroll, Inc. v. Pledge*, C 11-2334 SBA, 2014 WL 1347492, at *17 (N.D. Cal. Mar. 31, 2014)

(similar).

Here, Plaintiff alleges none of these. The SAC describes conduct by the Australian firms—

which are not alleged to have business interests or other contacts with the United States—that is

directed at a domestic audience, not the United States. There is no allegation that the Australian

firms' conduct had any contact with, or impact on, the United States apart from a conclusory

allegation that their conduct caused Plaintiff unspecified damages in the United States. As pleaded

in the SAC, the Australian firms used the internet to communicate with their domestic audiences,

and that, like most everything on the internet, their communications are thus "accessible" in the

United States. Such conduct on its own is insufficient to state a claim, given the limitation on the

extraterritorial application of United States copyright law.

Accordingly, Plaintiff has not adequately alleged a direct copyright infringement by the

Australian firms. For that reason, Plaintiff's secondary liability claims cannot succeed as alleged and

Plaintiff's motion to amend is denied as futile as pleaded with respect to counts seven, eight, and

nine of Plaintiff's proposed SAC. Plaintiff is granted leave to replead this claim. *See Cruz v. TD

Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to

dismiss to allow leave to replead.") (citation omitted).[8]

---

[8] These arguments apply only to the indirect copyright infringement claims because the sale of a replica to an Edward Jones employee—the basis of Plaintiff's direct copyright infringement claim against Defendant—occurred in the United States.

**b. Lanham Act Claims**

Plaintiff has also adequately alleged violations of the Lanham Act.[9]  The Lanham Act

"impose[s] liability for unpermitted 'use in commerce' of another's mark which is 'likely to cause

confusion, or to cause mistake, or to deceive' 'as to the affiliation . . . or as to the origin, sponsorship

or approval of his or her goods or services . . . by another person.'"  *Rescuecom Corp. v. Google, Inc.*,

562 F.3d 123, 128 (2d Cir. 2009) (first quoting 15 U.S.C. § 1114; and then quoting *id.*

§ 1125(a)(1)(A)) (brackets omitted).

Here, Plaintiff "is the exclusive owner of the FEARLESS GIRL trademark . . . in connection

with goods and services that support women in leadership positions and the empowerment of

women, and that promote public interest in and awareness of gender diversity and equality issues[.]"

Agreements at 23 (Trademark License Agreement § 1(a)).  Plaintiff is also "the owner of U.S.

Trademark Application No. 87/374,560 for the Trademark in connection with promoting public

interest in and awareness of gender diversity issues, and issues pertaining to the governance of

corporations and other institutions and funds investment[.]"  *Id.* (quotations omitted).

The Master Agreement permits Defendant to "create a website for direct sales of the

Artwork or replicas of the Statue using the domain fearlessgirlsculpture.com . . . and retain the

domain fearlessgirl.us to redirect to fearlessgirlsculpture.com."  Agreements at 9 (Master Agreement

§ 11(e)) (quotation marks omitted).  Finally, the Master Agreement provides that Plaintiff

"acknowledges that certain use of the Mark by Artist as the name of the Statue may be nominative

fair use, or not a trademark use, e.g., 'the Fearless Girl statue by Kristen Visbal,' or 'the Fearless Girl

statue – NYC[.]'"  *Id.* at 8 (Master Agreement § 11(c)).  However, "the use of the Mark on a label,

---

[9] *See* 15 U.S.C. § 1114(1)(a) ("Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.").

packaging, or advertising or promotional materials in connection with the sale, offer for sale, license, or distribution of reproductions of the Artwork, in any medium, other than as merely and only describing the Artwork as created by Kristen Visbal, shall be subject to the Trademark License Agreement[.]" *Id.*

Plaintiff alleges that Defendant is "using fearlessgirl.us [and associated URLs]" beyond the exception established in Section 11(e) of the Master Agreement. SAC ¶ 95 (quotation marks omitted). That is because Plaintiff alleges that Defendant is using fearlessgirl.us "in connection with educational services, and the promotion of public interest in gender and diversity issues in corporate governance, including in the financial services sector, in an attempt to emulate SSGA's Fearless Girl campaign." *Id.* ¶ 96.[10] Plaintiff identifies two webpages, https://www.fearlessgirl.us/the-facts/ and https://www.fearlessgirl.us/the-artist/, which—in conjunction with a third webpage https://www.fearlessgirl.us/purchase-a-reproduction—allegedly infringe on Plaintiff's trademark. The Court will refer to these URLs as the "Disputed URLs."

Plaintiff also alleges that Defendant is using the Disputed URLs "to promote and advertise herself and her replica sales, and to advertise and reinforce the connection between Fearless Girl and financial services and gender diversity issues in corporate governance[.]" *Id.* ¶ 97 (emphasis omitted). Plaintiff argues that Defendant's use of the fearlessgirl.us domain name "is an encroachment on SSGA's trademark rights that is likely to confuse consumers into believing that she has been authorized by SSGA to use the FEARLESS GIRL trademark in connection with, *inter alia,* gender diversity issues in corporate governance and in the financial sector." Mem. at 21

---

[10] The SAC also alleges that Defendant is breaching the Trademark License Agreement by "using fearlessgirl.us as her primary website to sell Fearless Girl statuettes rather than as a redirect page, and by using fearlessgirlsculpture.com to redirect to her website at www.fearlessgirl.us." SAC ¶ 95. However, these allegations are not at issue in Plaintiff's proposed amendments.

(citations omitted). Therefore, Plaintiff alleges that "Visbal's use of the FEARLESS GIRL mark in the Infringing URLs . . . constitutes trademark infringement[.]" SAC ¶ 201.[11]

Defendant argues that Plaintiff's Lanham Act claims are futile for three reasons, none of which are persuasive. First, Defendant argues that Plaintiff's claims "are barred by the First Amendment." Opp. at 13. Defendant cites the Second Circuit's decision in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). *Rogers* addressed whether subjecting the title of a movie to the restrictions in the Lanham Act violated the First Amendment. *Id.* at 997-99. The Circuit held that "the [Lanham] Act should be construed to apply to *artistic works* only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999 (emphasis added).

Defendant's first argument is unpersuasive because Plaintiff has not alleged that Defendant is using the mark as the title of an artistic work but rather "as a URL, and to identify a website and a series of webpages that promote and advertise Visbal." Rep. at 10 (footnote and emphasis omitted). The *Rogers* test applies to the titles of artistic works. However, Plaintiff has not alleged that Defendant violated the Lanham Act by using the Fearless Girl mark in the title of an artistic work. Therefore, the *Rogers* test is inapplicable and the First Amendment does not bar Plaintiff's Lanham Act claim.

Second, Defendant argues that her use is a "nominative fair use" of the "Fearless Girl" mark "as the name of the Artwork, rather than a source designation." Opp. at 15 (citations omitted). Under the fair use doctrine, "one party's exclusive right to use a mark will not prevent others from using the word or image constituting the mark in good faith in its descriptive sense, and not as a trademark." *TCPIP Holding Co.*, 244 F.3d at 103 (quotation and brackets omitted). Defendant's argument is not persuasive because the Second Circuit has held in a similar circumstance that use of

---

[11] The use of a trademark in a URL can constitute an infringing use if it is likely to cause consumer confusion. *See TCPIP Holding Co. v. Haar Commu'ns Inc.*, 244 F.3d 88, 100-04 (2d Cir. 2001).

a trademark like Fearless Girl in a URL is "not simply an adjective use" but rather is a use "as a mark." *Id.* at 104. Consequently, although there may be circumstances in which the use of a mark in a URL might qualify as an adjective use, that is not true in this case. Defendant's use of Fearless Girl in the Disputed URLs thus is not eligible for a fair use defense.[12]

Third, Defendant argues that her use of the Fearless Girl mark in the Disputed URLs is authorized by the Trademark License Agreement. In the Trademark License Agreement, Plaintiff grants Defendant a license to use the Fearless Girl trademark under certain circumstances. Section 2(a) of the Trademark License Agreement states that

> [s]ubject to the terms and conditions of this Trademark License Agreement, SSGA hereby grants to Artist an exclusive, royalty-free, worldwide, right and license to use the Trademark on and in connection with (i) three-dimensional copies of the Statue in various mediums and sizes in connection with the offer of goods for sale ("Merchandising"); (ii) two-dimensional copies of the Statue for Artist's portfolio for "fine art" purposes, and (iii) two-dimensional copies of the Statue in various mediums and sizes in connection with Merchandising (collectively, the "Licensed Products").

*Id.* at 24 (Trademark License Agreement § 2(a)). The Trademark License Agreement also states that "Artist may use the Trademark to advertise and promote the Licensed Products in any and all mediums now known or hereafter devised, pursuant to the terms and conditions herein." *Id.* (Trademark License Agreement § 2(c)). Defendant notes that the Trademark License Agreement

---

[12] Defendant also suggests that Plaintiff has not adequately alleged a "use in commerce"—one element of a Lanham Act claim, *see 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005) (citation omitted)—by Defendant because the SAC alleges that Defendant "has only used 'Fearless Girl' in connection with her sale of replicas of the Artwork and as the name of the Artwork." Opp. at 15. Therefore, according to Defendant, her use of the Fearless Girl mark is not a "'trademark use' as contemplated by the parties in the Master Agreement and the Trademark License Agreement." *Id.* (citations omitted). This argument is not persuasive because Plaintiff has specifically alleged that Defendant is using the Fearless Girl "name and mark as the dominant portion of the Infringing URLs . . . to promote public interest in gender diversity issues in corporate governance, including in the financial services sector[.]" SAC ¶ 98. In other words, Plaintiff alleges that Defendant is using the mark as a URL, not to identify the Fearless Girl statue. This constitutes a "use in commerce" because Plaintiff has alleged that Defendant has used the Fearless Girl mark in fearlessgirl.us and associated URLs "in the sale or advertising of" Fearless Girl replicas, which have been "rendered in commerce." 15 U.S.C. § 1127.

grants her a license to "offer[] replicas for sale[.]" Opp. at 16 (citing Agreements at 24 (Trademark License Agreement § 2(a), (d)). According to Defendant, this is what the Disputed URLs do.

As alleged in Plaintiff's proposed amendments, Defendant's use of the mark is not covered by the grant of the license in the Trademark License Agreement because the Plaintiff has alleged that Defendant uses the Fearless Girl mark in connection with services, not goods. The SAC alleges that Defendant has used the mark in connection with the "rendering of educational and public interest services that raise awareness of gender and diversity issues[.]" SAC ¶ 201. Section 2(a) of the Trademark License Agreement grants Defendant a license "to use the Trademark on and in connection with (i) three-dimensional copies of the Statue in various mediums and sizes in connection with the offer of goods for sale[.]" Agreements at 24 (Trademark License Agreement § 2(a)). Thus, Plaintiff has alleged that Defendant has exceeded the scope of the license granted to her in the Trademark License Agreement by using the mark to promote services rather than goods. Therefore, Defendant's argument that her use of the mark falls within the scope of the license granted in the Trademark License Agreement does not succeed, and Plaintiff's proposed amendments alleging a trademark infringement claim are not futile.[13]

### 2. Prejudice to Defendant

Plaintiff's amendments would not result in undue prejudice to Defendant. In deciding whether a defendant would suffer undue prejudice as a result of a plaintiff's amendments, courts in this circuit "generally consider whether the assertion of the new claim . . . would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or]

---

[13] Defendant also argues that Plaintiff's false designation of origin claim under 15 U.S.C. § 1125(a) is futile because it "lacks . . . specificity." Opp. at 17. However, the Court has already decided that Plaintiff has adequately alleged a trademark infringement claim and the factual predicate for Plaintiff's trademark infringement claim is expressly incorporated into its claim for relief under § 1125(a). *See* SAC ¶ 204. Because the "standards for pleading a § 1125 claim and a § 1114 claim are substantially similar," this claim is not futile. *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 903 (S.D.N.Y. 2016).

(ii) significantly delay the resolution of the dispute[.]" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (quotation omitted).

Neither of these factors weighs strongly against permitting Plaintiff to amend its complaint. Some of Plaintiff's proposed amendments simply provide further context for claims asserted in the First Amended Complaint ("FAC"), Dkt No. 1-2, at 2-28. *See, e.g.*, SAC ¶¶ 74-78 (alleging additional details with respect to Defendant's planned sale in Germany); *cf.* FAC ¶¶ 56-59 (alleging facts about Defendant's planned sale in Germany). These amendments will not require a significant expansion of discovery or significantly delay the resolution of the dispute. Plaintiff has also "update[d] allegations concerning Ms. Visbal's planned breaching activity to account for her actual breaches that have since occurred." Mem. at 7 (emphases omitted); *see, e.g.*, SAC ¶¶ 60-67 (alleging that Defendant's sale in Australia has already occurred); *cf.* FAC ¶ 51 (alleging that "Visbal will attend and promote the public unveiling event of the Australian replica, which is a further breach that will occur in just a day or so") (emphasis omitted). These amendments will also not require an expansion of discovery or significantly delay the resolution of the action.

Plaintiff's allegations of new causes of action for copyright and trademark infringement present a closer question, but the Court concludes that these allegations also will not unduly prejudice Defendant. Plaintiff's proposed direct copyright and trademark infringement claims arise out of the same transactions as claims Plaintiff asserted in its FAC. The direct copyright infringement claim arises out of Defendant's alleged sale of a statuette to an Edward Jones employee. *See* SAC ¶ 165. That sale served as the factual predicate for a claim for breach of the Copyright License Agreement in the FAC. *See, e.g.*, FAC ¶¶ 69-70 (Edward Jones). Plaintiff's trademark infringement claim arises out of her alleged infringing use of the Fearless Girl trademark in her website URL. *See* SAC ¶ 201. Plaintiff also alleged breaches associated with Defendant's website in the FAC. *See* FAC ¶¶ 60-71. Hence, Defendant will not be forced to engage in

substantially more burdensome discovery as a result of Plaintiff's amendments, and the necessity of defending these claims is unlikely to significantly delay the resolution of this lawsuit.[14]

*    *    *

Consequently, the Court concludes that Plaintiff's direct copyright infringement and trademark infringement claims are not futile and will not unduly prejudice Defendant. Plaintiff's motion to amend its complaint is therefore granted as to these claims. However, because Plaintiff's indirect copyright claims could not withstand a motion to dismiss as alleged, Plaintiff's motion to amend is denied as to counts seven, eight, and nine of its proposed SAC.

## II. PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS AND TO STRIKE AFFIRMATIVE DEFENSES

Plaintiff moves to dismiss four of Defendant's counterclaims under Federal Rule of Civil Procedure 12(b)(6) and to strike two of Defendant's affirmative defenses pursuant to Federal Rule of Civil Procedure 12(f). Dkt No. 120. Specifically, Plaintiff moves to dismiss Defendant's counterclaims for tortious interference with contract, fraud in the inducement, copyright infringement, and contributory copyright infringement and to strike Plaintiff's affirmative defenses based on fraudulent inducement and misrepresentation. Memorandum of Law in Support of Motion To Dismiss Defendant's Second Amended Counterclaims and To Strike Affirmative Defenses ("Mem."), Dkt No. 121.

### A. FACTUAL BACKGROUND[15]

The Second Amended Answer and Counterclaims ("SACC") alleges that Defendant was commissioned to create the Fearless Girl statue by a New York advertising agency. SACC, Dkt No.

---

[14] Because "[m]ere delay . . . absent a showing of bad faith or undue prejudice does not provide a basis for a district court to deny the right to amend," the Court need not decide if Plaintiff's amendments were timely. *Pasternack*, 863 F.3d at 174 (quotation omitted). In addition, Defendant has not argued that Plaintiff's amendments are proposed in bad faith, and the Court concludes that they have not been.

[15] Unless otherwise noted, the facts in this section are drawn from the Counterclaim portion of the SACC, and citations to paragraphs in the SACC refer to paragraphs of the Counterclaim. *See* SACC at 16-49.

109, ¶ 25.  Defendant "intended the public to see" Fearless Girl "and wanted to use it to promote women's equality on a worldwide basis." *Id.* ¶ 24.  Defendant alleges that Plaintiff first became involved with Fearless Girl six weeks after Defendant began sculpting it, and that Plaintiff was interested in receiving attribution on the Fearless Girl statue "in exchange for providing financial assistance with New York City's permitting process." *Id.*

When Fearless Girl was unveiled on March 7, 2017, the SACC alleges that "there was no written agreement between SSGA and Visbal" and that "Visbal owned all of the intellectual property rights—including both copyrights and trademarks—in the Fearless Girl statue, image, and name." *Id.* ¶ 27 (italics omitted).  Despite this fact, Defendant alleges that "SSGA improperly proceeded to file trademark applications in the name 'Fearless Girl' and filed for copyright registration of the statue, even though Visbal was the artist who created the statue and SSGA had no good faith basis to claim intellectual property rights in her creation." *Id.* ¶ 28.  The SACC further alleges that Plaintiff "sought to interfere with Visbal's ability to obtain a 3D-scan of her artwork by denying her access to the statue for four months, stating that the New York City Department of Transportation ('DOT') was waiting to hear from SSGA that she had signed an agreement with SSGA before Visbal would be granted the preservation scan." *Id.*

Defendant alleges that Plaintiff "us[ed] this leverage" to "negotiate an agreement with Visbal that would ensure SSGA's ability to benefit from the 'Fearless Girl' name." *Id.* ¶ 29.  Thus, "the parties signed a Master Agreement, along with accompanying documentation, including a Copyright License Agreement and Trademark License Agreement (collectively, the 'Agreements')." *Id.*  Defendant alleges that "[d]uring these negotiations, SSGA falsely represented to Visbal that its family of companies was committed to diversity and shared the goal of advancing women's equality; that it would honor the agreement and give attribution to Visbal whenever the statue was displayed;

and that it would not hinder Visbal's ability to sell copies of the statue or use the statue for non-profit work supporting gender diversity and equality." *Id.* ¶ 30.

The SACC further alleges that "SSGA knew at the time that these representations were false and affirmatively concealed embarrassing information about its discriminatory practices and, on information and belief, [an] ongoing federal investigation" into gender discrimination at SSGA's parent company, State Street Corporation. *Id.* ¶¶ 18-19, 31. The Agreements "imposed certain obligations on each of the parties, including rights of attribution, assistance with scanning, requirements to inform the artist regarding the statue's location, requirements of artist approval for all repairs and restorations, a notice and cure period, a dispute resolution process, notice requirements, and annual meeting requirements." *Id.* ¶ 33.

The SACC alleges that "SSGA's conduct after signing the Agreements demonstrates that SSGA never had any intention of honoring its obligations." *Id.* ¶ 37. Specifically, Defendant alleges that "[e]ven though SSGA has recognized Visbal as the true creator and copyright owner, it still has proceeded to publicly claim that it created Fearless Girl in promotional materials, such as in a video posted on its website: https://www.ssga.com/global/en/about-us/who-we-are/fearless-girl.html[.]" *Id.* ¶ 38 (italics omitted). In addition, "[a]fter the Agreements were executed, SSGA did not give Visbal access to the statue for scanning for approximately six weeks[.]" *Id.* ¶ 39. Moreover, "[i]n December 2018, SSGA caused the original statue, associated with street signage crediting Visbal as the sculptor of the work, to be removed from its location at Bowling Green. Upon removal of the work, SSGA placed a plaque stating the statue was being moved to the New York City Stock Exchange and suggesting visitors stand in her place. On the plaque, this statement was followed by attribution to SSGA, but attribution to Visbal was omitted." *Id.* ¶ 42. According to the SACC, "SSGA caused the statue to be moved to a new location outside the New York Stock Exchange but did not place a plaque or any attribution to Visbal near the statue" in its new location. *Id.* ¶ 43.

"To date, Visbal has sold or shipped eight full-size replicas and more than 115 miniature replicas." *Id.* ¶ 48. "In October 2017, Visbal sold a full-size replica to a German buyer for public placement in Germany (the 'German Sale')." *Id.* ¶ 53. Defendant alleges that "Visbal informed SSGA of this sale in person while visiting the SSGA headquarters in November 2017[.]" *Id.* ¶ 54. The SACC further alleges that "SSGA confirmed that it had knowledge of the German Sale and the accompanying sale contract when its counsel sent Visbal's counsel a notification of anticipatory breach, which outlined several purported breaches in great detail, via e-mail on February 9, 2018." *Id.* ¶ 55. "As a result of SSGA's interference and objections to the sale, to date," Defendant alleges that "the German buyer has been unable to secure the required authorizations to place the replica publicly, given SSGA's extensive involvement and threats to Visbal's customers, and therefore has sought to rescind the sale and return the replica for a full refund." *Id.* ¶ 56.

"In February 2019, Visbal sold a full-size replica to Maurice Blackburn, an Australian law firm, for public placement in Australia (the 'Australian Sale')." *Id.* ¶ 59. "On or about February 12, 2019, SSGA sent Visbal's counsel a notice of breach regarding the Australian Sale," which alleged "several breaches of the Agreements." *Id.* ¶ 60. "In the letter, SSGA demanded confirmation that Visbal would be taking curative action by the following day at 8 p.m. EST, a deadline which" the SACC alleges "ignored the 30-day cure period provided by the Master Agreement." *Id.* ¶ 61. Shortly after sending this letter, "SSGA sent a letter to Maurice Blackburn, threatening litigation if it proceeded with the sale, unveiling, and promotion of the replica in Australia" and then "filed suit against Maurice Blackburn in Australia." *Id.* ¶¶ 62-63. [16] On "the same day Visbal responded to the

---

[16] The SACC also discusses the parties' interactions surrounding other replica sales. For example, "[i]n January 2018, Visbal sold a full-size replica to a private collector for placement in Oslo, Norway. The sculpture was placed on the collector's property facing the Parliament building. . . . In response, on or about April 6, 2018, SSGA sent Visbal a notice of breach." SACC ¶¶ 57-58.

notice of breach, SSGA filed suit against Visbal in New York Supreme Court," commencing this litigation. *Id.* ¶ 64.[17]

## B. LEGAL STANDARD

### 1. Rule 12(b)(6)

As discussed above, Federal Rule of Civil Procedure 12(b)(6) permits a litigant to file a motion to dismiss for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) "appl[ies] equally to claims and counterclaims." *Travelex Currency Services, Inc. v. Puente Enterprises, Inc.*, 18 CIV. 1736 (ER), 2019 WL 1259102, at *4 (S.D.N.Y. Mar. 19, 2019) (citing *GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 99 (2d Cir. 2019)). Hence, the standard set out by the Supreme Court in *Twombly* and *Iqbal* applies to Plaintiff's motion to dismiss Defendant's counterclaims. *GEMOC Co.*, 918 F.3d at 92 ("[A] counterclaim, like all pleadings, must conform to the pleading requirements of *Twombly* and *Iqbal*.").

In deciding a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations [in the complaint] as true and draw[] all reasonable inferences in the plaintiff's favor." *DiFolco*, 622 F.3d at 110-11 (quoting *Shomo*, 579 F.3d at 183). In addition to the facts alleged in the complaint, courts may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *McLennon v. City of New York*, 171 F. Supp. 3d 69, 88 (E.D.N.Y. 2016) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. To avoid dismissal, a complaint must allege "sufficient facts, taken as true, to state a plausible claim for relief." *Johnson*, 711 F.3d at 275 (citing *Twombly*, 550 U.S. at 555-56).

---

[17] For the procedural history of this litigation, see Section I.A.2, *supra*.

### 2. Rule 12(f)

Pursuant to Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." To prevail on a motion to strike, "a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 497 (S.D.N.Y. 2014) (citation omitted). The Second Circuit has recently clarified that "the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense[.]" *GEOMC Co.*, 918 F.3d 92, 98 (2d Cir. 2019). Hence, a party asserting affirmative defenses must "support these defenses with some factual allegations to make them plausible." *Id.* at 99.

### C. DISCUSSION

#### 1. Tortious Interference with Contract

Plaintiff moves to dismiss Defendant's counterclaim that Plaintiff tortiously interfered with Defendant's contract to sell a Fearless Girl replica to a German buyer. The Court concludes that Defendant has failed to plausibly allege a tortious interference claim. Under New York law, the elements of tortious interference with contract are "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)). Defendant plausibly alleges that she had a valid contract for the sale of a replica with the German buyer, so the first element is satisfied.

Defendant has also sufficiently alleged that the German buyer breached a contractual obligation owed to her, as required by the fourth element of a tortious interference with contract claim under New York law. Defendant has not alleged that the German buyer has breached its obligation to purchase a replica because the Court can infer from the allegations in the SACC that Defendant has already provided the replica to the German buyer, and the German buyer has paid for the replica. *See* SACC ¶ 127 ("The German buyer . . . sought to return the replica and receive a full refund.").[18] However, the SACC alleges that "the German buyer agreed to install a plaque providing attribution to Visbal within 10 feet of the replica" and that "[t]he German buyer breached the Purchase Agreement by failing to install a plaque giving attribution to Visbal." *Id.* ¶¶ 118, 128.[19] Therefore, the SACC plausibly alleges that the German buyer has breached its contractual obligation to display a plaque giving attribution to Defendant.

To plead the second element of a tortious interference with contract claim under New York law—that Plaintiff had knowledge of the contract for sale of a Fearless Girl replica between Defendant and the German buyer—Defendant must plausibly allege that Plaintiff had "actual knowledge of the terms of the contract and of the contractual obligation that was allegedly breached." *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, 14-CV-7529 (RJS), 2016 WL 5414979, at *4 (S.D.N.Y. Mar. 18, 2016) (Sullivan, J.) (citing *Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008); *Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, No. 09-cv-

---

[18] Defendant also alleges that the German buyer "anticipatorily breached the Purchase Agreement" when it "sought to return the replica and receive a full refund." SACC ¶ 127; *see also* Opp. at 19 ("Moreover, as alleged the German buyer is also seeking a full refund and is trying to nullify its previous performance under the contract. This further bolsters Visbal's claim, as it indicates the extent to which SSGA's interference has affected Visbal's contract with her customer." (citations omitted)). However, a claim for anticipatory breach must occur "prior to the time designated for performance." *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 462-63 (1998). Because the German buyer had already fulfilled its contractual obligation to pay for the statue, Defendant has not plausibly pleaded that it anticipatorily breached the contract.

[19] Plaintiff argues that the decision not to display the statue publicly does not preclude compliance with the attribution requirement. *See* Mem. at 10. However, the Court must draw all reasonable inferences in favor of Defendant for purposes of this motion, and it is reasonable to infer from the allegations in the SACC that the German buyer has not installed a plaque giving attribution to Visbal. Therefore, Plaintiff's arguments are not persuasive at this stage of the litigation.

5580 (KBF), 2014 WL 5861984, at *10 (S.D.N.Y. Nov. 10, 2014)). However, a plaintiff is not required to plead that the "defendant had perfect or precise knowledge of the terms and conditions of the contracts in issue." *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) (citing *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183 (1980)). Thus, under New York law, a plaintiff must have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required. The SACC plausibly alleges that Plaintiff was aware of the contractual obligation for the German buyer to place the plaque crediting Visbal near the replica that it purchased.

Plaintiff argues that an email sent from its counsel to Defendant's counsel on February 9, 2018 shows that it did not have actual knowledge of this contractual obligation. *See* Ex. A to Declaration of Vivian Cheng ("February 9, 2018 Email"), Dkt No. 121-2; *see also* SACC ¶ 55 (referring to this email).[20] The February 9, 2018 email shows that Plaintiff knew of the sales agreement between Defendant and the German buyer but lacked details; in fact, the email is a request for more information about the upcoming sale. While the email does not specifically address whether Plaintiff knew about the attribution provision, it implies that Plaintiff reviewed Defendant's "template sales agreement." February 9, 2018 Email at 2. It is a reasonable inference that the template sales agreement included the attribution provision that the German buyer allegedly breached. Thus, drawing all reasonable inferences in Defendant's favor, the Court finds that the SACC has plausibly alleged that Plaintiff knew of the allegedly breached contractual provision.

The SACC must also allege that Plaintiff knew the "terms of the contract." *Wellington*, 2016 WL 5414979, at *4. As discussed above, a tortfeasor must know something about the allegedly

---

[20] The February 9, 2018 email is integral to Defendant's Counterclaims because the SACC specifically refers to this email. *See* SACC ¶ 55 ("SSGA confirmed that it had knowledge of the German Sale and the accompanying sale contract when its counsel sent Visbal's counsel a notification of anticipatory breach, which outlined several purported breaches in great detail, via e-mail on February 9, 2018."). Thus, the Court may properly consider it for purposes of this motion.

interfered-with contract's terms but need not have precise knowledge of those terms. The Court can reasonably infer from the February 9, 2018 email that Plaintiff had some knowledge of the terms of the purchase agreement between Defendant and the German buyer, but that it lacked detailed knowledge about that agreement. The email also states that Plaintiff's and Defendant's respective counsel had "several calls" to discuss Defendant's purchase agreement with the German buyer but asserted that Defendant continued to "withhold pertinent information[.]" February 9, 2018 Email at 2. However, based on Plaintiff's statement in the February 9, 2018 email that it had several calls with Defendant to discuss the contract for sale with the German buyer, the Court concludes that Defendant has satisfied this requirement.

Plaintiff argues that Defendant has not adequately alleged that it had knowledge of the identity of the German buyer and that this is required to plead a claim for tortious interference with contract. Plaintiff relies on *TechnoMarine SA v. Jacob Time, Inc.*, which held that "the alleged tortfeasor must be on notice of the *identity* of the third party bound by the interfered-with contract." 12 CIV. 790 KBF, 2013 WL 5231471, at *5 (S.D.N.Y. July 16, 2013). The Court agrees that the SACC does not allege that Plaintiff knew the identity of the German buyer and that the February 9, 2018 email supports that interpretation. However, both the allegations in the SACC and the February 9, 2018 email show that Plaintiff knew that Defendant had a sales agreement with a specific (though unidentified) German buyer.

The Court is not persuaded to adopt *Technomarine*'s conclusion that New York law requires that a tortfeasor must be on notice of the third party's identity to plead a tortious interference with contract claim. *Technomarine* based its interpretation on *Guard-Life Corp*. *Guard-Life Corp*. held that "it must be established, as a threshold predicate for any claim of tortious interference, that the alleged tortfeasor knew that his competitor had a contract with the third party." 50 N.Y.2d at 193. The *Technomarine* court reasoned that there was "a subtle yet important distinction between '*the*' third

party, as stated in *Guard–Life*, and 'a' third party: the use of the word 'the' indicates that the alleged

tortfeasor must be on notice of the *identity* of the third party bound by the interfered-with contract."

*TechnoMarine*, 2013 WL 5231471, at *5 (emphases in *Technomarine*). The Court declines to place such

heavy emphasis on *Guard-Life*'s use of "the" rather than "a." *Cf. Schlup v. Delo*, 513 U.S. 298, 343

(1995) (Scalia, J., dissenting) (criticizing the majority for "minutely parsing phrases, and seeking

shades of meaning in the interstices of sentences and words, as though a discursive judicial opinion

were a statute"). In addition, it seems inconsistent with the principles of notice pleading to require

that a plaintiff plead that a defendant had knowledge of the specific buyer's identity. *See* Fed. R. Civ.

P. 8(a)(2) (requiring only "a short and plain statement of the claim showing that the pleader is

entitled to relief"). Hence, the Court declines to follow *Technomarine* and graft into New York law

the requirement that a plaintiff to plead that a defendant had actual knowledge of the specific

buyer's identity, as opposed to pleading that the defendant had a contract with a specific buyer, the

identity of which is unknown.

To satisfy the third element of a tortious interference with contract claim, Defendant must

show that Plaintiff intentionally procured the German buyer's breach of the contract without

justification. This element has two requirements. First, Defendant must allege that Plaintiff

intentionally procured a breach of Defendant's purchase agreement with the German buyer by

showing that "the target of [a defendant's] conduct was [the third party's] contractual arrangements

with [the plainitff]." *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767-68 (2d Cir. 1995); *see also*

*Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 327-28 (S.D.N.Y. 2017) ("[A] plaintiff

must allege facts showing that the defendant's *objective* was to procure . . . a breach.") (quotation

omitted).

Defendant has adequately alleged that Plaintiff sought to procure a breach of Plaintiff's

Purchase Agreement with the German Buyer. Plaintiff alleges that "SSGA sought an injunction

against Visbal to keep her from selling and promoting the German replica under the terms of the Purchase Agreement. These actions were also directed toward the German buyer and designed to induce the buyer to breach the Purchase Agreement." *See* SACC ¶ 124. At the time that Plaintiff sought to enjoin the German sale, that sale had already been completed. *See* March 22, 2019 Hearing Transcript, Dkt No. 39, at 24. However, Defendant has alleged that Plaintiff sought to enjoin it from promoting the German replica. The Court entered an order enjoining Plaintiff from doing so. *See* Preliminary Injunction at 3; Amended Preliminary Injunction at 3. Because Defendant was enjoined from participating in the promotion of the German replica, the German replica was never placed publicly and the German buyer allegedly did not comply with the attribution requirement. Read in the light most favorable to Defendant, it is reasonable to infer from these allegations that one objective of Plaintiff's conduct was to prevent the German buyer from complying with the attribution requirement, the allegedly breached provision of the Purchase Agreement. This is sufficient to meet this requirement of the third element of Plaintiff's tortious interference with contract claim.

However, Defendant has failed to plausibly allege that Plaintiff acted without justification in seeking an injunction against the German sale. The SACC alleges that Plaintiff's decision to seek an injunction against Defendant's sale to the German buyer was unjustified. SACC ¶ 129. Under New York law, litigation or the threat of litigation can give rise to a claim for tortious interference with contract "(1) 'if the actor has no belief in the merit of the litigation' or (2) if the actor, having some belief in the merits of the suit, 'nevertheless institutes or threats to institute the litigation in bad faith.'" *Kramer v. Lockwood Pension Services, Inc.*, 653 F. Supp. 2d 354, 382 (S.D.N.Y. 2009) (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986)).

The SACC does not satisfy this requirement. The SACC alleges that "SSGA continues to seek to maintain the injunction against Visbal in bad faith despite having no belief in its merit and

intending only to harass Visbal and the German buyer." SACC ¶ 129. This is a conclusory assertion, and it is not entitled to a presumption of truth under *Iqbal*. The allegations in the SACC do not support the inference that Plaintiff believes that its lawsuit has no merit or is acting in bad faith. Indeed, the Court entered a preliminary injunction in favor of Plaintiff after concluding that Plaintiff had "demonstrated a substantial likelihood of success on the merits." Amended Preliminary Injunction at 3.[21] That fact in itself is sufficient to show that the SSGA's lawsuit had substantial merit and to refute the inference that SSGA has no belief in the merit of the litigation.[22] Accordingly, the Court finds that the SACC does not plausibly allege the elements of a tortious interference with contract claim. The Court grants Plaintiff leave to replead this counterclaim. *See Cruz*, 742 F.3d at 523.

### 2. Fraud in the Inducement

Plaintiff also moves to dismiss Defendant's claim that Plaintiff fraudulently induced Defendant to enter into the Agreements. "To state a claim for fraud in the inducement, the party must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to

---

[21] Defendant argues that Plaintiff breached two provisions of the Master Agreement by commencing litigation. First, the Master Agreement requires that a party asserting a breach "shall notify the other Party in writing of such breach[.] Upon receipt of such notice, the receiving Party shall immediately take steps to investigate the breach and will have thirty (30) days from receiving such notice to either cure such breach or have taken substantial measures to cure the breach if the breach is not capable of a cure within thirty (30) days or to negotiate a resolution with the complaining party (or be in substantial negotiations with a complaining party (the 'Cure Period')." Agreements at 10 (Master Agreement § 14); *see also* SACC ¶¶ 60-65. Second, the Master Agreement states that "[a]ny dispute or disagreement between the Parties under this Agreement that is not settled by good faith negotiation between the parties within the Cure Period (or as may be mutually agreed upon) from the date a Party gives notice to the other in writing specifying such dispute or disagreement, shall first be settled by non-binding mediation as follows: The Parties shall submit their dispute to either the office of the American Arbitration Association, JAMS, or other mutually agreed upon alternative dispute procedure (the 'Mediator') in New York, NY for mediation." Agreements at 10 (Master Agreement § 14); *see also* SACC ¶¶ 60-65. Defendant argues that if SSGA were truly interested in enforcing its contractual rights, "SSGA would have followed the path set out in the Master Agreement" by "heed[ing] the notice-and-cure period [and] ask[ing] for arbitration instead of giving Visbal an ultimatum and commencing litigation[.]" Opp. at 18. Defendant argues that Plaintiff's actions demonstrate that Plaintiff was acting in bad faith. However, even assuming that Plaintiff breached the Master Agreement by failing to follow the procedures described therein, it does not follow that Plaintiff commenced this litigation in bad faith.

[22] Defendant has alleged that she suffered damages from the German buyer's breach, as required by the fifth element of the tortious interference with contract claim, because the breach "damaged her reputation and ability to obtain future sales." SACC ¶ 133.

deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages. *Johnson v. Nextel Commu'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478 (2007); *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005)). "In addition, the plaintiff must allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Id.* (citing Fed. R. Civ. P. 9(b); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 51 (2d Cir. 1995)).

A party alleging a fraudulent inducement claim under New York law must also "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996) (citing *Van Neil v. Berger*, 632 N.Y.S.2d 48, 48 (4th Dep't 1995); *Papa's-June Music, Inc. v. McLean*, 921 F. Supp. 1154, 1161 (S.D.N.Y. 1996); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986)); *Metro. Transp. Auth. v. Triumph Advert. Productions, Inc.*, 497 N.Y.S.2d 673, 675 (1st Dep't 1986)); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("[G]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support a fraud claim.") (quoting *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)) (brackets omitted). The Court will refer to these requirements as the "*Bridgestone/Firestone* Requirements".

Defendant sets forth two theories of fraud in the SACC, which the parties label the "attribution" and "shared goals" theories. Defendant's "attribution" theory is that Plaintiff induced her to enter the Agreements by falsely promising to give her attribution for the Fearless Girl statue. Opp. at 20-21. Defendant's "shared goals" theory is that "Visbal entered into a contractual relationship with SSGA in reliance on SSGA's representation that it was genuinely committed to gender diversity and women's equality, when in reality SSGA had a secret, shameful, and recent

history of systemic discrimination."  Opp. at 21-22 (citing SACC ¶¶ 148-54).  The SACC sufficiently

alleges specific facts for both theories, as required under Rule 9(b), because it identifies the specific

statements that were allegedly fraudulent.  However, Defendant's attribution theory fails to state a

viable claim for relief because she has not adequately alleged that Plaintiff's statements satisfy the

*Bridgestone/Firestone* Requirements.  Defendant's shared goals theory similarly fails because she has

not adequately pleaded that Plaintiff intended to deceive her when it made the allegedly fraudulent

statements at issue.

### a. Attribution Theory

### i. Falsity and Materiality

The attribution theory is based on seven statements alleged in the SACC.[23]  Defendant has

not adequately alleged that most of these statements were material.  A false statement is material if

the "misinformation . . . would naturally tend to lead or is capable of leading a reasonable person to

change his conduct."  *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (quotation and brackets

omitted).  The statements that Plaintiff looked forward to working with Defendant and that "our

objectives are still being met in terms of shared recognition" are not material because no reasonable

person would have adjusted her conduct in reliance on those statements[24]  These "vague and general

statements of optimism" cannot "form the basis for a fraudulent inducement claim."  *Sgaliordich v.*

---

[23] *See* SACC ¶ 138 ("In an e-mail to Visbal dated March 12, 2017, John Brockelman, a Managing Director at SSGA, specifically represented that he was 'looking forward to our partnership and the future.'"); *id.* ¶ 139 ("On April 19, 2017, Visbal received an e-mail from Sean O'Malley, an in-house attorney for SSGA.  Mr. O'Malley stated that '[w]e are really looking forward to continuing to work with you on this.'"); *id.* ¶ 140 ("On May 12, 2017, Visbal received another e-mail from Sean O'Malley, where he stated that '[w]e are looking forward to getting the agreement over the finish line today so that we can continue this successful partnership.'"); *id.* ("In a separate e-mail on that same day, Mr. O'Malley stated that '[w]e are looking forward to continue working with you.'"); *id.* ¶ 141 ("In an e-mail to Visbal dated March 9, 2017, Mr. Brockelman stated that '[w]e are very cognizant of your interest in being recognized as the artist that created the statue.'"); *id.* ¶ 143 (alleging that a document provided to Defendant by Plaintiff stated "State Street agrees to attribute 'Fearless Girl' to you wherever and whenever practicable"); *id.* ¶ 144 ("In an e-mail to Visbal dated March 27, 2017, Mr. Brockelman stated that '[y]ou are referenced in the article as sculpting the statue, so our objectives are still being met in terms of shared recognition.'").
[24] Defendant states flatly that "Visbal's reliance on SSGA's representations was reasonable."  SACC ¶ 155.  This is a legal conclusion that is not entitled to a presumption of truth under *Iqbal*.

*Lloyd's Asset Mgt.*, 1:10-CV-03669 ERK, 2012 WL 4327283, at *9 (E.D.N.Y. Sept. 20, 2012).[25] However, Plaintiff's statement that it would provide Defendant with attribution wherever and whenever practicable is sufficiently definite that a reasonable person may have relied on it. Therefore, the Court finds that as to this statement alone, Defendant has adequately alleged materiality.

Defendant has also adequately alleged that the remaining statement supporting her attribution theory was false. The SACC alleges that "SSGA did not intend to honor the Agreements and did not intend to give Visbal attribution" and that "SSGA's behavior shows that it knew at the time of the signing of the Agreements that it did not intend to abide by the Agreements and deceived Visbal into thinking that it would abide by the Agreements." SACC ¶¶ 145, 147. This is sufficient to allege that the statement that Defendant would give Plaintiff attribution wherever and whenever practicable was false.

### ii. Intent to Deceive

Defendant has satisfied the intent to deceive requirement as to the only remaining statement under her attribution theory. "Although scienter need not be alleged with great specificity [under Federal Rule of Civil Procedure 9(b)], [parties] are still required to plead the factual basis which gives rise to a strong inference of fraudulent intent." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (quotation and citations omitted). A party can meet this requirement by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996) (citation omitted).

---

[25] "[T]he elements of reasonable reliance and materiality analytically overlap in that both concern the expected effectiveness of the misrepresentations." *United States v. Jamieson*, 427 F.3d 394, 416 (6th Cir. 2005) (quoting *United States v. Yeager*, 331 F.3d 1216, 1221 (11th Cir. 2003)). Whether the reasonableness of Defendant's alleged reliance on these statements is analyzed as an issue of materiality or reasonable reliance is immaterial to the Court's conclusion.

The SACC alleges that "SSGA did not intend to honor the Agreements and did not intend to give Visbal attribution." SACC ¶ 145. The SACC also alleges that Plaintiff created a video shortly after the Agreements were signed that stated that "[w]e created Fearless Girl" without giving attribution to Defendant. *Id.* ¶ 38. Given the short time between the allegedly fraudulent statement and Plaintiff's decision to make a video that did not give Defendant attribution where it allegedly would have been practicable, the Court cannot conclude as a matter of law on a motion to dismiss that Defendant has failed to allege that Plaintiff had an intent to deceive her when it made the statement promising her attribution. *See Clarke v. Max Advisors*, 235 F. Supp. 2d 130, 151 (N.D.N.Y. 2002) (declining to grant summary judgment on a fraud in the inducement claim because fraud in the inducement "is heavily dependent upon intent of the parties, a question which at this early juncture is not appropriately decided . . . in the absence of meaningful opportunity to engage in pretrial discovery"). Hence, Defendant has adequately alleged that Plaintiff intended to deceive her when it promised to give her attribution wherever and whenever practicable.

### iii. Reasonable Reliance

The third element of Defendant's claim for fraudulent inducement requires her to plead that she reasonably relied on the statements promising that Plaintiff would give her attribution for Fearless Girl. Defendant has alleged that she relied on these statements. *See* SACC ¶ 155. This reliance must also be reasonable. As noted above, there is significant overlap between the materiality and reasonable reliance requirements. The Court has already concluded that the statement that Defendant would receive attribution wherever and whenever practicable was "capable of leading a reasonable person to change his conduct." *Weaver*, 860 F.3d at 94 (quotation and brackets omitted). Therefore, the Court also concludes that Defendant's reliance on that statement was reasonable.

### iv. Damages

Defendant has sufficiently alleged that she was harmed by her reliance on Plaintiff's statement that she would receive attribution. The factual allegations in the SACC are sufficient to support the inference that Defendant would not have entered the Agreements but for Defendant's allegedly fraudulent statement promising her attribution wherever and whenever practicable. And Plaintiff has plausibly alleged that the Agreements "have damaged her reputation and ability to obtain future sales." SACC ¶ 133. Therefore, Defendant has sufficiently alleged the damages element of a fraud in the inducement claim.

### v. *Bridgestone/Firestone* Requirements

Defendant has failed to satisfy the *Bridgestone/Firestone* requirements. The only statement for which Defendant has adequately pleaded the elements of fraud in the inducement mirrors language in the Agreements. *Compare* SSAC ¶ 143 ("State Street agrees to attribute 'Fearless Girl' to you wherever and whenever practicable[.]") *with* Agreements at 2 (Master Agreement § 1(a)) ("SSGA agrees that it will give attribution to Artist as the sculptor of the Artwork wherever and whenever practicable[.]"). Therefore, Defendant's claim that this statement fraudulently induced her to enter the contract is essentially the same as a claim that Plaintiff breached the contract. Defendant has not alleged that this statement gave rise to a duty that is separate from the contract, nor that this statement would give rise to special damages. And this claim is not collateral or extraneous to the contract, as the allegedly fraudulent statement is a part of the contract itself.[26] Because "New York law does not recognize claims that are essentially contract claims masquerading as claims of fraud[,]" this statement cannot form the basis of a fraudulent inducement claim. *W.B. David & Co., Inc. v. DWA Commu'n, Inc.*, 02 CIV. 8479 (BSJ), 2004 WL 369147, at *3 (S.D.N.Y. Feb. 26, 2004) (citations

---

[26] The Agreements also contain a merger clause. *See* Agreements at 13 (Master Agreement § 17(n))) ("Entire Agreement. This Agreement encompasses the entire agreement and understanding between the Parties hereto with respect to the subject matter herein and supersedes any and all prior understandings or agreements, whether written or oral.").

omitted).  Accordingly, none of the statements that Defendant has pleaded as part of her attribution theory can form the basis of a fraudulent inducement claim.

### b. Shared Goals

Defendant's "shared goals" theory is based on three allegedly false statements about Plaintiff's commitment to gender diversity.[27]  Defendant has not alleged that the second statement—a press release stating that Plaintiff called on its portfolio companies to increase the number of women on corporate boards—is false.  Even if the Court assumes without deciding that the other two statements that form the basis of Plaintiff's "shared goals" theory were both false and material, Defendant has not adequately pleaded facts that "give rise to a strong inference of fraudulent intent." *Wexner*, 902 F.2d at 172.  Defendant alleges that "in 2017, the United States Department of Labor determined that [State Street Corporation ('SSC'), SSGA's parent company] systematically underpaid female executives since at least 2010, and, in September 2017, SSC paid $5 million in penalties and settlements to resolve a federal enforcement action related to these discriminatory practices."  SACC ¶ 152.  In addition, the SACC alleges that "SSC's subsidiary (and SSGA's sister company), State Street Bank and Trust Company, has also faced claims by individual female employees for gender discrimination, retaliation, and abuse." *Id.*  Defendant's theory is that "SSGA was desperate to clean up its image, which led SSGA to misrepresent itself as a female-friendly company in order to trick Visbal into a business relationship on the heels of 'Fearless Girl's' viral success."  Opp. at 24.  However, allegations of discrimination and a settlement agreement entered into by related corporate entities—but not Plaintiff—do not give rise to a strong inference of intent to deceive by Plaintiff's employees.  These allegations do not establish the inference that Plaintiff's

---

[27] *See* SACC ¶ 148 (alleging that a document provided to Defendant by Plaintiff stated that Plaintiff had "an interest in supporting women in leadership" and a "commitment to . . . gender diversity"); *id.* ¶ 150 (alleging that Plaintiff emailed Defendant a link to a press release about Plaintiff's actions to support gender diversity "[o]n the eve of International Women's Day"); *id.* ¶ 151 ("In an e-mail to Visbal dated March 9, 2017, Mr. Brockelman specifically represented that '[i]t's great to know we all share the same mission that the 'Fearless Girl' represents!'").

employees would have been motivated to defraud Plaintiff, and they do not show strong circumstantial evidence of conscious misbehavior or recklessness. *See S.Q.K.F.C., Inc.*, 84 F.3d at 634. Thus, even assuming that the relevant actors at SSGA were aware of investigations into gender discrimination at related corporate entities, Defendant's allegations are insufficient to meet the intent to deceive element of a fraudulent inducement claim.

### c. Conclusion

Because neither Defendant's "attribution" nor its "shared goals" theories is viable, Defendant's counterclaim for fraudulent inducement is dismissed without prejudice. For the same reasons that it has dismissed Defendant's fraudulent inducement claims, the Court also grants Plaintiff's motion to strike Plaintiff's fraud-related affirmative defenses under Federal Rule of Civil Procedure 12(f). "[T]he plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense[.]" *GEOMC Co.*, 918 F.3d at 98. Therefore, because Defendant has failed plausibly to allege the elements of fraud, the Court strikes Defendant's third and seventh affirmative defenses pursuant to Rule 12(f). The Court grants Defendant leave to replead this counterclaim. *See Cruz*, 742 F.3d at 523 (citation omitted).

### 3. Direct Copyright Infringement

Plaintiff moves to dismiss Defendant's counterclaim for direct copyright infringement. Defendant alleges that "SSGA has directly infringed Visbal's copyright by displaying, reproducing, and distributing copies of images and videos of the Fearless Girl visual artwork." SACC ¶ 170 (italics omitted). However, Defendant "grant[ed] to SSGA a royalty-free, irrevocable, assignable, worldwide, unencumbered, and exclusive right, license, and privilege to" use the Fearless Girl image for certain purposes in the Copyright License Agreement. Agreements at 15 (Copyright License Agreement § 1(a)). Defendant argues that this does not bar her claim because "SSGA is not licensed to use Visbal's copyright because . . . the Agreements should be voided due to SSGA's material

breaches of the Agreements, breaches of the implied covenant of good faith and fair dealing, and fraud in the inducement." SACC ¶ 173.

Defendant has not plausibly pleaded that the license granted to Plaintiff in the Copyright License Agreement has been rescinded. The Court has dismissed Defendant's claims for fraudulent inducement, so those claims cannot serve as a basis for rescission of the Agreements. Defendant has plausibly alleged a claim for breach of the Agreements, but this cannot serve as a basis for rescission because the license is irrevocable. The general rule is that "[a] material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter." *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998); *see also TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 93 (2d Cir. 2005) (A "license must formally be rescinded before an infringement action based on fraudulent inducement of a copyright license can proceed.") (citing *Graham*, 144 F.3d at 237; *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997); *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993)).

That general rule does not apply in this case because the Copyright License Agreement states that the license is irrevocable. An irrevocable license is "[i]mpossible to retract or revoke." *Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 400 (5th Cir. 2008) (quoting *American Heritage College Dictionary* 719 (3d ed. 1993)) (applying New York law). Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted); *see also Bank of New York Mellon v. WMC Mortg., LLC*, 12CV7096 DLC, 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (holding that a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."). Thus, where "[t]he licenses' language unambig[u]ously denies Plaintiff

the right to rescind its agreement," courts must enforce that limitation.  *Pot Luck, L.L.C. v. Freeman*, 06 CIV. 10195 (DAB), 2009 WL 693611, at *3 (S.D.N.Y. Mar. 10, 2009) (citing *Cafferty v. Scotti Bros. Records, Inc.*, 969 F. Supp. 193, 198 (S.D.N.Y. 1997)).[28]

Furthermore, adopting Defendant's proposed interpretation would give no effect to the term "irrevocable" in the Copyright License Agreement.  That is inconsistent with the rule that, under New York law, contracts must be construed to "give[] a reasonable and effective meaning to all terms" and not to leave "a part unreasonable or of no effect."  *Encyclopedia Brown Prods.*, 1998 WL 734355, at *9 (quotation omitted).  Put simply, Defendant cannot seek to revoke an irrevocable license.

The Court again grants Defendant leave to replead this counterclaim, *see Cruz*, 742 F.3d at 523 (citation omitted), because it has granted Defendant leave to replead her fraudulent inducement claims.  If Defendant plausibly alleges that the Agreements were procured by fraud, she might also plausibly allege that the grant of the irrevocable license is invalid as a result of the same fraud.  The Court takes no position at this time on whether a plausible allegation of fraudulent inducement would entitle Defendant to rescind the Copyright License Agreement.  However, because the Court

---

[28] *See also* Roger M. Milgrim, 3 Milgrim on Licensing § 27.02 (2019) ("Often a license is of such critical value to an enterprise or an undertaking that the prospective licensee may seek to make the license irrevocable despite nonpayment or other material breach. . . . The simplest [way] is to simply provide that: *The license conferred under this Agreement shall be perpetual and irrevocable.*") (emphasis in original); *Nano*, 537 F.3d at 400-01 ("Nano was not entitled to terminate the license because it contracted for an irrevocable and perpetual license.  At the time of material breach, Nano was entitled to sue Canon under any available form of relief, but termination of the PLA was not permissible."); *Powlus v. Chelsey Direct LLC*, No. 09 Civ. 10461(PKC), 2011 WL 135822, at *6 (S.D.N.Y. Jan. 10, 2011) ("[T]he terms of the Agreement recite[] that 'I, the Photographer, hereby irrevocably grant' which is language inconsistent with an intended right to rescind for non-payment[.]"); *Cafferty*, 969 F. Supp. at 193 (holding that under the "clear language of the relevant contracts[,]" a provision "irrevocably . . . grant[ing]" to a licensee and its assignees the "universewide, perpetual right . . . to synchronize, record, perform and otherwise exploit the Pre-existing Songs" barred a plaintiff's copyright claim against an assignee for continuing distribution of its songs, despite the plaintiff's alleged termination of the assignee's rights); *Timeline Inc. v. Proclarity Corp.*, No. C05-1013JLR, 2007 WL 1574069, at *4, *9 (W.D. Wash. May 29, 2007) (concluding that the terms "irrevocable" and "perpetual" are unambiguous and that the "ordinary meaning of the term supports Microsoft's argument that its license to Timeline patents may not be revoked under any circumstances, even if there is a material breach of the agreement") (applying Washington law).

cannot conclude that Defendant's argument for rescission would necessarily be futile, it will grant

Defendant leave to replead her claim for direct copyright infringement.

### 4. Contributory Copyright Infringement Claim

Plaintiff moves to dismiss Defendant's counterclaim for contributory copyright

infringement. "To state a claim for contributory infringement, a [party] must allege facts that a

[counterparty] 'with knowledge of the infringing activity, induces, causes or materially contributes to

the infringing conduct of another[.]'" *Rams v. Def Jam Recordings, Inc.*, 202 F. Supp. 3d 376, 383

(S.D.N.Y. 2016) (quoting *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d

Cir. 1971)). The infringing activity alleged by Defendant is that third parties use Fearless Girl

"alongside corporate branding and logos in marketing and promotional photographs" that the third

parties take and use. SACC ¶ 188. Defendant also points to a specific incident in which an

employee of Slack Technologies, Inc. posted a photograph on the social networking platform

LinkedIn depicting Fearless Girl and a banner bearing the Slack name and logo. *Id.* ¶ 190.

Defendant alleges that Plaintiff contributed to this infringement by "relocating the statue to

its new location in front of the New York Stock Exchange, knowing that numerous third-parties

would thereby directly infringe Visbal's copyright." *Id.* ¶ 184. The SACC further alleges that "[a]s a

company in the financial sector, SSGA must know that any time a company's stock begins trading

on the New York Stock Exchange, a giant banner, featuring that company's name, is hung on the

outer façade of the building." *Id.* ¶ 185. Hence, Defendant appears to allege that Plaintiff had

constructive knowledge of the infringing activities of third parties, such as the Slack employee

described above.

Defendant has not adequately alleged that Plaintiff had knowledge of third parties' allegedly

infringing activity. "As to the first element of a contributory infringement claim, knowledge may be

actual or constructive." *Rams*, 202 F. Supp. 3d at 383 (citing *Arista Records LLC v. Usenet.com, Inc.*,

633 F. Supp. 2d 124, 154 (S.D.N.Y. 2009)). "However, 'more than a generalized knowledge by the defendant of the possibility of infringement' is required." *Id.* (quoting *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (brackets omitted)). At most, Defendant has pleaded that Plaintiff had generalized knowledge of the possibility that third parties might infringe Defendant's copyright. That is insufficient to state a claim for contributory copyright infringement.

Defendant has also failed to plead that Plaintiff induced, caused, or materially contributed to the allegedly directly infringing activity. "[A]ny 'authorization or assistance must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer.'" *Id.* at 384 (quoting *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 473 (S.D.N.Y. 2002)). Defendant has not alleged that Plaintiff acted in concert with the allegedly infringing Slack employee or with any other direct infringer. Again, the Court grants Defendant leave to replead this counterclaim. *See Cruz*, 742 F.3d at 523 (citation omitted).

## III. CONCLUSION

For the foregoing reasons, Plaintiff's motion to amend is GRANTED except with respect to counts seven, eight, and nine and Plaintiff's motion to dismiss Defendant's counterclaims and to strike Defendant's affirmative defenses is also GRANTED. The Court has granted Plaintiff and Defendant leave to replead the claims that have been dismissed. Any amended pleading is due no later February 15, 2020.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 82 and 120.

SO ORDERED.

Dated: January 3, 2020
New York, New York

_____
GREGORY H. WOODS
United States District Judge