USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/16/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

STATE STREET GLOBAL ADVISORS            :
TRUST COMPANY,                                         :
                                                                      :
                                          Plaintiff,  :
                                                                      :          1:19-cv-1719-GHW
               -against-                                    :
                                                                      :
KRISTIN VISBAL,                                          :          MEMORANDUM ORDER AND
                                                                      :                   OPINION
                                          Defendant. :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

Over six years ago, a bronze sculpture known as Fearless Girl took New York City by storm.

The statue depicts a young girl, hands perched on hips and chin turned proudly upwards, unafraid

and prepared to take on the world.  It was the product of a partnership between the parties here—

Plaintiff State Street Global Advisors ("State Street" or "SSGA"), an asset-management company,

and Defendant Kristin Visbal, a sculptor.  And when it was unveiled the day before International

Women's Day 2017, boldly facing down the notorious Charging Bull statue at the tip of Bowling

Green Park near Wall Street, it sent a message that reverberated not only in New York but around

the world:  in all things, be *fearless*.

That message is unquestionably powerful.  But this case, perhaps, suggests the need for a

slight addendum—while there's no need to *fear* contractual agreements exactly, a little caution in

drafting and complying with them never hurts.  The immediate and astounding success of Fearless

Girl's unveiling prompted State Street and Visbal to negotiate their respective rights in the statue

itself, in two-and-three-dimensional replicas of the statue, and in other non-physical aspects of the

artwork.  But differences quickly emerged about how to interpret and implement the contracts that

the parties had signed.  Communication eventually broke down, and State Street sued Visbal for

breach of contract and a variety of other claims.  Visbal both denied liability and asserted

counterclaims against State Street.  And after years of litigation, the parties have each moved for

summary judgment as to aspects of their own claims and those of the opposing party.  For the

reasons provided below, and as explained in significantly more detail through this opinion, both

parties' summary-judgment motions are GRANTED IN PART.

## I. **BACKGROUND**[1]

To understand the Fearless Girl story, start by rewinding the clock to a year before the

statue's unveiling.  On March 7, 2016, the day before International Women's Day 2016, State Street

launched an exchange-traded fund known as the "SHE Fund" (full name:  SPDR® SSGA Gender

Diversity Index ETF).  Dkt. No. 423 ¶ 3.  The SHE Fund measures performance on the proprietary

SSGA Gender Diversity Index, which is comprised of large United States companies with the

highest levels in their sectors of gender diversity in senior leadership.  *Id.*  In early 2016, State Street

asked McCann World Group, an advertising agency, for a proposal to market the launch of the

fund.  *Id.* ¶ 4.  According to State Street, McCann pitched the idea of placing a female cow across

from Charging Bull as part of its response to State Street's request.  *Id.* ¶ 5.  (Visbal contends that

McCann's initial proposal was independent of State Street's contract with McCann.  *Id.*)

While that initial idea was rejected, McCann revived the concept after the November 2016

election.  *Id.* ¶ 7.  (The parties dispute whether the revived concept was in response to State Street's

proposal or reflected a McCann independent project.  *Id.*).  In this version, initially titled "Taking a

Stand," the female cow was replaced with the now-familiar young girl.  *Id.*  On November 30, 2016,

a McCann subcontractor emailed Visbal a proposal about "Taking a Stand" as part of discussions

about her potential role in the project.  *Id.* ¶ 9.  Sometime after November 2016, Visbal was hired to

---

[1] The facts are drawn from the parties Local Rule 56.1 statements and other documents submitted in connection with
the parties' cross-motions for summary judgment.  They are undisputed unless otherwise noted.  Documents with
paragraphs or page numbers are cited to the relevant paragraph or page number; for other documents, citation is to the
page of the exhibit on which the cited material appears.

sculpt the statue.  *See* Dkt. No. 406 ¶¶ 18–19.  She states that she consented to do so because she understood that there was no sponsor for the project, a contention that State Street denies.  *Id.* ¶ 18. Working with McCann, Visbal completed a clay model of the statue, which was completed on January 21, 2017.  *Id.* ¶ 25.  Another sculptor then made a wax cast of the model.  *Id.* ¶ 28.  The statue was eventually given the name "Fearless Girl."  *Id.* ¶ 52.  And on March 7, 2017, the day before International Women's Day 2017, Fearless Girl was unveiled to the world.  *Id.* ¶ 53.

 

Dkt. No. 237 ¶ 2.  The statue was accompanied by a plaque:



Dkt. No. 423 ¶ 28.

The initial plan had been to leave the statue in place at Bowling Green for a short time. *Id.* ¶ 31. But that changed when, upon unveiling, Fearless Girl went viral. Media coverage of the statue, and of both State Street and Visbal's roles in its creation, was immediate and overwhelming. *See, e.g.,* *id.* ¶¶ 33–36; Dkt No. 406 ¶¶ 56–58. Online, Fearless Girl devotees circulated a petition requesting that it be made a permanent installation. Dkt. No. 423 ¶¶ 37, 41. State Street eventually entered the "Arterventions" program run by the New York City's Department of Transportation ("DOT"), which allowed the statue to stay in place for several additional months. *Id.* ¶ 41. In compliance with the requirements of the Arterventions program, DOT removed the plaque and replaced it with a street sign on April 12, 2017:



*Id.* ¶¶ 43–44. At some point during this time period, State Street also registered "FEARLESS GIRL" as a trademark. *Id.* ¶ 50.

After the unveiling's success, the parties began discussing the possibility of making reproductions of Fearless Girl. *See id.* ¶ 53. (The parties dispute whether the idea was Visbal's, State Street's, or mutual. *See id.*) In spring 2017, the parties—both represented by counsel—began to negotiate a "series of contracts to govern how each party may and may not use the Fearless Girl

artwork and SSGA's FEARLESS GIRL trademark." *Id.* ¶ 55.  Part of the impetus for the negotiations was that Visbal asserted then—and asserts now—that she is and was "the author and holder of copyright in the work of art known as 'Fearless Girl.'" Dkt. No. 406 ¶ 4.  (It is undisputed that she has registered a copyright for the work, though State Street disputes that she is the sole author or copyright holder. *Id.*)

Over the course of several months, the parties negotiated a series of agreements, which were fully executed on May 12, 2017.  Dkt. No. 423 ¶¶ 56–57; *see* Dkt. No. 381 Ex. 30 at 1–13 ("Master Agreement," or "MA"), 15–20 ("Copyright Agreement"), 24–32 ("Trademark Agreement," and together with the Master Agreement and the Copyright Agreement, the "Agreements").  The Agreements are "governed by the substantive laws of New York."  Dkt. No. 423 ¶ 58.  They established that State Street "owned" the original Fearless Girl statue (the "Statue").  Trademark Agreement at 24.  But they also recognized that Visbal asserted copyright ownership over the "work of visual art that is embodied by the Statue," which they termed the "Artwork."  Master Agreement at 1.  As a result, under the Agreements, Visbal granted State Street an exclusive copyright right in multiple areas—including certain use of the Artwork and Statue in connection with gender diversity issues in corporate governance and in the financial services sector—while State Street granted Visbal an exclusive right to use the Fearless Girl trademark for certain purposes, including merchandising.  Copyright Agreement § 1(a); Trademark Agreement § 2.  Pursuant to the agreements, State Street paid Visbal $450,000 for three life-size, three-dimensional replicas of Fearless Girl.  Dkt. No. 423 ¶ 78.  And the Master Agreement otherwise apportioned, in detail, the rights of Visbal and State Street to use the Fearless Girl Statue and Artwork more generally.  *See id.* ¶¶ 59–77.

Quickly, however, disputes emerged about how the Agreements should be interpreted and implemented.  For instance, several sections of the Master Agreement address instances where one party may use the Artwork only upon approval from the other party.  *See, e.g.*, Master Agreement § 7.

Where such a situation arises, and one party requests the other's approval, all such requests much be "considered in good faith" and responded to without "unreasonabl[e] delay[ ]." Master Agreement § 17(i). But Visbal states that upon her request, State Street declined to participate in—or, as Visbal casts it, declined to allow Visbal to participate in—an Australian "Day of the Girl" event in October 2017. Dkt. No. 406 ¶ 144. State Street says there was no actual request, because Visbal went behind its back to guarantee use of Fearless Girl to the event organizers before State Street could consider the request. Dkt. No. 406 ¶¶ 142–144. In any event, the disagreements continued: Visbal asserts that the problems only got worse after State Street Corporation—an entity that SSGA notes is distinct from Plaintiff here—entered into a settlement with the Department of Labor relating to allegations that they had discriminated against and underpaid female employees. *Id.* ¶ 146. And the parties agree that, as a result of the negative press from the settlement, State Street postponed placement of a Fearless Girl replica in Asia and that Visbal lost an opportunity to participate in October 2017 International Day of the Girl events in Paris. *Id.* ¶¶ 147, 150–152.

By this time, the parties were finding themselves in the midst of larger dispute about the scope of the Agreements. State Street viewed a chief benefit of the Agreements as aligning Fearless Girl specifically with "SSGA's commitment to increasing gender diversity in corporate leadership," and therefore had (and has) "implemented stringent policies governing all uses of Fearless Girl." Dkt. No. 423 ¶ 46; *see id.* ¶¶ 47–49; Master Agreement § 7(c)(ii) (requiring Visbal to request approval for uses of the Artwork "in connection with gender diversity issues in corporate governance or in the financial services sector"). But in Visbal's view, the Agreements articulated a broader view of Fearless Girl: as she wrote in an October 10, 2017 letter to State Street's Chief Marketing Officer John Brockelman, she believed that both parties had a duty to use Fearless Girl to support mutual gender diversity goals beyond "just the call for diversity in corporate governance." Dkt. No. 423 ¶ 391; *see* Master Agreement at 1 ("WHEREAS, the Parties agree to the terms below to further their

mutual goals of using the Artwork to support [a variety of] 'Gender Diversity Goals.'")  To that end, and as she told Brockelman then, Visbal had created a "fearlessgirl.us website" to promote broader activities surrounding Fearless Girl and to sell three-dimensional reproductions.  *Id.*  Her website would eventually begin selling "Fearless Girl NFTs" also.  Dkt. No. 420 ¶ 530.

Sometime in 2017, Visbal began exploring the sale of a full-size replica to purchasers in Germany.  *See* Dkt. No. 423 ¶¶ 85–86.  Visbal executed a sale on October 8, 2017 to Heiko Fischer, the CEO of brand-development company Resourceful Humans, and Fischer's wife.  Dkt. No. 406 ¶¶ 223–224.  Visbal knew—and State Street contends that she concealed—that Fisher was buying the replica for the purpose of placing it on the corporate campus of Accenture, one of Resourceful Human's clients.  *Id.* ¶ 225.  But when State Street caught wind of the sale in late 2017, it began to raise concerns with Visbal that the sale (or the unveiling) might violate one or more provisions of the Agreements.  *See id.* ¶¶ 231–241.  Those conversations culminated in a formal "Notice of Breach" sent from State Street attorney Sean O'Malley to Visbal and Visbal's then-attorney Nancy Wolff on February 20, 2018.  *Id.* ¶ 242.  After receiving the notice, Visbal informed State Street in early March 2018 that Fischer had decided to hold off on the unveiling of the replica.  *Id.* ¶ 243.  Ultimately, the replica was never placed on Accenture's campus and there was no unveiling.  *Id.* ¶¶ 228, 243.

Also in 2017, the Ringnes Foundation—a Norwegian foundation named after art collector Christian Ringnes—contacted Visbal about a potential sale of a Fearless Girl replica.  *Id.* ¶¶ 247–248, *see id.* ¶ 254.  Visbal and Christian Ringnes entered into an agreement for a replica sale on January 10, 2018.  *Id.* ¶ 250.  That agreement contained the language from Visbal and State Street's Agreements—appended to those Agreements as "Exhibit C"—forbidding the use of the Artwork for branding purposes.  *Id.* ¶ 251; *see* Dkt. No. 381 Ex. 30 at 23 (Exhibit C).  But the agreement between Visbal and Ringnes also stated that Ringnes could reproduce the Artwork in two-

dimensional format—including through print material, web pages, and social media—to promote the acquisition, and was required to credit Visbal when doing so. Dkt. No. 420 ¶ 441. No mention of State Street was made in this provision of the agreement. *Id.* According to State Street, Visbal also anticipated attending an unveiling event, though Visbal disputes that such an unveiling event ever occurred. *Id.* ¶ 439. However characterized, the statue was placed outside of the Grand Hotel in Oslo, Norway on March 8, 2018. *Id.* ¶ 442. A plaque next to the statue did not provide attribution to State Street. *Id.* ¶ 443.

While Visbal states that she alerted State Street to the Oslo sale at some point "as a courtesy," State Street contends that it did not find out about the sale or display until a press inquiry to State Street after the replica was placed outside the Grand Hotel. Dkt. No. 423 ¶ 490. Roughly a month after the replica was placed in Oslo, State Street—in accordance with the Master Agreement's dispute resolution section—sent a formal notice-of-breach letter to Visbal about the Norwegian sale on April 6, 2018. *Id.* ¶ 492; *see* Master Agreement § 14 (where one party believes the other has breached, the party asserting the breach must first notify the other party of the asserted breach in writing). Visbal's attorney responded by letter on April 17, 2018 by stating that, because she did not believe the sale breached the Agreements, "no steps [would] be taken to cure." Dkt. No. 420 ¶ 447; *see also* Master Agreement § 14 (stating that upon receiving notice of an alleged breach, the allegedly breaching party then has thirty days to take steps to cure the breach, cure the breach, or negotiate a resolution with the other party). That decision led the parties to begin negotiating potential mediation of the dispute. *See* Dkt. No. 420 ¶ 448; Master Agreement § 14 (requiring non-binding mediation before submission of a dispute to a court). No mediation was ever held, however, because—while the parties dispute the exact sequence of events—the parties could not agree on a mediation date. Dkt. No. 420 ¶ 448; Dkt. No. 423 ¶¶ 494–495.

During and after this period, meanwhile, both parties were at least exploring the possibilities

for additional use of the Fearless Girl Artwork.  For its part, State Street discussed the possibility of placing the Fearless Girl logo on pins, t-shirts, and other "swag."  Dkt. No. 406 ¶¶ 180–182.  (State Street denies that any t-shirt was ever made, or that any products were ever sold to the public.  *Id.*)  And Visbal was continuing to sell miniature replicas through her website.  One of the mini-replica sales was to an executive at Edward Jones named Penny Pennington, whom Visbal had met in at an event in Florida in 2017.  Dkt. No. 406 ¶¶ 316–318.  Pennington paid a deposit for a mini-replica in March 2018, and the purchase was completed (and Visbal shipped the miniature replica) in August 2018.  *Id.* ¶¶ 321–322.  Pennington paid for the replica herself and was not reimbursed by Edward Jones.  *Id.* ¶¶ 322–323, 325.  When Pennington paid the deposit in March 2018, Visbal's website did not include language stating either (a) that a replica could not be purchased without State Street's pre-approval by a financial institution for any commercial or corporate purpose, or (b) that replicas could not be used in connection with gender diversity in corporate governance or in the financial services sector (both of which reflect restrictions in the Master Agreement).  Dkt. No. 420 ¶ 525; *see* Master Agreement §§ 7(c)(i)–(ii).

In February 2019, Pennington chose to place the miniature replica in the atrium of Edward Jones's St. Louis offices for one morning during a "Women's Conference," which was being held to celebrate top women financial advisors in that office.  Dkt. No. 406 ¶¶ 327, 329–330.  Visbal did not know that Pennington did this, nor was Visbal invited to the conference.  *Id.* ¶¶ 328, 331.  Several Edward Jones employees posted photos on social media with the replica.  *See id.* ¶¶ 337–341, Dkt. No. 420 ¶ 527.  But Visbal was unaware of these postings until after this lawsuit was filed.  Dkt. No. 406 ¶ 343.

Visbal also continued to pursue opportunities to sell full-size replicas.  In June 2018, members of the Australian law firm Maurice Blackburn ("MBL") emailed Visbal about potentially acquiring a replica statue for Maurice Blackburn and entities that were the firm's "key partners."

Dkt. No. 423 ¶ 101.  Rebecca Hanlan, MBL's national brand and social media manager, had been developing a "broad campaign in relation to gender equality in the workplace."  Dkt. No. 406 ¶¶ 259–260.  When she reached out to Visbal, Hanlan initially envisioned the possibility of using a replica at an Equal Pay Day event in September 2018.  *Id.* ¶ 263, 267.  Eventually, however, Hanlan wrote Visbal to say that the gender-equality campaign's launch would be pushed back to align with International Women's Day in 2019.  *Id.* ¶ 275.

As Visbal and MBL began negotiating the potential sale and use of the replica, MBL made clear that they were planning to use it at one or more gender-diversity-related events in early 2019, and that they would be promoting their investment in Fearless Girl across multiple websites and social media platforms.  Dkt. No. 423 ¶ 103.  MBL also informed Visbal that they had "coalition members" who were partnering with them for the campaign—partners who eventually ended up being "superannuation funds" named HESTA and Cbus, as well as perhaps a bank.  Dkt. No. 406 ¶¶ 273, 280.[2]  As the parties negotiated the sale and use of the replica, Visbal informed MBL that while it and its partners could not "use the figure as a brand identity," they could "freely announce" through these mediums "that the sculpture [had] been gifted to the people of Australia."  Dkt. No. 406 ¶ 272.  She also explained that the replica could not be used in connection with "gender diversity issues in the corporate governance or in the financial services sector."  *Id.*  As the parties negotiated the agreement, moreover, Visbal insisted that a "no branding clause" analogous to Exhibit C of Visbal and State Street's agreement remain in the contract with MBL.  *Id.* ¶ 274.  And she checked in with Hanlan in December 2018 to make sure that "none of the sponsors" of the purchase were "financial organizations."  *Id.* ¶ 276.

While these negotiations—of which State Street was unaware—were ongoing between

---

[2] Superannuation funds serve as pension funds in Australia.  *See* Dkt. No. 406 ¶ 303.  Though the parties otherwise heavily dispute the particulars of what superannuation funds do and how they should be characterized, *see id.*, resolving that dispute is unnecessary for purposes of this motion.

Visbal and MBL, Visbal and State Street continued to find themselves at loggerheads over other issues related to the Agreements' implementation.  One such disagreement arose when the Fearless Girl statue was moved from its original location in Bowling Green Park to outside the New York Stock Exchange (the "NYSE").  *See* Dkt. No. 406 ¶¶ 208, 211.  When the Statue was removed from Bowling Green on November 27, 2018, a plaque was placed at her former location.  *Id.* ¶¶ 208, 210.  The plaque stated that it was "[b]y State Street Global Advisors," but made no mention of Visbal:



Dkt. No. 423 ¶ 183.  The plaque remained at that location until the Statue was unveiled at the NYSE on December 10, 2018, and the sign at Bowling Green—which credited Visbal, *see id.* ¶ 44— remained up at the Bowling Green location.  *Id.* ¶ 185.  When the Statue was placed at its new location at the NYSE, there was no plaque placed with it.  Dkt. No. 406 ¶ 212.

On December 21, 2018, Wolff sent a letter to State Street officially notifying it that, in Visbal's view, State Street had breached Section 1 of the Master Agreement.  Dkt. No. 423 ¶ 187; *see* Dkt. No. 387 Ex. 80 (letter).  Under the Master Agreement, Visbal found problematic both the plaque at the Statue's former location in Bowling Green Park (because it did not credit Visbal), and the lack of any plaque at the NYSE (such that Visbal was also not credited there).  Dkt. No. 387 Ex.

80 at 1; *see* Master Agreement § 1(a) ("SSGA agrees that it will give attribution to Artist as the sculptor of the Artwork wherever and whenever practicable, such as, for example, . . . plaques placed with SSGA Replicas . . . ."); Master Agreement § 1(b) ("SSGA will attempt attribution with good faith efforts and will use commercially reasonable efforts to correct omission upon notice from Artist.").

That letter also gave State Street notice of another putative violation. In the Master Agreement, State Street had committed to purchase 300 miniature replicas of the Artwork from Visbal. Master Agreement § 4(d). The Master Agreement does not specify the timing or price for the completion of this sale, instead stating that "[t]he price and specifications of such reproductions shall be negotiated in good faith between the Parties." *Id.* Within weeks of the Agreements' execution in mid-2017, State Street and Visbal had begun these negotiations. Dkt. No. 406 ¶ 194. But they eventually broke down. According to Visbal, the sale was never completed because Brockelman and State Street were more interested in additional full-size replicas than in honoring the commitment in Master Agreement Section 4(d). *Id.* ¶¶ 196–198. On State Street's telling, however, it was Visbal who was "unresponsive" to State Street's inquiries about completing the purchase; according to them, she "delayed getting SSGA cost estimates and was apologetic about her delays." Dkt. No. 423 ¶¶ 212–213. In any event, in the December 21, 2018 letter, Wolff cited Visbal's anxiousness to complete the purchase, and stated that if State Street did not complete an order by December 20, 2020, she would "consider Visbal's obligation under the Master Agreement satisfied and these miniatures will no longer be available for purchase by SSGA." Dkt. No. 387 Ex. 80 at 2. State Street contends that Visbal had no right to impose such a deadline, Dkt. No. 406 ¶ 200; in any case, the purchase was never completed. *See* Dkt. No. 423 ¶ 216.

In the months following Wolff's letter, State Street explored the possibility of installing a plaque next to the Statue at its new location, though Visbal contends that State Street was not

vigorous enough in its attempts to verify City rules about signage and plaques.  Dkt. No. 406

¶¶ 213–214 (State Street was informed by McCann that DOT would not allow a plaque, but never

asked DOT specifically whether that information was accurate); *id.* ¶ 217 (DOT informed McCann

that signage would not be re-installed at the NYSE because of site constraints).  Ultimately, signage

crediting Visbal was installed by DOT at the NYSE in April 2019, though Visbal contends that it is

both too far from the Statue and too high to read.  *Id.* ¶¶ 220–221.

      Separate and apart from the issues surrounding the Statue's move from Bowling Green to

the NYSE, but at virtually the same time that the move was occurring, the parties had yet another

dispute on their hands.  On December 14, 2018, Visbal asked Brockelman if she could "attend and

bring a resin of Fearless Girl" to the Los Angeles Women's March in January 2019.  Dkt. No. 423

¶ 96.  She also requested an expedited review of her request.  *Id.*; *see* Master Agreement § 7(e)

("When requested by Artist to consider and review a non-Pre-Approved Use, SSGA shall respond in

writing to Artist, with a definitive approval or denial of the request no more than three (3) weeks

from receiving sufficient details of the proposed use, but Artist may request an expedited review,

from time to time, for a two-week review on a case by case basis.").  The parties dispute what

happened next.  State Street says it "began vetting the event," but needed additional time "to

conduct due diligence since the speakers had not yet been announced and individuals involved in

Fearless Girl approvals were away for the holidays," and that it ultimately denied use of the replica

because of the political nature of the Women's March.  Dkt. No. 423 ¶¶ 98–99.  Visbal, however,

points to an email sent internally at State Street the same day as Visbal's request.  In the email, a

State Street executive stated that she would vote to deny the request, and mentions that the

Women's March looked like it would "focus on all aspects of women's rights and empowerment."

Dkt. No. 406 ¶ 307.  Visbal argues that this email shows that State Street actually denied her request

on December 14, and for reasons related to the Gender Diversity Goals (rather than politics).  *Id.*

In any event, Visbal wrote Brockelman on December 28, 2018 to remind him that—in her view—it was the final day for expedited review, and on January 3, 2019, she shipped the replica to Los Angeles.  Dkt. No. 406 ¶¶ 308–309.  But a day later, on January 4, 2019, Brockelman declined the request to use the replica at the Women's March.  *Id.* ¶ 310.  Undeterred, Visbal nonetheless proceeded to participate in the event:  on January 19, 2019, she delivered a speech—flanked by the replica—at a podium with the Women's March logo and information, and later posted a picture of the event to her Twitter account:



Dkt. No. 420 ¶¶ 469–470.

All of this was the backdrop for Visbal's completion of the Australia sale with MBL, which

was formally executed on January 31, 2019.  Dkt. No. 406 ¶ 283; *see* Dkt. No. 387 Ex. 44 (the

Australian contract, or the "Art Agreement").  The Art Agreement listed only "Maurice Blackburn

Lawyers" as the "Client."  Dkt. No. 387 Ex. 44 at 1.  But it also referred to unnamed "co-

contributors to the Cost" of the replica, and provided certain rights to those co-contributors.  *See,*

*e.g., id.* at 4.[3]  The Art Agreement also contained a "no branding" provision functionally equivalent to

Exhibit C of Visbal and State Street's Agreements.  *Id.* at 5.  Just below that section, however, the

Art Agreement further explained "[f]or clarity" that it did not prevent "the Client or companies or

firms who contribute to the cost of the Artwork from," among other things, "referring to or using

. . . images and footage of the Artwork in connection with the acquisition of the Artwork . . . in their

social media (including, without limitation, Face Book, Twitter, Instagram, YouTube, and Linked In)

. . . ; on their website; and . . . in their newsletters or other publications."  *Id.*  The Art Agreement

further provided that a plaque reading "Fearless Girl by Kristen Visbal"—but with no mention of

State Street—would be installed within ten feet of the Artwork.  *Id.* at 6.  It stated that Visbal would

make herself available to speak at "various events" associated with the Artwork in February 2019.

*Id.* at 7.  And the Art Agreement contemplated "promotional material" and "press coverage" related

to the event.  *Id.*

　　　　After the Art Agreement was executed, Hanlan emailed Visbal on February 2, 2019 to

explain that the replica's unveiling would occur on February 26, 2019, and that the unveiling would

be preceded by a breakfast event.  Dkt. No. 406 ¶ 287.  The replica was set to be unveiled on

"Federation Square" in Melbourne, Australia, a "big tourist attraction and public space."  *Id.* ¶ 282.

Several days later, on February 6, 2019, State Street first learned of the replica sale and unveiling

through a media article; Brockelman emailed Visbal to ask if she was involved in the installation and

---

[3] MBL alone paid Visbal for the replica, neither Cbus nor HESTA contributed to the purchase price, and Visbal never saw any agreement among MBL, Cbus, and HESTA.  Dkt. No. 406 ¶¶ 284–286.

if MBL was her client.  *Id.* ¶ 288.  Visbal confirmed that she was involved in the sale and unveiling.

*Id.* ¶ 289.

Days later, on February 11, 2019, State Street emailed Visbal and Wolff a notice of breach

regarding the Australian sale (and also reiterated its belief that previous sales and activities had

breached the Agreements).  *Id.* ¶ 290; *see* Dkt. No. 397 Ex. 202 (email).  In the email, State Street

noted that MBL had posted a photograph of the Fearless Girl replica teasing its unveiling (and

MBL's partnership with HESTA and Cbus) on MBL's "@wefightforfair" Instagram account:



Dkt. No. 423 ¶ 117.  That Instagram account also contained MBL's trademarks and logo.  *Id.*  (MBL,

HESTA, and Cbus had also by this time made other social media posts and press releases connected

to their participation in the Australian unveiling.  *Id.* ¶¶ 118–120.)  On February 14, 2019, Wolff

responded to State Street's notice of breach.  Dkt. No. 406 ¶ 291; *see* Dkt. No. 375 Ex. 203 (Wolff's

letter).  She denied any breach, and made clear that "[t]he sale to Australia [would] not be

rescinded."  Dkt. No. 375 Ex. 203 at 2–3.

That same day, State Street filed two legal cases.  One was in the Federal Court of Australia

(the "FCA") against MBL.  *See* Dkt. No. 375 Ex. 60 (FCA trial court decision, or "FCA Trial

Order") ¶ 15.  The other was in New York state court against Visbal.  Dkt. No. 406 ¶ 292.  In both

cases, State Street moved for immediate injunctive relief.  In Australia, it sought and initially

obtained interim injunctions preventing MBL from unveiling or promoting the replica, but those

injunctions were lifted after a February 21, 2019 hearing.  FCA Trial Order ¶¶ 15–16.  Meanwhile,

State Street moved for a temporary restraining order ("TRO") in New York state court to prevent

Visbal from—among other things—participating in the Australian unveiling event and pre-unveiling

breakfast event, which were set to occur on February 26, 2019.  *See* Dkt. No. 14 (proposed TRO).

When that case was removed from New York state court to this Court on February 25, 2019, *see*

Dkt. No. 1, this Court held a hearing on the TRO.  Dkt. No. 29 (transcript of hearing).  Ultimately,

the Court declined to enter a TRO, based partially on proffers from Visbal's counsel that Visbal, "in

connection with her conversation or speech regarding the Australian sculpture" on February 26,

would "not be promoting the corporate entity, or financial institution, or the law firm which worked

together, apparently, to fund its acquisition."  Dkt. No. 29 at 52:19–24; *see id.* at 56:21–23.

Visbal accordingly proceeded with her participation in the February 26, 2019 events in

Australia.  During the breakfast event, Visbal gave a speech that discussed gender diversity issues

broadly and described her process in creating the original Statue.  Dkt. No. 406 ¶ 294.  She credited

State Street in her remarks as placing the original statue on Wall Street.  Dkt. No. 423 ¶ 532.  But she

also made references to multiple studies concerning gender diversity in corporate governance.  *Id.*

¶ 126.  After the event, Visbal and Australian dignitaries unveiled the replica in Federation Square; in

the background, there was an electronic billboard with an image of Fearless Girl, along with the

logos of Federation Square, MBL, HESTA, and Cbus:



*Id.* ¶ 128.  In a speech after the unveiling, while standing next to the replica, Visbal again gave a

speech focused broadly on gender diversity, but that also referenced two studies concerning "the

impact of having women on boards."  Dkt. No. 406 ¶ 296.  In both speeches, Visbal also

commended MBL, HESTA, and Cbus for bringing Fearless Girl to Australia.  *Id.* ¶ 296; Dkt. No.

423 ¶ 126.

The next day, on February 27, 2019, State Street filed a letter with this Court bringing

Visbal's statements at the Australian events to this Court's attention and renewing its request for

injunctive relief, with a focus on enjoining any aspects of Visbal's German sale (or the promotion of

that sale) that had not been completed.  Dkt. No. 7.  The Court held a hearing on the motion on

March 5, 2019, and entered a preliminary injunction on March 6, 2019 enjoining Visbal from

completing the delivery of the German replica if it had not been delivered, from promoting the

German replica, and from using an automated sales form to sell replicas through her website or

otherwise.  Dkt. No. 27 (order); Dkt. No. 39 (transcript of hearing).

The cases proceeded in both courts.  In this Court, the preliminary injunction was affirmed in May 2019 (with minor modifications) and remains in place today.  Dkt. No. 79.  Though the parties attended mediation in March 2020, that mediation was unsuccessful.  Dkt. No. 230.  Shortly thereafter, on March 23, 2020, State Street filed its second amended complaint, which is the active complaint for purposes of this order.  Dkt. No. 237 ("SAC").  The same day, Visbal filed her amended counterclaims, which are likewise her active counterclaims here.  Dkt. No. 238 ("Amended Counterclaims").

On February 21, 2021, the FCA trial court issued a final order in the Australian case.  There, State Street had made various statutory claims related to provisions of the "Australian Consumer Law," trademark and copyright infringement claims, and several tort claims.  FCA Trial Order ¶¶ 21–22.  With minor exceptions not relevant here, the Australian court rejected State Street's claims and found in MBL's favor.  *Id.* ¶ 24.  And that decision was affirmed by an Australian appellate court on April 8, 2022.  *See* Dkt. No. 375 Ex. 1 (FCA appellate court decision, or "FCA Appellate Order").

Back in this Court, on September 22, 2022, both parties filed motions for summary judgment.  *See* Dkt. No. 369 (Visbal's motion for summary judgment); Dkt. No. 370 (memorandum of law in support); Dkt. No. 379 (State Street's motion for summary judgment); Dkt. No. 389 (memorandum of law in support).  Each party's motion is fully briefed.  *See* Dkt. No. 404 (Visbal's opposition to State Street's motion); Dkt. No. 414 (State Street's opposition to Visbal's motion); Dkt. No. 422 (Visbal's reply in support of her motion); Dkt. No. 429 (State Street's reply in support of its motion).

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The Court's job is not to "weigh the

evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13-cv-793, 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because both parties move for summary judgment. *Morales*, 249 F.3d at 121.

## III. DISCUSSION

### 1. State Street's Claims

In its Second Amended Complaint, State Street brings a total of nine claims for relief. *See generally* SAC. Visbal argues that summary judgment as to all of State Street's claims should be granted because those claims are collaterally estopped by the Australian decisions. Dkt. No. 370 at 16–17. Because the Court does not find that the Australian courts necessarily decided any issues that are decisive here, however, it will not give those decisions preclusive effect.

As a result, the Court proceeds to evaluate the summary-judgment motions by State Street and Visbal concerning various aspects of seven of State Street's claims for relief. In sum, and as explained in more detail below, the Court (a) partially grants and partially denies both parties'

summary-judgment motions concerning Visbal's purported breaches of the Agreements; (b) grants

Visbal's motion for summary judgment as to the following claims by State Street:  (i) implied

covenant of good faith and fair dealing, (ii) anticipatory breach, (iii) direct copyright infringement,

and (iv) vicarious copyright infringement; and (c) denies Visbal's motion for summary judgment

concerning State Street's trademark infringement claim.

### a.  Collateral Estoppel

State Street's claims are not barred by collateral estoppel because the issues relevant to this

litigation were not necessarily decided in previous proceedings.  Visbal argues that aspects of the

FCA Trial Order and the FCA Appellate Order have collateral estoppel effect here.  Dkt. No. 370 at

16; *see* FCA Trial Order; FCA Appellate Order.  In the Australian case, after the sale and

subsequence unveiling events in Melbourne, State Street sued MBL under several statutory

provisions, for the torts "of passing off," and "interference with contractual relations," and for

trademark and copyright infringement.  FCA Trial Order ¶¶ 21–22, 25.  With one exception not

relevant here, the FCA Trial Court rejected State Street's claims.  *Id.* ¶ 1188.  The Appellate Court

then affirmed the Trial Court's decision.  FCA Appellate Order ¶ 126.

"Collateral estoppel, also known as issue preclusion, 'applies to judgments issued by courts

of foreign countries.'"  *F.T. Maritime Servs. Ltd. v. Lambda Shipholding Ltd.*, 533 F. Supp. 3d 149, 155

(S.D.N.Y. 2021) (quoting *Yukos Cap. S.A.R.L. v. OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 295

(S.D.N.Y. 2013)).  In order for a foreign judgment to have preclusive effect, the court first must

"recognize the foreign judgment . . . based on principles of comity."  *Id.*  "Federal courts generally

extend comity whenever the foreign court had proper jurisdiction and enforcement does not

prejudice the rights of United States citizens or violate domestic public policy."  *Id.* (quoting *Victrix*

*S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987)).

The Australian decisions are entitled to recognition.  The Second Circuit has previously

recognized Australian court judgments. *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993). And the Australian proceedings in this case specifically meet the generally applied standards for comity. *See F.T. Maritime*, 533 F. Supp. 3d at 155 ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."). There is no question that the Australian courts had jurisdiction given that State Street chose to sue MBL, an Australian law firm, in Australia. *See* Dkt. No. 422 at 4–5. State Street's choice to prosecute in Australia, moreover, likewise defeats its argument that enforcing that decision here would prejudice its rights or violate domestic public policy. By suing in Australia, State Street created the possibility that it would suffer an adverse decision (with adverse findings). And enforcing the Australian judgments would not be so "repugnant to fundamental notions of what is decent and just" such that it would violate public policy. *Ackermann v. Levine*, 788 F.2d 830, 842 (2d Cir. 1986); *see also id.* (noting that this "standard is high, and infrequently met," and that "only in clear-cut cases ought it to avail" the party seeking not to apply the foreign judgment (internal citation and brackets omitted)). State Street argues that because the Agreement had a choice-of-law provision favoring New York law, enforcing the Australian judgments here violative of domestic policy. Dkt. No. 414 at 14. But again, it was State Street's choice to sue in Australia, and the Australian courts' decisions did not rely on choice-of-law provisions. *See also* FCA Trial Order ¶ 1110 (noting that the parties apparently agreed in Australia that the court could apply Australian law). So State Street cannot show that enforcing those decisions here would be "repugnant to fundamental notions of what is decent and just" as necessary to preclude recognition here. *Ackermann*, 788 F.2d at 842.

Even if the foreign judgment is recognized, however, it cannot have preclusive effect unless it meets the generally applicable collateral-estoppel requirements. *See F.T. Maritime*, 533 F. Supp. 3d at 155–56. "Under New York law, collateral estoppel bars relitigation of an issue when (1) the

identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021) (internal citation omitted).  In addition to those requirements, "under New York law, 'the question of fairness . . . in the application of the doctrine [of issue preclusion] must be the crowning consideration.'" *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365, 372 (2d Cir. 2023) (quoting *Read v. Sacco*, 375 N.Y.S.2d 371, 375 (2d Dep't 1975)); *see also Bear, Stearns & Co., Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) ("This court has been careful to assure that collateral estoppel is not employed unfairly.").  And finally, "[t]he burden of showing that the issues . . . were necessarily decided . . . rests with the party seeking . . . issue preclusion." *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996).

Visbal argues that the Australian courts necessarily determined "whether Visbal violated the Master Agreement; the scope of SSGA's license; and consumer confusion over the origin of the Fearless Girl replica."  Dkt. No. 370 at 17.  The latter two of these issues can be disposed with quickly.  First, while the Australian trial court articulated (and the Australian appellate court adopted) a construction of the scope of SSGA's license that limited it to "gender diversity issues in corporate governance, the financial services sector, and itself and the products and services it offers," FCA Appellate Order ¶ 95, Visbal has not attempted to explain how that construction is decisive of any portion of the claims presented here.  *See Plymouth Venture*, 988 F.3d at 642.  And second, the trial court's findings on customer confusion were plainly reliant on what *Australian* customers would have known; as a result, they are not "identical" to issues of customer confusion in this case.  *Id.*; *see* FCA Appellate Order ¶ 37 (quoting the trial court order on confusion, which assessed what "members of the Australian public may have known of the New York statue").

Nor does Visbal's primary collateral-estoppel argument—that the Australian court decisions

should preclude State Street from pursuing its arguments that Visbal breached the Master

Agreement—withstand scrutiny, because Visbal has not met her burden to show that issues identical

to those in this litigation were necessarily decided by the Australian courts. *See Plymouth Venture*, 988

F.3d at 642. For collateral-estoppel purposes, an issue is "necessary or essential" to a prior judgment

"only when the *final outcome* hinges on it." *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 82 (quoting

*Bobby v. Bies*, 556 U.S. 825, 835 (2009)) (emphasis in *Bifolck*). Visbal points primarily to paragraphs

432–465 of the FCA Trial Order as those that should have preclusive effect here. Dkt. No. 370 at

17. In those paragraphs, the FCA trial court considered whether Visbal had breached the Master

Agreement as a sub-element of whether State Street had established its interference with contractual

relations claim. *See* FCA Trial Order ¶ 407. That claim contained six elements, the fourth of which

was that MBL "must [have] intend[ed] to and in fact induce[d] or procure[d] [Visbal] to breach the

contract . . . ." *Id.* ¶ 415. As a result, and as the FCA court noted, it was not enough for State Street

to show that Visbal breached the contract—State Street was also required to show that MBL took

"some step which manifest[ed] an intention to induce the breach." *Id.* ¶ 422.

The FCA court clearly (and repeatedly) stated that MBL did not manifest any intent to

induce any breach by Visbal. *See, e.g.*, *id.* ¶ 578 ("State Street (US) has failed to show the requisite

intention on the part of MBL to interfere with the artist's performance of her obligations under the

master agreement or to procure a breach of the master agreement."); *id.* ¶ 631 ("MBL did not

procure or induce" any breach by Visbal due to her participation in the Australian events). And the

court further stated that this failure to show MBL's intent to induce a breach precluded State Street

from succeeding on its interference of contractual relations claim. *See, e.g.*, *id.* ¶ 438 (stating that

even if there was a breach, "this was without intention or knowledge of MBL"); *id.* ¶ 455 (stating

that "even if [Visbal breached], MBL had no intention that she would do so or sought to procure or

encourage her to do so"). As a result, the outcome of State Street's interference of contractual

relations claim plainly "hinge[d]" on the Australian court's determination that MBL did not induce any breach. *See Bifolck*, 936 F.3d at 82.

Visbal notes—correctly—that because more than one court finding can be outcome-determinative, the FCA court's reliance on MBL's non-inducement does not necessarily mean that it could not additionally find that Visbal did not breach the Agreements. *See Irving Nat. Bank v. Law*, 10 F.2d 721, 724 (2d Cir. 1926) ("[I]f a court decides a case on two grounds, each is a good estoppel."). The problem for Visbal, however, is that the language used by the trial court to describe whether or not she breached the Master Agreement was far less conclusive than the language used to describe MBL's non-inducement. Visbal points to several statements that, standing alone, appear definitive. *See* FCA Trial Order ¶ 577 ("[T]he entry into by the artist of the art agreement did not cause her to be in breach of the [M]aster [A]greement."); *id.* ¶ 630 ("I do not accept that any . . . breach has been established by the artist."). But State Street singles out several other statements that are decidedly more equivocal, and seem to return to MBL's non-inducement as the primary rationale to reject State Street's tort claim. *See id.* ¶ 435 ("I am not, *for the most part*, satisfied that those breaches [by Visbal] have been established. *But even if they were*, as against MBL the tort has not been established.") (emphasis added); *id.* ¶ 438 ("I am not convinced that there was any breach by the artist. *But if there was*, this was without the intention or knowledge of MBL.") (emphasis added). Given the trial court's hedging as to whether or not it was making a definitive determination that Visbal had not breached the Master Agreement, Visbal cannot meet her burden to show that the rejection of State Street's interference with contractual relations claim hinged on—that is, necessarily depended on—any finding concerning those breaches. For that reason, it would be inappropriate to give the trial court's statements on that issue preclusive effect. *See Bifolck*, 936 F.3d at 82.

Giving the trial court's statements preclusive effect, moreover, would undermine the "crowning consideration" of the collateral estoppel doctrine: "the question of fairness." *Phoenix*

*Light*, 66 F.4th at 372.  It would be manifestly unfair to hold that State Street is collaterally estopped from arguing that Visbal breached the Master Agreement based on statements that, at the very least, left room for doubt as to whether the Australian courts actually held.[4]  *See Legnani v. Alitalia Linee Aeree Italiane,* 400 F.3d 139, 142 n.2 (2d Cir. 2005) ("[A] reasonable doubt as to what was decided in the first action should preclude the drastic remedy of foreclosing a party from litigating an essential issue." (quoting *McNellis v. First Fed. Sav. & Loan Ass'n of Rochester*, 364 F.2d 251, 257 (2d Cir. 1966) (alteration in *Legnani*))).  At bottom, giving the Australian court decisions preclusive effect here would be contrary to the collateral-estoppel doctrine because Visbal has not shown that any issue in this litigation was necessarily decided by the Australian courts, and because using the doctrine in this case would not accord with the fairness that must accompany any preclusion determination.

### b.  Breach of Contract

As a result, the Court turns to an evaluation of State Street's breach of contract claims, where Visbal again raises a threshold issue:  that State Street did not provide Visbal with thirty days to cure any breach or submit their dispute to non-binding mediation before initiating legal action, as required by a provision of the Master Agreement.  As detailed below, however, Visbal rendered the cure period futile, and while State Street did breach the Master Agreement by not engaging in mediation, the proper remedy for the breach is not to dismiss State Street's contract-breach claims.

As to the merits of those claims, the Court finds—again, as described in additional detail below—that State Street has shown that there is no materially disputed fact as to whether some of Visbal's actions breached some provisions of the Agreements, that Visbal has shown the same as to

---

[4] Normally, the Court might also find potential unfairness from the fact that—despite the Master Agreement's statement that it must be "governed by the substantive laws of New York without regard to and exclusive of any conflict of laws rules," Master Agreement § 17(e)—the Australian trial court specifically disclaimed the need to "receive evidence on New York law" to interpret it.  FCA Trial Order ¶ 1110.  Any unfairness is substantially mitigated here, however, because State Street apparently "agreed that Australian common law principles of contractual construction should be utilised in construing the terms of the master agreement as they were not functionally different to New York law."  *Id.*  In any event, the Court need not rely on the interpretive method used by the Australian courts to determine that collateral estoppel is inappropriate here.

other incidents, and that some of the parties' disputed issues must be resolved by the finder of fact. As a result, both parties' motions for summary judgment are granted in part and denied in part concerning these claims.

### i.  Cure and Mediation Provisions

Visbal argues that because State Street brought suit here without waiting thirty days after giving notice of a breach concerning the Australian event (the "Cure Period") and without entering non-binding mediation (the "Mediation Provision"), it breached provisions of the Master Agreement and its contract claims should be dismissed on that basis.  Dkt. No. 404 at 14–17.  While the Court agrees with Visbal that the Master Agreement imposes both of these independent requirements for suit, it does not find that State Street breached the Cure Period because Visbal rendered it futile. And although State Street did breach the mediation provision, the proper remedy for that breach is not dismissal of its contract claims.

As an initial matter, and as Visbal argues, the Master Agreement "imposes *two distinct* obligations:  (1) a notice and 30-day Cure Period . . . *and* (2) a requirement to mediate if the dispute is not resolved during the 30-day Cure Period."  Dkt. No. 422 at 7.  That interpretation reflects the only reasonable reading of the "Cure Period" and "Dispute Resolution" Section of the Master Agreement.  Master Agreement § 14.  That section first states that, if one party believes that the other has breached, it must notify the purportedly breaching party in writing.  *Id.*  Once notice is submitted, the allegedly breaching party "shall immediately take steps to investigate the breach" and "will have thirty (30) days from receiving such notice" to either cure or negotiate a resolution with the complaining party—a period that the Master Agreement calls "the 'Cure Period.'"  *Id.*  And "[d]uring the Cure Period, no legal action shall be taken by the Party alleging the breach."  *Id.*  The section continues by stating that if the dispute "is not settled by good faith negotiation between the Parties within the Cure Period," the dispute "*shall* first be settled by non-binding mediation."  *Id.*

(emphasis added).  And a party is only free to sue—in accordance with available remedies in Section 17(g) of the Master Agreement—"[i]n the event" that the mediation is successful or one of the parties terminates the mediation via written notice.  *Id.*  This language plainly imposes two requirements that ordinarily must be met before bringing suit:  (1) compliance with the Cure Period, and (2) submission of any remaining dispute to mediation.

Visbal argues that State Street breached the Cure Period because it "filed this lawsuit within 3 days of informing Visbal of an alleged breach regarding the Australia sale."  Dkt. No. 370 at 18; *see* Dkt. No. 406 ¶¶ 290, 292.  State Street does not (and could not) dispute this timeline:  it concedes that it first gave written notice to Visbal concerning allegedly breaching activities in Australia on February 11, 2019, while this suit was first filed (in New York state court) on February 14, 2019.  *See* Dkt. No. 414 at 15; Dkt. No. 406 ¶ 292.  Nonetheless, it argues that complying with the 30-day Cure Period was unnecessary because Visbal's actions rendered compliance futile.  Dkt. No. 414 at 15–17.

The Court agrees.  Under New York law, "where it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent."  *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty*, 135 A.D.2d 891, 892 (3d Dep't 1987); *see also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (citing *Sunshine Steak* and noting that in New York, parties are "excused from performing a futile act" in a contract).  After State Street sent notice to Visbal that it believed Visbal's activities around the sale of a replica to MBL and the planned event unveiling it in Australia violated the parties' Agreements, Visbal's then-counsel Nancy Wolff responded with a letter on February 14, 2019.  Dkt. No. 375 Ex. 203 (Wolff's letter).[5]  That letter denied that Visbal's activities related to Australia breached the Master Agreement.  *Id.* at 3.  And—crucially for the purposes of Visbal's Cure Period

---

[5] The parties have affirmed that State Street received this letter before filing suit later on February 14, 2019.  *See* Dkt. No. 436–437.

argument—it made clear that "[t]he sale to Australia will not be rescinded." *Id.*

That statement reflected Visbal's unmistakable intent to go forward with the Australian sale. And as described in more detail below, that sale breached at least some provisions of the Master Agreement. As a result, based on Wolff's representation that the (breaching) sale would not be rescinded, State Street was entitled to conclude that Visbal would not live up to the contract, and therefore was not required to comply with the Cure Period before bringing suit. *See Sunshine Steak*, 135 A.D.2d at 892.

Visbal nonetheless maintains that State Street breached its separate obligation to mediate any disputes before initiating legal action. *See* Dkt. No. 422 at 7–8. As described above, if the Cure Period is unsuccessful in resolving any disputes that arise under the Master Agreement, that dispute "shall first be settled by non-binding mediation," and a party may only sue "in the event" that mediation is unsuccessful. Master Agreement § 14. Here, it is undisputed that the parties did not mediate any of their disputes, including the dispute about the sale to MBL, before this litigation. Dkt. No. 406 ¶ 257. State Street's briefing, moreover, focuses only on why the Cure Period was futile (rather than explaining why compliance with mediation provision would have been futile). *See* Dkt. No. 414 at 15 ("The record clearly shows that SSGA's efforts to have Visbal cure were and would have been futile."). And Visbal's commitment to proceeding with the Australian sale cannot render the mediation provision (as opposed to the Cure Period) in the contract futile; to so hold would effectively destroy the purpose of mediation clauses. *See A. Raymond Tinnerman Mfg., Inc. v. TecStar Mfg. Co.,* No. 11-cv-0987, 2012 WL 1191617, at *2 (E.D. Wis. Apr. 10, 2012) ("[M]ediation is not futile simply because one party has taken the position that it is not liable. At the outset of almost any legal dispute, the parties will have very different views of the case. The purpose of mediation is to attempt to reach a compromise."). So State Street breached the Section 14 of the Master Agreement by filing this case without attempting to mediate its dispute with Visbal.

While the Court therefore agrees with Visbal that State Street breached this provision, it disagrees as to the effect of the breach.  Visbal argues that the proper remedy is to dismiss State Street's breach of contract claims "in their entirety."  Dkt. No. 370 at 18.  But New York courts have held directly to the contrary, writing that "an agreement to submit a dispute to mediation and arbitration is not a defense to an action, and, thus, may not be the basis for a motion to dismiss a complaint based on documentary evidence."  *C & M 345 N. Main St., LLC v. Nikko Const. Corp.*, 96 A.D.3d 794, 795 (2d Dep't 2012) (citing *Allied Bldg. Inspectors Intl. Union of Operating Engrs., Local Union No. 211, AFL–CIO v. Office of Labor Relations of City of N.Y.*, 45 N.Y.2d 735, 738 (1978)); *see also Governara v. 7-Eleven, Inc.*, No. 13-cv-6094, 2014 WL 4476534, at *8 (S.D.N.Y. Aug. 20, 2014) (applying this rule to reject a motion to dismiss a claim because the plaintiff failed to submit it to non-binding mediation in accordance with a contractual agreement).  That rule precludes dismissal of State Street's contract claims here.

Even to the extent that *C & M* and New York law do not *require* this Court to reject Visbal's argument that State Street's contract claims should be dismissed for its failure to mediate, moreover, the Court would have discretion to either require mediation or dismiss the claims without prejudice.  *See, e.g.*, *N-Tron Corp. v. Rockwell Automation, Inc.*, No. 09-0733-WS-C, 2010 WL 653760, at *7 (S.D. Ala. Feb. 18, 2010) (noting that "[w]hen confronted with objections that plaintiffs have initiated litigation without satisfying arbitration or mediation requirements, courts routinely stay rather than dismiss the proceedings to allow for implementation of the agreed-upon dispute resolution mechanism" because "district courts are vested with discretion to determine whether stay or dismissal is appropriate"); *Trone Health Servs. Inc. v. Exp. Scripts Holding Co.*, No. 4:16-cv-1250, 2017 WL 3412158, at *3 (E.D. Mo. Aug. 8, 2017) (finding that "the Court has discretion to determine whether stay or dismissal is appropriate" in a case involving failure to comply with contractual provision requiring pre-suit mediation); *see also Tattoo Art, Inc. v. Tat Int'l, LLC*, 711 F. Supp. 2d 645,

651 (E.D. Va. 2010) (collecting cases that dismissed claims, and other cases that issued stays, where a party failed to mediate in accordance with a contractual requirement). And exercise of that discretion to dismiss State Street's claims here would be inappropriate. That is because, where courts do dismiss claims for failure to comply with pre-suit mediation requirements, it is often "to allow the parties to satisfy" the mediation provision of their contract "in the first instance." *Trone*, 2017 WL 3412158, at *3. But here—unlike any case that the Court is aware of—the parties have *already mediated*; they did so, albeit unsuccessfully, while litigation was ongoing. Dkt. No. 230.[6] So even if the Court could do so, dismissing the case to allow the parties to mediate again would make little sense. Instead, as explained in more detail below in Part III(2)(a)(ii), the proper remedy for State Street's failure to comply with the Master Agreement's mediation provisions is to allow Visbal to pursue any damages that she can prove to have been caused by that breach. *See* Dkt. No. 422 at 9 (Visbal noting that State Street "does not dispute [that] Visbal properly pled a contract breach claim arising from SSGA's breach of MA § 14").

In sum, because Visbal rendered the 30-day Cure Period futile, and because dismissal is not the proper remedy for State Street's failure to mediate its dispute before bringing suit, Section 14 of the parties' Master Agreement does not require dismissal of State Street's breach of contract claims. So the Court will consider those claims on the merits.

### ii.  Breach Claims

"Under New York law, the elements of a claim for breach of contract are '[i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages.'" *Abraham v. Leigh*, 471 F. Supp. 3d 540, 556 (S.D.N.Y. 2020) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). In interpreting a contract to

---

[6] Should the parties wish to engage in additional mediation before trial, the Court would be pleased to accommodate the request.

determine whether a breach occurred, a "fundamental tenet of contract law is that agreements are construed in accordance with the intent of the parties." *Goldman v. White Plains Ctr. for Nursing Care, LLC*, 11 N.Y.3d 173, 176 (2008).  And because "[t]he best evidence of what parties to a written agreement intend is what they say in their writing," "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract." *Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082 (2019) (quoting *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992), and *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014)).  As a result, "unless the document itself is ambiguous," "extrinsic evidence" outside of the contract itself "may not be considered." *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009).

State Street and Visbal have cross-moved for summary judgment as to whether Visbal's Australian replica sale, and participation in subsequent events in connection with that sale, violated the Master Agreement or the Copyright Agreement.  And Visbal has moved for summary judgment concerning whether three other activities—(1) her replica sale in Norway, (2) her replica sale in Germany, and (3) the use of a replica at the 2019 Los Angeles Women's March—breached sections of the Master Agreement.  Because some of Visbal's actions in connection with the Australian sale violated some provisions of the Master and Copyright Agreements, but material disputes of fact preclude determination as to whether other those actions violated other provisions of the Master Agreement, State Street's summary-judgment motion with respect to the Australian sale will be granted in part, while the same portion of Visbal's motion will be denied in full.  As for the remainder of Visbal's summary-judgment motion concerning State Street's contract-breach claims, that motion will be (1) granted in part with respect to the Norwegian sale, (2) granted in full with respect to the German sale, and (3) denied in full with respect to the use of the replica at the Women's March.

### 1. Australian Sale and Events

Both sides move for summary judgment as to whether Visbal's sale of the replica to MBL in Australia and subsequent activities connected to that sale violated parts of the Master or Copyright Agreements. *See* Dkt. No. 370 at 25–29 (Visbal's motion); Dkt. No. 389 at 11–18 (State Street's motion). The Court finds that material disputes of fact preclude summary judgment as to whether that sale breached Master Agreement §§ 7(c)(i)–(ii). But under the plain language of the contracts, Visbal's Australian activities breached Master Agreement §§ 1(d), 3(a), and 7(b), as well as Copyright Agreement § 1(a), entitling State Street to summary judgment on those aspects of its claims.

*Master Agreement § 7(c)(i).* A disputed issue of material fact precludes summary judgment as to whether Visbal's sale to MBL breached Master Agreement § 7(c)(i). That clause states that Visbal may not, outside of exceptions irrelevant here, knowingly "sell, license, or distribute copies of the Artwork in any medium or size to any financial institution for any commercial and/or corporate purpose." Master Agreement § 7(c)(i). Visbal's contract to sell the replica that was later unveiled in Australia lists the "Client" as "Maurice Blackburn Lawyers"—a law firm, rather than a financial institution. Dkt. No. 387 Ex. 44 at 3. So that sale does not run afoul of the Master Agreement's prohibition on sales to "financial institution[s]." Master Agreement § 7(c)(i). But the agreement references not only the "Client" MBL, but also "co-contributors to the Cost" of the replica. Dkt. No. 387 Ex. 44 at 6. And those "co-contributors" are given a license to "reproduce and authorize the 2-d reproduction of the Artwork to promote or publicise . . . their . . . acquisition of the Artwork . . . [through] print material, website, press and media coverage and social media." *Id.*

But it is not clear who the "co-contributors" were—and thus, neither party can be granted summary judgment on this issue. It is an undisputed fact that "[n]either Cbus nor H[ESTA]"—the two superannuation firms who participated in the Australia event—"contributed financially to the purchase price of the Fearless Girl replica." Dkt. No. 406 ¶ 285. But State Street has pointed to

some (admittedly disputed) evidence that suggests that Cbus or HESTA, or other similar firms, may have nonetheless been involved with the purchase of the replica such that they are the firms referenced as "co-contributors" in the contract selling the replica to MBL. *See, e.g.*, Dkt. No. 423 ¶ 113 (stating that Visbal "knew that HESTA and Cbus are 'financial funds' that . . . were helping with the purchase of the Australia Replica"). It is for a jury, not this Court on summary judgment, to get to the bottom of whether Cbus, HESTA, or any other financial institution was a "co-contributor" to the cost of the replica. If so, and if Artwork was knowingly distributed for a corporate purpose to those financial institutions, the Australian sale could have violated Master Agreement § 7(c)(i); if not, liability cannot have occurred. As a result, summary judgment is denied to both sides as to this aspect of State Street's breach of contract claims.

*Master Agreement § 7(c)(ii).* Summary judgment will also be denied to both sides concerning State Street's argument that Visbal's sale to MBL and subsequent participation in the Australian event violated Master Agreement § 7(c)(ii). That provision states that Visbal may not knowingly "sell, license, or distribute copies of the Artwork in any medium or size to any third party to use in connection with gender diversity issues in corporate governance or in the financial services sector." Master Agreement § 7(c)(ii). This provision, unlike Master Agreement § 7(c)(i), regulates sales to any third party, rather than just to financial institutions. So the parties' dispute focuses on whether Visbal "knowingly" sold the replica "to use in connection with gender diversity issues in corporate governance or in the financial services sector." Master Agreement § 7(c)(ii).

Disputes of material fact preclude granting summary judgment on this issue. The Australian agreement itself prevents the use of the Artwork "in connection with gender diversity issues in corporate governance or in the financial services sector." Dkt. No. 387 Ex. 44 at 7. But State Street has introduced evidence that a reasonable jury could use to support a finding that, notwithstanding that provision, Visbal sold the replica for use in that area. Visbal knew, for instance, that among the

co-contributors to the agreement were "organizations in the 'financial services' sectors." Dkt. No. 396 ¶ 109.  Visbal was also aware that the sale and display of the replica would be used as part of MBL's "multiple pillar campaign on equal pay." *Id.* ¶ 104.  She further knew that the Australian replica would be unveiled at a launch event. *Id.* ¶ 114.  Then, after the sale was completed, MBL and HESTA issued media releases about the replica unveiling that stated, in part, that "HESTA was the first major Australian superannuation fund to publicly commit to voting against the re-appointment of directors at companies with all male boards" and that "Maurice Blackburn remains deeply committed to promoting gender equality within the broader Australian community as well as within the firm, including announcing in 2018 that in its Board would be made up of more than 50 per cent female representation in what is believed to be an Australian-first for a national law firm." *Id.* ¶ 120. Additionally, in her speech at the breakfast event to commemorate the replica unveiling, Visbal referenced multiple studies about the benefits of having women and gender diversity on corporate boards. *Id.* ¶ 126.  And finally, at an event after the replica's unveiling, and while standing next to it, Visbal again referenced multiple studies about the impact of having women on boards. *Id.* ¶ 130.

The events after the sale's completion—HESTA and MBL's press release pointing to gender diversity on their boards and the boards of other companies' boards as well as Visbal's two speeches making multiple mentions of the benefits of gender diversity on boards—plainly reflected a "use" of a "cop[y] of the Artwork" "in connection with gender diversity issues in corporate governance or in the financial services sector."  Master Agreement § 7(c)(ii).  And a reasonable jury *could* infer from these facts (and other testimony presented at trial) that Visbal knew, at the time of the sale to MBL, that the replica would be used in this way; Visbal's speeches are particularly suggestive of such knowledge (thus requiring denial of Visbal's summary-judgment motion).  But State Street has not conclusively *shown* that, when the sale was completed, Visbal knew the replica would be used in connection with gender diversity issues in corporate governance or in the financial services sector:

her knowledge that organizations in the financial services sectors would be involved, that the sale would be part of an equal pay campaign, and that there would be a launch event is insufficient to grant State Street summary judgment.  As a result, summary judgment is denied to both parties on this aspect of State Street's breach of contract claims.[7]

*Master Agreement § 1(d).*  Summary judgment will be granted to State Street—and denied to Visbal—as to whether Visbal's sale to MBL breached Master Agreement § 1(d).  Under that provision, "Artist agrees that any two-dimensional or three-dimensional reproductions of the Artwork that are provided by Artist to any third party as part of any promotional or corporate event, conference, ceremony, banquet, retreat, awards dinner, or the like, shall give attribution to SSGA as follows: 'Statue commissioned by SSGA.'"  Master Agreement § 1(d).  The parties' dispute focuses primarily on the phrase "promotional or corporate event."  The FCA trial court held, and Visbal argues here, that the unveiling and breakfast event do not fit this definition "because they 'had little if anything to do with . . . promoting financial services or products,'" and instead "promoted the installation of Fearless Girl as a 'gift' to the public, the equal pay campaign, and International Women's Day."  Dkt. No. 404 at 25–26 (quoting FCA Trial Order ¶ 19).

With respect, this argument plainly misreads the Master Agreement.  Section 1(d) requires attribution at "any promotional *or* corporate event."  Master Agreement § 1(d) (emphasis added).  The FCA trial court seems to have read the language of the contract to omit the word "or" and to therefore state "promotional corporate event."  *See* FCA Trial Order ¶ 19.  But that is not what the contract states, and under New York law, written contracts must "be enforced according to [their] terms."  *U.S. Bank Nat'l Assoc. v. DLJ Mortg. Cap., Inc.*, 38 N.Y.3d 169, 178 (2022) (quoting *Nomura*

---

[7] The Court also denies State Street's motion for summary judgment concerning whether the sale breached Master Agreement § 6(f).  Dkt. No. 389 at 15 & n.16.  This is an argument in the alternative, as State Street argues that the sale of the Australian replica violated Section 6(f) if it did not violate Sections 7(c)(i) and 7(c)(ii).  *Id.*  With the Court denying summary judgment on the Section 7(c)(i) and 7(c)(ii) claims, the Section 6(f) claim is not yet properly presented for the Court's determination.

*Home Equity Loan, Inc. v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581 (2017)).

In any case, the events in Australia were both corporate and promotional. Visbal testified that she interpreted an email about the plan for the unveiling in Australia as describing "a corporate event on International Women's Day where [they] have Fearless Girl there, and hopefully [Visbal] as a guest speaker." Dkt. No. 387 Ex. 1 at 399:14–19. And there is no doubt that the events were promotional; again, Visbal concedes as much. Dkt. No. 404 at 26 (Visbal arguing that the events "promoted" the equal pay campaign and International Women's Day); *see also, e.g.*, *Promotional*, Merriam-Webster Dictionary Online ("[T]he act of furthering the growth or development of something."). And as described above, Visbal was aware that the replica would be used at these events when she sold the replica to MBL. *See* Dkt. No. 396 ¶ 114. Visbal was therefore required to follow the attribution requirements in Master Agreement § 1(d).

Though Visbal argues that she did so "by referencing SSGA's role in the original installation of the Statue in her remarks," Dkt. No. 404 at 26, the Court disagrees. Section 1(d) states that the "two-dimensional or three-dimensional reproductions of the Artwork"—not the Artist—"shall give attribution to SSGA as follows: 'Statue commissioned by SSGA.'" Master Agreement § 1(d). That language clearly contemplates a notation giving credit to State Street on the replica itself (and specifies the exact language that should be used). *See In re NXXI Inc.*, 216 F. Supp. 3d 381, 392 n.11 (S.D.N.Y. 2016) ("Under ordinary contract construction rules, the rules of English grammar apply." (internal citation omitted)); *but see* FCA Trial Order ¶ 438 (stating that Visbal's "verbal attribution" may have complied with the contract). As a result, that Visbal mentioned State Street's role in the original installation during her remarks did not represent compliance with Section 1(d)'s attribution requirements, and summary judgment will be granted for State Street on this aspect of its claim.

*Master Agreement § 3(a) and Copyright Agreement § 1(a).* The Court will grant State Street's summary-judgment motion, and deny Visbal's motion, concerning Section 3(a) of the Master

Agreement and Section 1(a) of the Copyright Agreement.  Section 3(a) of the Master Agreement

reads, in pertinent part, as follows:

> [t]he Parties . . . agree that SSGA shall have the exclusive right, pursuant to a license
> set forth in [the Copyright Agreement], to display and distribute two-dimensional
> copies, and three-dimensional Artist-sanctioned copies, of the Artwork to promote
> . . . gender diversity issues in corporate governance and in the financial services
> sector. . . .   Notwithstanding, Artist is free to discuss issues involving Gender
> Diversity Goals in connection with the Artwork, provided the Artwork is not used to
> promote any third party.

Master Agreement § 3(a).  Section 1(a) of the Copyright Agreement uses functionally identical

language to describe State Street's rights:

> Artist hereby grants to SSGA a[n] . . . exclusive right, license, and privilege to, in
> connection with . . . gender diversity issues in corporate governance and in the
> financial services sector . . . display and distribute three-dimensional, physical copies
> of the Artwork . . . that are sanctioned by the Artist.  For the avoidance of doubt, the
> Parties agree that Artist is free to discuss issues involving Gender Diversity Goals in
> connection with the Artwork, provided the Artwork is not used to promote any third
> party . . . ."

Copyright Agreement § 1(a).

The Australian events and sale plainly represented a display and distribution of a three-

dimensional Artist-sanctioned copy of Fearless Girl that was used to promote gender diversity issues

in corporate governance and in the financial services sector.  Most obviously, and as discussed

above, during Visbal's speech at the breakfast event, she made multiple references to studies about

the importance of gender diversity on corporate boards.  Dkt. No. 423 ¶ 126.  And Visbal then

referred to those studies again, while standing next to the replica, during her speech after the

replica's unveiling.  *Id.* ¶ 130.  When Visbal did so, the replica was on display and therefore used to

promote gender diversity issues in corporate governance—which both Section 3(a) of the Master

Agreement and Section 1(a) of the Copyright Agreement forbid.

Visbal responds by seeking safe harbor in the latter part of both sections, which provide that

notwithstanding the restriction on use in connection with gender diversity issues in corporate

governance, Visbal may discuss issues involving Gender Diversity Goals provided that the replica is not used to promote a third party. Master Agreement § 3(a); Copyright Agreement § 1(a). No reasonable jury, however, could find that the replica was not used to promote multiple third parties. While Visbal gave her speech at the unveiling, she stood in front of a display screen that featured the logos of MBL, HESTA, and Cbus. Dkt. No. 423 ¶¶ 128–129. And as Visbal herself argues, one of the purposes of the unveiling was to promote MBL's equal pay campaign launched in connection with the replica. *See* Dkt. No. 404 at 11. These facts demonstrate that the replica was used to promote third parties at the unveiling, which precludes Visbal's entitlement to the "Gender Diversity Goals" safe harbor in either agreement.[8] Accordingly, summary judgment will be granted to State Street concerning the Australian unveiling's violation of Master Agreement § 3(a) and Copyright Agreement § 1(a).

*Master Agreement § 7(b).* Finally, the Court will grant State Street's motion for summary judgment, and deny Visbal's motion, as to whether the Australian sale violated Section 7(b) of the Master Agreement. In that section,

> [t]he Parties agree that the Artwork shall never be authorized for use by any third party as a logo or brand, including, without limitation, the display of the Artwork on third party "branded" merchandise . . . that is designed to promote a third party, its products, or services. . . . Unless otherwise agreed . . . the foregoing restriction on use for any branding purpose as set forth in Exhibit C hereto, shall be incorporated as a condition of Artist's sale of copies of the Artwork to third parties.

Master Agreement § 7(b). Exhibit C of the parties' Agreements reads, in turn, that

> [e]xcept as otherwise agreed between the Parties, the following clause shall be included in all agreements entered into by Artist with all third parties in connection with the use of the Artwork:

> The Artwork shall never be used, or authorized for use, as a logo or brand. The Artwork shall never be displayed on "branded" material, in any medium now know

---

[8] Visbal's argument that the replica was not used to promote third parties because "[n]o speaker marketed or endorsed the goods and services of Cbus, Hesta, or MBL," Dkt. No. 404 at 11, misinterprets the contractual language; the language in both Master Agreement § 3(a) and Copyright Agreement § 1(a) disallows third-party promotion—full stop—without singling out any type of promotion as violating the agreement.

> or hereafter devised, including without limitation any merchandise, products, or
> printed or electronic material, that features a trademark, service mark, trade name,
> tagline, logo, or other indicia identifying a person or entity except for Kristen Visbal
> or State Street Global Advisors or its affiliates.

Dkt. No. 381 Ex. 30 at 23.  Visbal's contract authorizing the sale of the Australian replica to MBL

included the language from Exhibit C of Visbal and State Street's agreement.  *See* Dkt. No. 387 Ex.

44 at 5.  And separate from the contractual language, Visbal also instructed the Australia coalition

that the replica could not be used "as a brand identity," and that it could not be used as an

advertisement.  Dkt. No. 406 ¶ 272.  As a result, Visbal contends, she complied with Section 7(b).

Dkt. No. 404 at 23–25.

The problem with this argument is that the Australian agreement gutted this "no branding"

language through the inclusion of language that limited the effect of Exhibit C's limits.  Exhibit C of

the Agreements—incorporated through Section 7(b) of the Master Agreement—specifies precisely

the actions that constitute a "display[ ]" of the Artwork "on 'branded' material" in violation of the

contract.  Dkt. No. 381 Ex. 30 at 23.  Among those proscribed activities is displaying the Artwork

on "printed or electronic material . . . that features a trademark, service mark, trade name, tagline,

logo, or other indicia identifying a person or entity except for Kristen Visbal or State Street Global

Advisors or its affiliates."  *Id.*  And while Visbal included Exhibit C's restriction in the contract with

MBL, that contract also had a section that stated, "[f]or clarity," that the Client and co-contributors

were affirmatively *not* precluded from

> referring to or using (and, where relevant, authorizing use of) images and footage of
> the Artwork in connection with the acquisition of the Artwork:  i. in their social
> media (including, without limitation, Face Book, Twitter, Instagram, YouTube, and
> Linked In); ii. on their websites; and iii. in their newsletters or other publications . . . .

Dkt. No. 387 Ex. 44 at 5.  This paragraph of the Australian agreement authorizes use of the Artwork

that Exhibit C forbids:  use in electronic and printed material, including social media, featuring the

names and logos of MBL and the other organizations involved in the replica's purchase and

unveiling.  Unsurprisingly, MBL took advantage of this contractual provision by posting an image of the Artwork to their @wefightforfair Instagram account, "which depicts the company's trademarks and logo" as well MBL's "wefightforfair" tagline and the names of partners HESTA and Cbus. Dkt. No. 420 ¶ 489; *see also id.* ¶ 490 (describing other use of the Artwork on social media).  The Australian contract's allowance for posting of the Artwork in connection with entities other than Visbal and State Street, in short, gave MBL and its co-contributors the right to violate the plain language of the Exhibit C to the Agreements (and, therefore, the right to violate Section 7(b) of the Master Agreement).[9]

Visbal responds by urging the Court to reject this textual interpretation of Exhibit C because, in her view, it cannot be "reconciled with other clauses of the Master Agreement recognizing that Visbal must sell and distribute replicas to further the Gender Diversity Goals, contemplating circumstances involving public announcements."  Dkt. No. 404 at 24.  It is true that, under New York law, contracts "should be 'read as a whole, and every part . . . interpreted with reference to the whole.'"  *Glob. Reins. Corp. v. Century Indem. Co.*, 30 N.Y.3d 508, 518 (2017) (quoting *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007)).  But it is also true that "[a]ll parts of a contract must be read in harmony to determine its meaning," such that "one portion" is not read "so as to negate another portion."  *Bombay Realty Corp. v. Magna Carta, Inc.*, 100 N.Y.2d 124, 127 (2003).  As a result, "[e]ffect and meaning must be given to every term of the contract . . . , and reasonable effort must be made to harmonize all of its terms."  *Corter-Longwell v. Juliano*, 161 N.Y.S.3d 525, 531 (4th Dep't 2021) (quoting *Vill. of Hamburg v. Am. Ref-Fuel Co.*, 284 A.D.2d 85, 89 (4th Dep't 2001)).  In other words, if Exhibit C can be read alongside the other parts of the contract, it must be.

---

[9] Visbal's conduct in negotiating an express carveout, in the Australian Art Agreement, to the limitation included in her Agreements with State Street suggests bad faith or a gross misunderstanding of the Agreement's terms.  It is as if she had entered into a contract to pay someone $100, laid $100 in the person's hand, taken back $50, and then claimed that she had 'paid' the $100 because of the transient moment the recipient had $100 in her hand.

It can.  Visbal points to her right to sell replicas, reproductions, and other merchandise under Section 6(c) of the Master Agreement, as well as her ability to provide reproductions for promotional or other events under Sections 1(d) and 7(d) of that Agreement, as supposedly inconsistent with Exhibit C's language.  Dkt. No. 404 at 24; *see* Master Agreement §§ 1(d), 6(c), 7(d). But Exhibit C does not limit Visbal's ability to sell products otherwise allowed by the Master Agreement, it merely constricts her ability to market those products (or to allow others to do so). Under the terms of the Master Agreement as a whole, she can still sell merchandise and reproductions, including for use at certain events, but neither she nor others may use the names of entities other than Visbal or State Street on material discussing the Artwork if the Artwork is displayed on that material.  Visbal may dislike these restrictions, and they may result in a reduction of the market value of her products, but they represent a "hardship [she] might have avoided" through more careful drafting of the contract that cannot change the contract's meaning.  *JFK Holding Co. LLC v. City of New York*, 21 N.Y.3d 722, 728 (2013).  Because these terms of the Master Agreement can be read harmoniously with Exhibit C, the Court "must" give "[e]ffect and meaning to every term" of the contract.  *Corter-Longwell*, 161 N.Y.S.3d at 531.  Doing so, Visbal's sale to MBL violated Exhibit C, and summary judgment will be granted for State Street on this issue.[10]

## 2.  Norwegian Sale

Visbal has moved for summary judgment on the issue of whether Visbal's 2018 sale of a replica to Christian Ringnes of the Norwegian Ringnes Foundation breached the parties' Agreements.  *See* Dkt. No. 370 at 19–22.  The parties agree that the provisions at issue are Master Agreement Sections 7(c)(ii), 7(b), and 1(d).  *Id.*; *see* Dkt. No. 414 at 27–28.  The Court agrees with

---

[10] Because the meaning of Exhibit C is unambiguous, moreover, the Court rejects Visbal's attempt to introduce extrinsic evidence to interpret it.  *See Triple Diamond Café, Inc. v. Those Certain Underwriters at Lloyd's London*, 124 A.D.3d 763, 765 (2d Dep't 2015) ("Extrinsic evidence cannot be used to create an ambiguity in an agreement, but only to resolve an ambiguity.").

Visbal that the Norwegian sale did not violate Master Agreement § 7(c)(ii), and so will grant Visbal's motion for summary judgment as to that aspect of State Street's claims.  But because there are, at the least, disputed issues of material fact concerning whether that sale violated Sections 7(b) and 1(d) of the Master Agreement, Visbal's motion will be denied as to those aspects of State Street's claims.

_Master Agreement § 7(c)(ii)._  Summary judgment will be granted to Visbal as to Section 7(c)(ii). That provision, as described above, states that Visbal may not knowingly "sell, license, or distribute copies of the Artwork in any medium or size to any third party to use in connection with gender diversity issues in corporate governance or in the financial services sector."  Master Agreement § 7(c)(ii).  And here, as with the Australian sale, the parties dispute the applicability of the phrase "in connection with gender diversity issues in corporate governance or in the financial services sector." As its evidence that Visbal breached this provision through this sale, State Street points first to Visbal's comments while negotiating the sale, wherein she said:  "[W]ithout true equality we, as society, cannot grow and move forward.  Business people must understand that, if they don't incorporate all types of diversity, they will lose the leading edge in their respective industries."  Dkt. No. 420 ¶ 438.  State Street also notes the message on the plaque accompanying the replica, which stated that it was "[i]n support of women in leadership positions."  _Id._ ¶ 443.  And finally, State Street takes issue with Visbal's comment in a press release connected to the sale, where she stated that that the replica sends "the message of and call for diversity and collaboration between genders in decision making."  _Id._ ¶ 445.

These facts do not raise a material dispute about whether Visbal sold the replica in Norway for use in connection with gender diversity issues in corporate governance or in the financial services sector.  Unlike the sale in Australia, none of Visbal's comments made any mention of diversity _in corporate governance_, on corporate boards, or in connection to the financial services sector. _Compare_ Dkt. No. 423 ¶¶ 126, 130 (Visbal's comments at the Australian events, which referenced

studies about the benefits of gender diversity on corporate boards).  The buyer of the Norwegian replica was the Christian Ringnes on behalf of the Ringnes Foundation—not a financial institution—and State Street has not adduced any evidence that the Foundation used the replica for the forbidden purpose of discussing gender diversity issues in corporate governance or in the financial services sector (much less that Visbal knew about any such use).  As a result, State Street has failed to raise a material dispute of fact as to whether Visbal's Norwegian sale violated Section 7(c)(ii) of the Master Agreement, and Visbal will be granted summary judgment on that issue.

*Master Agreement § 7(b)*.  Visbal's motion concerning whether the Norwegian sale violated Master Agreement § 7(b) will be denied.  As described in detail above, that provision incorporates Exhibit C to the parties' Agreements, which prevents—among other things—the Artwork from being "displayed on 'branded' material, . . . including . . . printed or electronic material, that features a trademark, service mark, trade name, tagline, logo, or other indicia identifying a person or entity except for Kristen Visbal or State Street Global Advisors or its affiliates."  Dkt. No. 381 Ex. 30 at 23.  And similar to the Australian sale, the Norwegian sale also appears to have violated this provision:  the agreement between Visbal and Ringnes stated that the "Client's name" could be included, and the "Artwork" could be "reproduce[d] . . . in order to promote acquisition of the Artwork," on promotional material "includ[ing] print material, website, press and media coverage and social media."  Dkt. No. 420 ¶ 441.  That license appears to have violated the Exhibit C's prohibition on including the name of an entity other than Visbal or State Street on print and electronic promotional material.  At the least, Visbal's motion for summary judgment arguing that the Norwegian sale indisputably did *not* violate Master Agreement § 7(b) must be denied.

*Master Agreement § 1(d)*.  Finally, summary judgment will be denied on the issue of whether the Norwegian sale violated Master Agreement § 1(d).  As discussed, under that provision, Visbal agrees that reproductions given to a third party "as part of any promotional or corporate event,

conference, ceremony, banquet, retreat, awards dinner, or the like, shall give attribution to SSGA."
Master Agreement § 1(d).  The parties agree that the plaque accompanying the Norwegian replica
gave no attribution to State Street, Dkt. No. 420 ¶ 443, but dispute whether any event within the
meaning of Section 1(d) occurred (as necessary to trigger Visbal's attribution obligations).

There are material disputes of fact on this question, necessitating denial of summary
judgment.  State Street has pointed to Visbal's offer to "attend [a] ceremony" in connection with the
event, as well as a later email from Visbal referencing an "unveiling" of the Norwegian replica, as
evidence that an event within the meaning of Section 1(d) took place.  Dkt. No. 420 ¶¶ 439, 442.
Visbal denies that any such event actually occurred.  *Id.*  Given these disputes, it is for the finder of
fact to determine whether any "event" triggering attribution obligations under Section 1(d) of the
Master Agreement happened.  So Visbal's motion for summary judgment is denied on this issue.

### 3.  German Sale

Visbal has also moved for summary judgment as to whether her sale of a replica in Germany
breached the Master Agreement.  Dkt. No. 370 at 22–24.  Again, the parties agree as to the
provisions at issue:  Master Agreement Sections 7(c)(i), 7(c)(ii), and 1(d).  *Id.*; *see* Dkt. No. 414 at 29–
30.  Because State Street has failed to raise any material disputes of fact from which a reasonable jury
could conclude that the German sale violated the Master Agreement, Visbal's motion will be granted
as to that sale.

*Master Agreement § 7(c)(i).*  Summary judgment will be granted for Visbal on the question of
whether the Germany sale breached Master Agreement § 7(c)(i).  As described, that provision
precludes Visbal from knowingly selling, licensing, or distributing replicas to financial institutions.
Master Agreement § 7(c)(i).  But Visbal's sale of the German replica was signed by a German
couple—Angela Maus and Heiko Fischer—and named only Mr. Fischer as the "Client."  Dkt. No.
406 ¶ 223.  It is true that, as State Street submits, there is substantial evidence to suggest that Visbal

knew at the time of sale that Fischer was purchasing the replica on behalf of his company Resourceful Humans, and that he planned to place the replica on the campus of Resourceful Humans' client Accenture.  *See, e.g.*, Dkt. No. 420 ¶ 452.  But the terms of the Master Agreement are clear:  it states only that Visbal may not "sell, license, or distribute" copies of the Artwork to financial institutions for certain purposes.  Master Agreement § 7(c)(i).  Visbal sold to Fischer and Maus—not Accenture—and, unlike the Australian sale, the German contract included no language suggesting a license provided to Accenture for any purpose.  Instead, it indicated only that Accenture might be mentioned on a future plaque accompanying the replica.  *See* Dkt. No. 397 Ex. 170 at 3 ("The Artist would be pleased to order a larger plaque with specific text honoring Resourceful Humans or Accenture.").  But Section 7(c)(1) of the Master Agreement contains no prohibition on *use* (or intended use) by a financial institution; as described, it limits only sale, licensing, or distribution.  So Visbal's German sale did not breach Master Agreement § 7(c)(i).[11]

   *Master Agreement § 7(c)(ii).*  Summary judgment will also be granted for Visbal on the question of whether the sale of the German replica violated Master Agreement Section 7(c)(ii).  That provision precludes her from selling, licensing, or distributing replicas to any third party "to use in connection with gender diversity issues in corporate governance or in the financial services sector."  Master Agreement § 7(c)(ii).  Like the Australian contract, the German contract contained this language as a restriction on the replica's use.  *See* Dkt. No. 397 Ex. 170 at 3.  But unlike the Australian sale, State Street has not introduced sufficient evidence from which a reasonable jury could find that, notwithstanding this contractual limitation, Visbal in fact knowingly sold or licensed the German replica for use in in connection with gender diversity issues in corporate governance or in the financial services sector.  *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of

---

[11] Because the Court resolves this issue based on the fact that Visbal did not "sell, license, or distribute" a replica to Accenture, it need not—and does not—take a position on whether a reasonable jury could find that Accenture constitutes a "financial institution" within the meaning of the Master Agreement.

evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].").  State Street points to two pieces of evidence to that, in its view, require denial of summary judgment.  The first is that, during initial conversations about the German replica, Fisher disclosed to Visbal that his company— Resourceful Humans—"helps the global consulting brand Accenture bring Diversity to their leadership."  Dkt. No. 420 ¶ 452.  And the second is that Visbal at one point said to the replica could be used "as part of [a] multiple pillar campaign on gender diversity."  *Id.*

Neither piece of evidence raises a dispute of material fact from which a reasonable jury could find that Visbal sold the German replica for use connected to gender diversity issues in corporate governance or to the financial services sector.  That Visbal knew that Resourceful Humans, as an organization, helps to bring diversity to the Accenture's leadership says nothing about her knowledge of how the *replica* would ultimately be used.  And Visbal's statement that the replica could be used as part of a gender diversity campaign was accurate:  the Master Agreement specifically gives her the right to take various actions in accordance with the "Gender Diversity Goals," so long as her products are not used in State Street's protected area of gender diversity issues in corporate governance or in the financial services sector.  Her comment approving the use of the work for "gender diversity" purposes, making no mention of corporate governance, accorded with her rights under contract.  And most importantly, as described, Visbal and Fisher signed a contract that precluded the replica's use in areas prohibited by the Master Agreement.  As a result, the German sale did not breach Master Agreement § 7(c)(ii), and Visbal will be granted summary judgment on this issue also.

*Master Agreement § 1(d).*  Finally, Visbal will be granted summary judgment on the issue of whether the German sale breached Master Agreement Section 1(d).  In that clause, Visbal agrees that any replica that she provides to a third party as part of a promotional or corporate event will

give attribution to State Street.  Master Agreement § 1(d).  But as Visbal notes, it is undisputed that no event within Section 1(d)'s meaning ever occurred in connection with the German sale.  *See* Dkt. No. 370 at 24; Dkt. No. 414 at 30.  It is unclear to the Court—and State Street does not explain— how Visbal could have provided attribution at an event that did not take place, much less how State Street was damaged by the failure to include a hypothetical attribution at a phantom event.  Undaunted, State Street nonetheless contends that Visbal's *plan* to deny attribution at an event is sufficient to sustain a breach of this provision.  Dkt. No. 414 at 30.  But that is inaccurate:  the clause only applies to replicas provided "*as part of* any corporate or promotional event."  Master Agreement § 1(d) (emphasis added).  The phrase "as part of" indicates that an event within Section 1(d)'s meaning must in fact occur in order for the Master Agreement to be violated by the failure to give State Street attribution; if no event occurs, no replicas can have been provided "as part of" that event, and no violation is possible.  As a result, Visbal is entitled to summary judgment on this issue also, and the German sale did not violate Section 1(d) of the Master Agreement.

### 4.  Los Angeles Women's March

Finally, the Court will deny Visbal's motion for summary judgment as to whether her use of a resin replica of Fearless Girl to the Los Angeles Women's March in January 2019 and speech next to that replica violated the Master Agreement.  Dkt. No. 370 at 29; *see* Dkt. No. 420 ¶¶ 465, 470.  Visbal does not dispute that this use was one that "required SSGA's approval" under the Master Agreement.  Dkt. No. 420 ¶ 466.  But she never obtained said approval:  after requesting, on December 14, 2018 via email, that she be permitted to "attend and bring a resin of Fearless Girl" to that event, her request was denied on January 4, 2019.  *Id.* ¶¶ 465, 468.  Visbal nonetheless asks this Court to hold that she did not breach the Master Agreement for two reasons.  First, she notes that she requested expedited approval of her request, and argues that State Street was therefore required to respond within fourteen days of her December 14, 2018 request.  Dkt. No. 370 at 29.  And

second, she argues that in considering her request, State Street breached its obligation under Master Agreement Section 17(i) to consider all requests for approval "in good faith" and not to "unreasonably delay[ ]" responses to such requests.  Master Agreement § 17(i).

Neither argument permits the Court to grant Visbal summary judgment on this issue.  It is true that under the Master Agreement, Visbal may, "from time to time" and "on a case by case basis" "request an expedited . . . two-week review" of replicas for non-pre-approved uses.  Master Agreement § 7(e).  And Visbal's December 14, 2018 email made such a request for expedited review.  Dkt. No. 420 ¶ 465.  But the Master Agreement does not specify that State Street is obligated to take any action in response to such a request for expedited review.  *See* Master Agreement § 7(e).  So its failure to respond within the two-week time period did not violate Section 7(e).  And State Street did respond within three weeks of Visbal's request—the time that Section 7(e) sets forth as the window by which it is required to do so.  *See id.* ("When requested by Artist to consider and approve a non-Pre-Approved Use, SSGA shall respond in writing to Artist, with a definitive approval or denial of the request no more than three (3) weeks from receiving sufficient details of the proposed use.").  As a result, it complied with that part of the Master Agreement.

Nor can summary judgment be granted based on Visbal's allegations of bad faith in considering her request to use the replica, because there are disputed issues of material fact about that issue.  State Street says that they needed the full three weeks to review Visbal's request in order to "conduct due diligence since the speakers had not yet been announced and individuals involved in Fearless Girl approvals were away for the holidays."  Dkt. No. 420 ¶ 467.  But Visbal points to emails sent back-and-forth by leaders within State Street the same day as her request, in which one individual pointed out the negatives of granting the request and stated:  "[m]y vote is no."  *Id.*; Dkt. No. 397 Ex. 81 at 2.  Visbal submits, based on that evidence, that State Street in fact decided to deny her request that day, but held off on telling her because they "first wanted Visbal to agree to sell

SSGA additional full-size bronze replicas."  Dkt. No. 420 ¶ 467.

This is a paradigmatic dispute of fact that must be submitted to a jury.  If State Street in fact decided to deny Visbal's request on December 14, but held off on telling her to maintain leverage for future sales, that may very well have represented a bad faith purpose or unreasonable delay in responding to her request.  But Visbal's evidence is simply inconclusive:  the email exchange she points to shows that *a member* of State Street's team did not favor her request on December 14, but it does not show—as would be necessary to grant summary judgment—that State Street had made the organizational decision to deny her request at that time.[12]  As a result, summary judgment will be denied as to whether Visbal's use of the replica at the Women's March breached the Master Agreement.[13]

### c.  Anticipatory Breach/Repudiation

The Court will grant Visbal's motion for summary judgment as to State Street's anticipatory breach claim.  *See* Dkt. No. 370 at 30–31 (Visbal's motion); SAC ¶¶ 151–157 (State Street's claim).  In New York, anticipatory breach is synonymous with anticipatory repudiation.  *See, e.g.*, *Princes Point LLC v. Muss Dev. L.L.C.*, 30 N.Y.3d 127, 133 (2017) ("An anticipatory breach of a contract" is "also known as an anticipatory repudiation.").  And "[t]o support the claim of anticipatory repudiation, there must be 'an unqualified and clear refusal to perform with respect to the *entire contract.*'"  *Highbridge Dev. BR, LLC v. Diamond Dev., LLC*, 888 N.Y.S.2d 654, 656 (3d Dep't 2009) (quoting

---

[12] Visbal also contends that a "whereas" clause on the first page of the Master Agreement "obligate[s]" State Street "to further the Gender Diversity Goals," and that any decision that does not further those goals is accordingly a bad faith consideration under the Master Agreement.  Dkt. No. 370 at 29; *see* Master Agreement at 1 ("WHEREAS, the Parties agree to the terms below to further . . . the 'Gender Diversity Goals.'").  But at most, that argument raises a dispute about what constitutes a good faith purpose to deny a request; as a matter of Second Circuit law, "whereas" clauses are generally not viewed as dispositive.  *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) ("[A]lthough a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, 'it cannot create any right beyond those arising from the operative terms of the document.'" (quoting *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985))).

[13] State Street has clarified that it casts Visbal's website sales as anticipatory breaches, not actual breaches, and so the Court addresses them in Part III(1)(c).  *See* Dkt. No. 414 at 31 n.36.

*O'Connor v. Sleasman*, 830 N.Y.S.2d 377, 379 (3d Dep't 2007)) (emphasis added); *see also Am. List Corp. v. U.S. News & World Rpt., Inc.*, 75 N.Y.2d 38, 44 (1989) (noting that a nonrepudiating party recovers "damages from the repudiating party's breach of the *total* contract") (emphasis added).

That rule entitles Visbal to summary judgment on State Street's anticipatory breach claim because there is no indication that Visbal repudiated the entirety of any of the Agreements.  State Street points to Visbal's sales through her website as forming the foundation of its anticipatory breach claim, and it claims that Visbal's sales (prior to the initiation of this litigation) breached "at least ¶¶ 1(d) and 7(c)(i)–(iii) . . . of the [Master Agreement]."  Dkt. No. 414 at 31; *see* SAC ¶ 153.  It is unnecessary to assess whether State Street's contention that Visbal's website sales breached those provisions of the Master Agreement because State Street does not (and could not) allege that Visbal's website sales evinced "unqualified and clear refusal to perform with respect to the entire contract."  *Highbridge Dev. BR*, 888 N.Y.S.2d at 656; *see also Princes Point*, 30 N.Y.3d at 133 ("For an anticipatory repudiation to be deemed to have occurred, the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'" (quoting *Tenavision, Inc. v Neuman*, 45 N.Y.2d 145, 150 (1978))).  As a result, Visbal is entitled to summary judgment on State Street's anticipatory breach claim.

### d.  Good Faith and Fair Dealing

The Court will also grant Visbal's motion for summary judgment as to State Street's claim for breach of the implied covenant of good faith and fair dealing.  "It is well settled that '[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance.'" *Singh v. City of New York*, --- N.E.3d ---, 2023 WL 3098734, at *2 (N.Y. Apr. 27, 2023) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).  "Broadly stated, the implied covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting

*511 W. 232nd*, 98 N.Y.2d at 153).  However, "[a] claim for violation of the covenant survives . . .

only if it is based on allegations different from those underlying the breach of contract claim, *and* the

relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN*

*Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022) (citing *Harris v.*

*Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)) (emphasis added); *see also The*

*Hawthorne Group, LLC v. RRE Ventures*, 776 N.Y.S.2d 273, 323 (1st Dep't 2004) ("A cause of action

for breach of the implied duty of good faith and fair dealing cannot be maintained where the alleged

breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract.'"

(quoting *Canstar v. Jones Constr. Co.*, 212 A.D.2d 452, 453 (1st Dep't 1995))); *Iskolo Elec. Tower LLC v.*

*Stantec Consulting Servs., Inc.*, 174 A.D.3d 1420, 1424 (4th Dep't 2019) (same); *Deer Park Enters., LLC*

*v. Ail Sys., Inc.*, 57 A.D.3d 711, 712 (2d Dep't 2008) (same).

That rule compels summary judgment on State Street's good faith and fair dealing claim.

The parties dispute whether State Street based its implied covenant claim off of allegations separate

from its breach of contract claims. *Compare* Dkt. No. 370 at 31 (Visbal arguing that the claims are

duplicative because they rely on the same facts), *with* Dkt. No. 414 at 32 (State Street articulating

certain facts that, in its view, were pertinent only to its implied covenant claims).  But to maintain its

implied covenant claim, State Street was obligated not only to argue and provide evidence that this

claim was based on separate facts from its breach of contract claims, but also was required to allege

that its sought damages from this claim are not intrinsically tied to the breach of contract claims.  *See*

*JN Contemp. Art*, 29 F.4th at 128 ("The district court correctly dismissed this [implied covenant]

claim as duplicative.  Even accepting [the plaintiff's] arguments that it set out a different factual basis

for this claim than the factual basis set out in its breach of contract claim, the damages sought for

both claims would be the same.").

State Street has not done so.  Its damages allegations—that "Visbal's actions weakened

SSGA's association with Fearless Girl . . . , caused confusion and mistaken association, and diminished and disrupted SSGA's objectives for [its] campaign," Dkt. No. 414 at 35—are not specific to any of its claims.  *See also* SAC ¶¶ 119–120, 149–150 (seeking the same damages for the alleged breach of the implied covenant as for the alleged breaches of contract:  damages from Visbal's "unjust enrich[ment]" as well as "equitable relief, specific performance, damages, costs and attorneys' fees"); Dkt. No. 397 Ex. 213 at 11 (State Street's amended Rule 26 disclosures, in which it specifies that State Street seeks "damages in the nature of expectation damages for damages suffered by SSGA because of Ms. Visbal's breach of the agreements and/or restitution damages because Ms. Visbal was unjustly enriched by breaching the agreements" without specifying a separate claim for damages based on the violation of the implied covenant).  And the evidence that State Street points to in support of its implied covenant claim is all connected to the potential that Visbal's actions could dilute its brand—the same damages that it seeks through its contract claims.[14]  *See, e.g.*, Dkt. No. 420 ¶¶ 437–440 (arguing that Visbal took steps that would cause the Norwegian sales to violate the Agreements and lead to incursion into State Street's focus on diversity in corporate governance); *id.* ¶ 530 (arguing that Visbal's website could cause confusion about gender diversity in corporate governance).  Because State Street has not shown that it seeks relief through its implied covenant claims different from the relief sought through its contractual claims, its implied covenant claim cannot proceed, and this aspect of Visbal's summary-judgment motion is granted.

### e.  Copyright Infringement

State Street pleads two causes of action for alleged copyright infringement:  direct copyright infringement (claim six) and vicarious copyright infringement (claim seven).  SAC ¶¶ 158–166 (direct infringement); *id.* ¶¶ 167–173 (vicarious infringement).  Visbal has moved for summary judgment on both.  Dkt. No. 370 at 32–35.  "To establish copyright infringement, a plaintiff must prove '1) that

---

[14] As discussed in Part III(4)(a) *infra*, State Street is unable to pursue this theory of damages in any event.

his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful.'" *Spin Master Ltd. v. Alan Yuan's Store*, 325 F. Supp.3d 413, 422 (S.D.N.Y. 2018) (quoting *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014)).  Visbal registered Fearless Girl with the United States office of copyright, and neither party disputes that the visual art embodied by Fearless Girl is protected by a valid copyright.  *See* Dkt. No. 397 Ex. 3.[15]  In the Copyright Agreement, the parties agreed upon the terms of a license permitting State Street to use that copyright:

> Artist hereby grants to SSGA a royalty-free, irrevocable, assignable, worldwide, unencumbered, and exclusive right, license, and privilege to, in connection with (A) gender diversity issues in corporate governance and in the financial services sector, and (B) SSGA and the products and services SSGA offers and/or will offer at any time after the Effective Date:  (i) create, use, display, and distribute two-dimensional copies of the Artwork and Statue, in any medium now known or hereafter developed; (ii) create, use, display and distribute three-dimensional copies of the Artwork and Statue, in any non-physical medium now known or hereafter developed, including, but not limited to holograms and virtual reality; and (iii) display and distribute three-dimensional, physical copies of the Artwork in the form of statuettes and/or mini replicas, that are sanctioned by the Artist.

Copyright Agreement § 1(a).  Because this license provides State Street with an "exclusive right, license, and privilege" to use the copyright in certain areas, State Street has an ownership interest in those areas and may sue others—including Visbal—for copyright infringement.  *Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007) (noting that because "[a]n exclusive license . . . conveys an ownership interest," "an exclusive licensee may sue others for infringement, including the licensor if the licensor infringes on the exclusive right he granted the licensee").  And because there is no dispute that Visbal made copies of Fearless Girl, the only disputed element here is wrongfulness—that is, whether Visbal's actions infringed on State Street's exclusive license.  *See* Dkt. No. 414 at 33 n.38.

---

[15] The parties do dispute the extent of Visbal's ownership of that copyright.  *See, e.g.*, Dkt. No. 406 ¶ 4.  But neither party submits that resolving that dispute is necessary to resolving State Street's copyright claims, because those claims—as described in this section—turn not on Visbal's copyright rights but on the scope of State Street's exclusive copyright license from Visbal.

Because State Street has not adduced any evidence that Visbal undertook actual infringing conduct, Visbal's summary-judgment motion will be granted as to State Street's direct infringement claim. And because State Street has failed to provide evidence supporting a causal relationship between any infringing activity and Visbal's financial benefit, summary judgment will be granted as to the vicarious infringement claim also.

### i. Direct Infringement

Visbal's summary judgment motion will be granted as to State Street's direct infringement claim. That claim is premised on a sale made by Visbal of "a copy of the Fearless Girl artwork in the form of a statuette to an employee of the financial institution Edward Jones which was then used by Edward Jones in connection with gender diversity issues in corporate governance and in the financial services sector." SAC ¶ 162. As described above, under the Copyright Agreement, State Street has an "exclusive right, license, and privilege" to, among other things, "display and distribute three-dimensional, physical copies of the Artwork in the form of statuettes" "in connection with . . . gender diversity issues in corporate governance and in the financial services sector." Copyright Agreement § 1(a). And it asserts that Visbal directly encroached on its license by selling a mini-replica Fearless Girl statuette to an Edward Jones executive named Penny Pennington, who then used the figure at an event involving gender diversity issues in corporate governance. SAC ¶ 163, *see* Dkt. No. 414 at 32–33; Dkt. No. 406 ¶ 317.

This claim fails, however, because the undisputed facts cannot support a reasonable finding that Visbal—as opposed to Pennington—took any action to display or distribute the mini-replica for use in connection with gender diversity issues in corporate governance and in the financial services sector. After Pennington paid Visbal over several installments, Visbal shipped the Fearless Girl replica to Pennington in August 2018. Dkt. No. 406 ¶¶ 321–322. Pennington later displayed it at a February 2019 Women's Conference put on by Edward Jones. *Id.* ¶¶ 327, 329–330. While

Pennington had told Visbal, before purchasing the statuette, that she was an Edward Jones Managing Partner, *id.* ¶ 321, she never told Visbal about her intention (if it existed at the time of purchase) to use the statuette at the Women's Conference, and Visbal neither knew about nor authorized the use of the mini-replica at the conference. *Id.* ¶ 328, 331.

Given those facts, Visbal cannot be held directly liable for copyright infringement. "[T]he copyright act does not expressly render anyone liable for infringement committed by another." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (quoting *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 434 (1984)). As a result, "to establish *direct* liability under . . . the [Copyright] Act . . . [t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal [action] that one could conclude that the [alleged infringer] trespassed on the exclusive domain of the copyright owner." *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008) (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)) (emphasis in *CoStar*). Here, the undisputed facts show that Visbal took no actions that encouraged Pennington to display the statuette at the Edward Jones conference, which is the action that State Street alleges breached its copyright. Indeed, State Street has not adduced any evidence that Visbal even *knew* of the conference, or that she knew of any plans whatsoever that Pennington had for the replica when the sale was made. As a result, Visbal cannot be held directly liable for infringing State Street's copyright.

State Street argues that Visbal can be held liable because "copyright infringement is a strict liability offense." Dkt. No. 414 at 33 (quoting *Spin Master*, 325 F. Supp. 3d at 422). This misunderstands the law. It is true that, because "intent or knowledge is not an element of infringement" under the Copyright Act, "[e]ven an innocent infringer is liable for infringement." *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.*, 807 F.2d 1110, 1113 (2d Cir. 1986). But the key word is *infringer*. Under *Fitzgerald*, an infringer can be held directly liable even if she is unaware that

her actions are infringing. But she cannot be held liable if she has not infringed in the first place. For the reasons just explained, because State Street has failed to show that Visbal took any actions representing display or distribution of the statuette in connection with the areas protected by State Street's exclusive license, Visbal was not an infringer. So she cannot be held directly liable for infringement, and summary judgment will be granted to Visbal on this claim.

### ii. Vicarious Infringement

Visbal's motion for summary judgment will also granted as to State Street's vicarious infringement claim. A person "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer*, 545 U.S. at 930. "To establish liability, a plaintiff must show that the defendant '[1] had the right and ability to supervise the infringing activity and . . . [2] has a direct financial interest in such activities.'" *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 434–35 (S.D.N.Y. 2011) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). "The first element of the test for vicarious liability is satisfied if the plaintiff proves that the defendant had the ability to supervise or control the third parties' infringing activity and failed to do so." *Id.* at 435. "The second element of the vicarious infringement test requires showing a 'causal relationship between the infringing activity and any financial benefit [the] defendant reaps.'" *Id.* (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). Such a causal relationship can be demonstrated either (1) by showing the defendant's direct financial benefit from the sales of the infringing goods, or (2) "by evidence showing that users are attracted to a defendant's product because it enables infringement, and that use of the product for infringement financially benefits the defendant." *Id.*

State Street has adduced evidence that Visbal had the "ability to supervise and control the third parties' infringing activity and failed to do so." *Id.* Visbal had the ability to post disclaimers on her website—through which she conducted most of her sales, including the mini-replica sale to

Pennington—reflecting the limitations on the use of any replica, including that it could not be used in connection with gender diversity issues in corporate governance and in the financial services sector. But she did not include that limitation on her website until April 2019, long after Pennington made her purchase. *See* Dkt. No. 406 ¶¶ 312–314. That Visbal eventually added the language shows that she had the ability to supervise (and warn against) any infringing activity. This is sufficient to demonstrate that the first element of the vicarious liability test is met. *See, e.g.*, *Arista Recs.*, 784 F. Supp. 2d at 435 (holding that because the defendant could have denied access or otherwise supervised or regulated users to prevent infringing purposes, the first vicarious liability element was met).

Nonetheless, summary judgment is warranted here because State Street has failed to provide any evidence supporting its argument that Visbal had a direct financial interest in infringing activities. Visbal has submitted undisputed evidence that Pennington likely purchased the Fearless Girl statuette "for herself" because she "loves art." Dkt. No. 397 Ex. 211 at 56:6–9; *see* Dkt. No. 406 ¶ 325 ("When Pennington purchased the statue from Visbal, she was not acting on behalf of Edward Jones."). Pennington then chose, six months later and without Visbal's knowledge, to place the mini-replica in the Edward Jones atrium during the Women's Conference for a day before moving it back to her office. Dkt. No. 406 ¶¶ 329–330. This evidence demonstrates that there was no "causal relationship between the infringing activity and any financial activity [the] defendant reap[ed]." *Arista Recs.*, 784 F. Supp. 2d at 435. That is because, according to the evidence State Street does not contest, Pennington would have purchased the statuette regardless of her later use of it at the Women's Conference; put differently, using the statuette at the conference was not a but-for cause of Pennington's purchase.

Nor has State Street provided any other evidence that supports a finding that Visbal benefitted directly from purchase of her products for infringing uses, or that any user was attracted

to her products for that purpose.  State Street's brief on this point, tellingly, asserts that "Visbal profits from her unauthorized sales, which she uses for self-promotion to make more sales"—but does not cite to any evidence to support the assertion.  Dkt. No. 414 at 34.  It is certainly not *implausible* that Visbal could have profited from infringing sales; State Street's claim would survive a motion to dismiss.  But on summary judgment, State Street was required to provide admissible evidence to support its financial-benefit argument.  Because it has not done so, summary judgment for Visbal will be granted as to State Street's vicarious infringement claim.

### f.   Trademark Infringement

Visbal's motion for summary judgment will be denied as to State Street's trademark infringement claim.[16]  Visbal's first argument for summary judgment is that, because "contract[s] govern[ ] the relationship between the parties," their "'dispute should be determined by the principles of contract law,' *not* the Lanham Act."  Dkt. No. 370 at 35 (quoting *Silverstar Enters., Inc. v. Aday*, 537 F. Supp. 236, 242 (S.D.N.Y. 1982)).  Section 11(e) of the Master Agreement precludes Visbal from registering "a domain name that incorporates the Mark" Fearless Girl, "except that [she] may create a website for direct sales . . . using the domain 'fearlessgirlsculpture.com' (the 'Website') and retain the domain 'fearlessgirl.us' to redirect to the Website."  Master Agreement § 11(e).  And as part of the predicate for its Lanham Act Claim, State Street notes that Visbal has registered several domain names outside of the two domains allowed by the Master Agreement.  *See* SAC ¶ 94 (noting the allegedly infringing domain names), *id.* ¶ 178 (arguing that the "Infringing URLs . . . constitute[ ] trademark infringement").  So Visbal argues that State Street's Lanham Act claim is duplicative of its contract claims and should be dismissed on that basis.  Dkt. No. 370 at 35.

But because State Street's Lanham Act claim is not based solely on Visbal's registration of

---

[16] State Street's trademark infringement claim arises under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, so the Court uses the phrases "trademark infringement claim" and "Lanham Act claim" interchangeably.

the allegedly infringing domain names, summary judgment as to State Street's Lanham Act claim is not warranted based that claim's overlap with the contract claims. *See, e.g.*, *Gen. Elec. Co. v. Feuz Manufacturing, Inc.*, No. 07-cv-1008, 2008 WL 11355394, at *3–4 (N.D.N.Y. May 15, 2008) (noting that courts have "repeatedly maintained Lanham Act claims alongside breach of contract claims" so long as the "Lanham Act claim is not based *solely* on breach of contract," and collecting cases to that effect (emphasis added)). Specifically, in addition to noting Visbal's registration of domains using the Fearless Girl mark outside of the domains listed in the Master Agreement, State Street also alleges that Visbal is *using* these domains in a manner that is likely to create confusion about "SSGA's entire FEARLESS GIRL mark"—the use of the mark in connection with "gender and diversity issues in corporate governance, including in the financial services sector"—because the allegedly infringing websites "cite[ ] to the same or similar gender diversity studies that have been discussed by SSGA in promotional material for its own Fearless Girl campaign." SAC ¶ 93. These allegations thus go beyond the scope of the Master Agreement—which governs Visbal's right to register domains—and speak to purported customer confusion (which, as discussed below, is the central issue in Lanham Act claims). *See Gen. Elec. Co.*, 2008 WL 11355394, at *4 (noting that because the plaintiff's "Lanham Act claim [was] based on [the defendant's] alleged misrepresentation to [certain] customers that it was authorized to sell and/or distribute" certain items, it went beyond the contractual focus on misuse of intellectual property, "and thus [was] not based solely on [the] contract"); *cf. SilverStar Enters.*, 537 F. Supp. at 241 (dismissing a Lanham Act claim as duplicative of a contract claim because "it appear[ed] that . . . no confusion [would] result" from the defendant's alleged misuse of the trademark). So State Street's Lanham Act will not be dismissed as impermissibly duplicative of its contract action.[17]

---

[17] Visbal did not respond to State Street's arguments on this issue in her reply brief, and has thus "arguably conceded the point" in any event. *Edgar Agents, LLC v. Empire Filings LLC*, No. 22-cv-647, 2022 WL 1128902, at *2 (S.D.N.Y. Apr. 15, 2022); *see also Fieldcamp v. City of New York*, 242 F. Supp. 2d 388, 391 (S.D.N.Y. 2003) ("[T]he failure to provide

Nor is Visbal otherwise entitled to summary judgment on State Street's Lanham Act claim. The Lanham Act imposes "liability for unpermitted 'use in commerce' of another's mark which is 'likely to cause confusion, or to cause mistake, or to deceive,' . . . 'as to the affiliation . . . or as to the origin, sponsorship or approval of his or her goods [or] services . . . by another person.'" *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128 (2d Cir. 2009) (first quoting 15 U.S.C. § 1114, then quoting 15 U.S.C. § 1125(a)(1)(A)).  In accordance with that text, to advance a Lanham Act claim, a "plaintiff must demonstrate that it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 520 (S.D.N.Y. 2009).  Here, there is no dispute that State Street has a valid mark entitled to protection because it

> owns U.S. Trademark Registration No. 5,728,466 (the "'466 Registration") for FEARLESS GIRL in connection with "[p]romoting public interest in and awareness of gender and diversity issues, and issues pertaining to the governance of corporations and other institutions" in International Class 35, and "[f]unds investment; [f]inancial management services; [f]inancial investment advisory services; [f]inancial administration of donor-advised funds for charitable purposes; [a]ccepting and administering monetary charitable contributions; [and] [f]inancial information" in International Class 36.

SAC ¶ 34; *see also* SAC Ex. E (copy of the trademark registration); Dkt. No. 423 ¶ 50 ("SSGA owns the FEARLESS GIRL trademark.").  Instead, Visbal moves for summary judgment because, in her view, State Street has not sufficiently demonstrated "likelihood of confusion."  Dkt. No. 370 at 35.

"[I]n order to succeed in a trademark infringement suit," there must be "a likelihood of confusion," meaning "that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993). "Under the law of this Circuit, courts deciding whether a plaintiff has established likelihood of confusion must consider the eight factors elaborated by Judge Friendly in *Polaroid Corp. v. Polarad*

argument on a point at issue constitutes abandonment of the issue.").

*Elecs. Corp.*"  *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995) (citing 287 F.2d 492 (2d Cir. 1961)).  The factors are:  "(1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap" . . . ; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers."  *Id.*  Because the "inquiry is 'normally factual in nature,'" "'[d]isputes between parties as to trade-mark validity and infringement can rarely be determined satisfactorily on a motion for summary judgment.'"  *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, No. 12-cv-7992, 2014 WL 1855222, at *9 (S.D.N.Y. Jan. 16, 2014) (first quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 116 (2d Cir. 1984), then quoting *Dan–Foam A/S v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 305 (S.D.N.Y. 2007)).

### i.  The *Polaroid* Factors

*Factor One:  Strength of State Street's Mark.*  Because State Street's mark is not particularly strong, the factor cuts against its Lanham Act claim.  "The term 'strength' refers to a mark's 'tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'"  *Arrow Fastener*, 59 F.3d at 391 (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979)).  State Street's trademark, as described above, is for the use of the term "Fearless Girl" in certain fields related to gender diversity issues in corporate governance and financial institutions.  *See* SAC ¶ 34.  But there is no reason to think that the use of Fearless Girl, even in those fields, would necessarily "identify [any] goods sold . . . as emanating from" State Street, and State Street has presented no evidence to support such a conclusion.  *Arrow Fastener*, 59 F.3d at 391.  As the term "Fearless Girl" bears no intrinsic relation to State Street or its products, State Street's trademark is not strong, and this factor cuts against its Lanham Act claim.

*Factor Two:  Degree of Similarity.*  If Visbal's use of the mark is infringing, the mark becomes identical to State Street's mark, so this factor weighs against summary judgment.  "In judging

63

similarity," "courts consider whether the similarity of the marks is likely to cause confusion among potential customers" by assessing "all factors that could reasonably be expected to be perceived by and remembered by potential purchasers," including "the context in which the respective marks are generally presented." *Arrow Fastener*, 59 F.3d at 394 (internal citations and quotation marks omitted). Here, State Street holds a trademark for "Fearless Girl" but has licensed the use of that trademark to Visbal for certain uses. *See* Trademark Agreement § 2. So if, as State Street alleges, Visbal is using the mark in an area that State Street holds the rights to, the two marks are not just similar—they are identical. And State Street has provided evidence supporting its contention that Visbal indeed used the mark in this way. *See, e.g.*, Dkt. No. 420 ¶ 530 (alleging that Visbal used the mark on her website in connection with "statistics and links to studies on gender diversity, the gender pay gap, and women in corporate governance"). To the extent that Visbal used (or is using) the mark in an infringing manner, potential customers would likely be confused by Visbal's use of the mark. As a result, this factor cuts against summary judgment on the Lanham Act claim.

*Factor Three: Proximity of the Products.* Factor three also weighs against granting summary judgment. This factor "is concerned with the competitive distance between the [plaintiff's and defendant's] products," with a focus on "the likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves." *Arrow Fastener*, 59 F.3d at 396 (quoting *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134 (2d Cir. 1982)) (emphasis in *Spring Mills*). If Visbal is or was using the trademark in an infringing manner, as State Street has alleged and supported with at least some evidence, this could certainly cause confusion among consumers as to whether State Street held trademark rights for Fearless Girl in any capacity. Instead, consumers might begin to view any uses of the trademark—including State Street's uses within its license—as indicating that Visbal has some connection to State Street's products, which is the confusion that is the focus of this factor. As a result, the third *Polaroid* factor militates against

64

summary judgment.

*Factor Four:  Likelihood of "Bridging the Gap."*  The fourth factor weighs in favor of summary judgment.  This factor considers the likelihood that the plaintiff will enter the defendant's market.  *Arrow Fastener*, 59 F.3d at 397.  Visbal argues that this factor cannot weigh in State Street's favor because, under the terms of the Master Agreement, State Street "has no right to sell Fearless Girl"— as opposed to display or distribute Fearless Girl—"in any medium at all."  Dkt. No. 370 at 36; *see also* Trademark Agreement § 2(a) (giving Visbal an exclusive license for merchandising use of Fearless Girl).  That argument appears to be accurate.  Even if it were not, and State Street could use Fearless Girl for sales purposes, this factor would cut Visbal's way because State Street has not pointed to any evidence that they in fact intend to enter the market of selling either two-dimensional or virtual three-dimensional replicas of Fearless Girl.  "In order to bridge the gap, plaintiffs must demonstrate that they intend to enter the market of defendants and that prospective customers are aware of this intention."  *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 493 (S.D.N.Y. 2004) (citing *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 582 (2d Cir. 1991)).  While State Street has defended their contractual rights to make two-dimensional copies of Fearless Girl, they have not stated that they intend to sell or distribute them (or any NFT-like product) in any way, and therefore have not shown any intent to enter the Visbal's market.  *See* Dkt. No. 423 ¶ 238 (State Street merely noting that "the Master Agreement does not prohibit SSGA from creating two-dimensional items with Fearless Girl within its exclusive copyrights" (emphasis removed)).  As a result, this factor cuts in favor of summary judgment.

*Factor Five:  Actual Confusion.*  This factor weight in favor of summary judgment because State Street has failed to present evidence of actual confusion.  State Street's expert concerning alleged brand dilution, Dr. Renée Richardson Gosline, chose not to conduct a survey on customer confusion and State Street has not otherwise produced any evidence that any actual purchaser was

confused about what rights State Street has in the term "Fearless Girl."  *See* Dkt. No. 375 Ex. 215 at 82:8–15 (Dr. Gosline stating in her deposition that she neither undertook consumer surveys nor "collected any data directly from consumers or from members of the public in this case").  And while Dr. Gosline herself reached the conclusion that Visbal's actions have and "would likely continue to . . . create confusion around SSGA's role" and rights in Fearless Girl, Dkt. No. 367 Ex. 4 ¶ 20, that conclusion does not represent evidence of "actual confusion affecting purchasers." *Miriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (finding no actual confusion absent any survey evidence or any testimony by any customer about confusion, even where the testimony of "its own salesmen" and other non-consumers alleged confusion).  So the "actual confusion" factor cuts against State Street's Lanham Act claim.

*Factor Six:  Visbal's Good Faith.*  The sixth *Polaroid* factor weighs against summary judgment. "This factor considers 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Arrow Fastener*, 59 F.3d at 397 (quoting *Lang*, 949 F.2d at 583).  State Street has presented evidence both that the initial launch of Fearless Girl generated a large amount of goodwill, and that this goodwill was created in the area in which State Street holds trademark rights (gender diversity issues in corporate governance).  *See, e.g.*, Dkt. No. 423 ¶ 29 (State Street noting its promotion of "its gender diversity message" and its "call for companies to increase women in leadership" in the run-up to the launch of Fearless Girl); *id.* ¶¶ 33–36 (noting the success of the launch of Fearless Girl both generally and for State Street's brand specifically). And State Street has also presented evidence that, it says, evinces Visbal's bad faith purpose to "disassociate SSGA from Fearless Girl."  Dkt. No. 414 at 32; *see, e.g.*, Dkt. No. 420 ¶ 440 (alleging that Visbal disclosed State Street's plans to potential buyers as a means of selling her replicas).[18]  A reasonable jury could conclude that this evidence

---

[18] Visbal disputes State Street's factual assertions relevant to this factor.  But because Visbal has moved for summary

supports a finding that Visbal acted in bad faith in infringing on State Street's trademark.  So this factor cuts against granting summary judgment.  *See also Lang*, 949 F.2d at 583 (noting that "[i]ssues of good faith are generally ill-suited for disposition on summary judgment" (internal citation omitted)).

 *Factors Seven and Eight:  Quality of Defendant's Products and Sophistication of Buyers.*  The final two factors, however, militate in favor of summary judgment.  State Street has not introduced any evidence that the Visbal's allegedly infringing products are "of inferior quality."  *Arrow Fastener Co.*, 59 F.3d at 398.  Indeed, State Street's contention that the public will be unable to tell when Visbal is making unauthorized use of the Fearless Girl mark, *see* Dkt. No. 414 at 35, impliedly admits that Visbal's products are not meaningfully different from—and therefore are no worse than—State Street's comparable uses of the trademark.  Nor does State Street make any argument that the buyers of Visbal's products are unsophisticated.  And as with factor seven, the contentions that State Street makes elsewhere in its briefing would undermine such an argument:  to argue that Pennington's purchase of the Fearless Girl statuette was problematic, for instance, State Street emphasizes her role as an "Partner of Edward Jones."  Dkt. No. 420 ¶ 525.  As a result, both factors seven and eight weigh in favor of summary judgment.

### ii.  Weighing the Factors

 All told, factors one, four, five, seven, and eight point towards summary judgment, while factors two, three, and six point the other way.  But "the evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused."  *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (quoting *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993)).

---

judgment on this claim, the Court resolves the factual disputes in State Street's favor.  *See Johnson*, 680 F.3d at 236.

With that instruction in mind, and also mindful that fact disputes must be resolved in State Street's favor, the Court finds that a reasonable jury could determine that State Street has established a likelihood of confusion. Factor two, in particular, weighs strongly in favor of that conclusion. As discussed above, to the extent Visbal is infringing on State Street's protected trademark in this case, she is doing so with a mark that is *identical* to State Street's. That separates this case from the many in which summary judgment is granted because "the marks are so dissimilar that no question of fact is presented." *Id.* (quoting *Res. Devs., Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991)). To be sure, in order to ultimately succeed on its Lanham Act claim at trial, State Street will need to prove up its theory that Visbal has, in fact, infringed on its trademark. And it will have to do so without the deference on factual disputes that, in keeping with the case's summary-judgment posture, the Court is required to provide here. *See Johnson*, 680 F.3d at 236. But at this stage, and making inferences in its favor, State Street has provided enough evidence for a reasonable jury to conclude that Visbal's infringing uses caused a likelihood of confusion concerning State Street's trademark. That is sufficient to deny Visbal's motion for summary judgment on State Street's Lanham Act claim. *See Guthrie*, 2014 WL 1855222, at *9 (noting that infringement disputes can rarely be determined on summary judgment).

### 2. Visbal's Counterclaims

Visbal brings three counterclaims against State Street: breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful injunction. *See* Amended Counterclaims ¶¶ 66–120. Visbal has moved for summary judgment with respect to aspects of her contract-breach counterclaim and as to her wrongful-injunction counterclaim; State Street has moved for summary judgment on all three counterclaims. *See* Dkt. No. 370 at 38–40 (Visbal's motion); Dkt. No. 389 at 21–40 (State Street's motion). State Street's motion will be granted as to a variety of unpleaded and abandoned aspects of the contract-breach claim, as well as to whether it

breached the thirty-day Cure Period; both parties' motions will be denied, as relevant, concerning the remaining aspects of Visbal's contract claim.  Additionally, State Street's motion will be denied as to Visbal's implied covenant claim, and both parties' motions will be denied concerning the wrongful injunction counterclaim.

### a.   Breach of Contract

In her breach of contract counterclaim, Visbal raised a variety of incidents that, in her view, violated one or more provisions of the Agreements.  State Street's summary judgment motion will be granted as to some aspects of Visbal's claim because she failed to plead them in her counterclaim or because, through the course of her briefing, she abandoned them by failing to respond to State Street's arguments.  As to the remaining aspects of this claim, both parties' summary motions will be denied (a) concerning whether State Street violated Master Agreement §§ 1(a)–(b) by failing to provide Visbal with proper attribution, and (b) concerning whether State Street violated Master Agreement § 4(d) by failing to complete a purchase of miniature replicas from Visbal in good faith.  Further, State Street's motion for summary judgment will be (a) granted concerning its purported breach of the thirty-day Cure Period, but (b) denied as to whether it breached the Master Agreement's mediation provision.

### i.   Unpleaded or Abandoned Aspects of Visbal's Claim

State Street is entitled to summary judgment concerning a number of Visbal's allegations because of deficiencies in Visbal's pleading and briefing.  First, Visbal argues that State Street breached the Master Agreement by creating unauthorized three-dimensional replicas of Fearless Girl.  Dkt. No. 370 at 39.  But as State Street notes, these allegations are not contained in Visbal's counterclaims.  Dkt. No. 414 at 39; *see* Amended Counterclaims ¶¶ 66–100.  Visbal contends that consideration of these allegations is nonetheless proper because she "has always alleged SSGA breached the MA in multiple ways."  Dkt. No. 422 at 20; *see* Amended Counterclaims ¶ 68 ("SSGA

has without justification repeatedly breached its obligations under the Agreements in a number of material respects."). But "[i]t is well settled that a party may not amend its pleadings in its briefing papers." *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013). In keeping with that principle, "[a] plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings." *Id.* at 224; *see also First Am. Commercial Bancorp, Inc. v. Saatchi & Saatchi Rowland, Inc.*, 865 N.Y.S.2d 424, 427–28 (4th Dep't 2008) (holding that a party may not simply allege a general breach of contract and, later on, sort out the specific breach that it intends to litigate). So summary judgment will be granted to State Street concerning Visbal's allegations of unauthorized three-dimensional replicas.[19]

In addition, Visbal has abandoned a number of aspects of her breach of contract claim by failing to defend them in her opposition to State Street's briefing. "[W]hen a counseled party moves for summary judgment, 'a partial response [by the non-movant] arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.'" *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (citing *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014)). That is because generally, "a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others." *Id.* (citing *Jackson*, 766 F.3d at 196). So a court may "infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Id.* (citing *Jackson*, 766 F.3d at 198).

Here, State Street moved for summary judgment as to all aspects of Visbal's breach of contract claim. *See* Dkt. No. 389 at 21–33. But in her briefing, Visbal only defended its allegations

---

[19] In a last-ditch effort to save this aspect of her claim, Visbal argues that "Federal Rules of Civil Procedure 15(b) or 16 permit amendment to conform the pleadings to the evidence." Dkt. No. 422. But courts in this circuit have rejected the use of those rules to conform the pleadings to the evidence, and Visbal provides no argumentation—or precedent—in support of her argument that this Court should deviate from that practice. *See, e.g.*, *Myers v. Moore*, 326 F.R.D. 50, 60–65 (S.D.N.Y. 2018) (holding that "Rule 15(b) does not authorize this Court to conform the Amended Complaint to the evidence adduced during discovery" and that Rule 16 likewise did not apply absent a showing of good cause).

concerning (a) State Street's failure to give attribution to Visbal, (b) State Street's bad faith failure to purchase Fearless Girl miniatures, and (c) State Street's breaches of the thirty-day cure period and mediation provisions.[20] *See* Dkt. No. 404 at 13–17, 33–36.  As a result, State Street will be granted summary judgment on all other aspects of Visbal's breach of contract claim, including whether State Street (a) violated Master Agreement § 2(b) by denying Visbal access for a three-dimensional scan of the Statue, Dkt. No. 389 at 22–24; (b) violated Master Agreement §§ 1(a)–(b) by failing to provide attribution in email signatures or on a State Street video, *id.* at 24, 27–28, (c) violated Master Agreement § 2(a) by failing to inform Visbal of a plan to move the Statue to Ireland, *id.* at 28–29; (d) violated Master Agreement § 2(c) by failing to consult Visbal about refinishing the Statue, *id.* at 29; or (e) violated Master Agreement § 17(b) by failing to attend an annual meeting, *id.* at 30–31.[21]

### ii.  Remaining Aspects of the Claim

With her unpleaded and abandoned allegations removed, the Court now turns to considering Visbal's remaining breach of contract allegations.

*Failure to Attribute.*  Both party's motions for summary judgment will be denied concerning whether State Street's failure to give Visbal attribution on the bronze plaque placed at Fearless Girl's original Bowling Green location or State Street's alleged failure to attribute Fearless Girl to Visbal from December 2018 to April 2019 at the NYSE violated Master Agreement §§ 1(a)–(b).  *See* Amended Counterclaims ¶¶ 69–72, 77–78.  Under Section 1(a) of the Master Agreement,

SSGA agrees that it will give attribution to Artist as the sculptor of the Artwork

---

[20] Visbal also defended her allegations concerning State Street's decision to deny her approval to use a replica at the Los Angeles Women's March.  *See* Dkt. No. 404 at 34–36.  But her briefing makes clear that Visbal does so in the context of defending her implied covenant of good faith and fair dealing claim.  Her briefing containing these allegations comes in response to State Street's motion for summary judgment as to Visbal's implied covenant claim, and relies on covenant-based caselaw.  *See id.* (citing implied covenant law from *S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 511 (S.D.N.Y. 2021), and *InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 566 (S.D.N.Y. 2021)).  So it will be considered in the implied covenant portion of this order.  *See infra* Part III(2)(b).  In any event, the distinction is semantic:  the evidence provided concerning the Women's March would support a breach of contract claim just as it supports an implied covenant claim.

[21] Visbal also did not raise any of these issues in her affirmative summary-judgment briefing, further confirming that the Court may properly deem them abandoned.  *See* Dkt. No. 370 at 38–39; Dkt. No. 422 at 19–20.

> wherever and whenever practicable, such as, for example, in written and visual
> materials displaying the Artwork prepared or authorized by SSGA, in official
> statements made by SSGA, and plaques placed with SSGA Replicas (defined below)
> of the Statue. . . .  The Parties understand and agree that there may be places where
> attribution is not possible or practicable (e.g., in e-mail signatures).

Master Agreement § 1(a).  After the Statue was taken from Bowling Green to the NYSE, State Street

placed a plaque at the Statue's former site—but without attribution to Visbal.  Dkt. No. 406 ¶ 210.

State Street argues that it was not required to provide attribution on the plaque because, as there was

no statue there, the plaque was not placed with a State Street replica.  Dkt. No. 389 at 24–25.  But

giving attribution to Visbal on plaques placed with replicas is merely one *example* of what State Street

must do under Section 1(a).  That provision's baseline command is that State Street must "give

attribution to Artist as the sculptor of the Artwork *wherever and whenever practicable*."  Master

Agreement § 1(a) (emphasis added).  Without additional details about the plaque's creation, whether

or not it would have been practicable to credit Visbal on the plaque placed at Bowling Green after

the Statue's departure is a question of fact for the jury, precluding summary judgment to either party.

Similarly, the parties have introduced conflicting evidence as to whether the failure to

attribute the statue to Visbal from December 2018 to April 2019 when it was moved to the NYSE

was due to State Street's actions or DOT regulations.  *Compare* Dkt. No. 406 ¶ 214 (State Street

alleging that it was informed that DOT would not allow a plaque), *and* Dkt. No. 396 ¶¶ 193–194

(State Street detailing efforts to get a sign installed at the Statue's new location), *with* Dkt. No. 406

¶ 215 (Visbal alleging that State Street failed to confirm whether DOT's policy actually precluded

installation of a plaque), *and* Dkt. No. 396 ¶ 193 (Visbal disputing whether State Street made

practicable or commercially reasonable efforts to install a sign).  Resolving these factual disputes is

necessary to determining whether it was "practicable" for State Street to attribute the Statue to

Visbal during this period, and so summary judgment must be denied to both sides on this issue also.

For similar reasons, summary judgment must be denied concerning Visbal's Section 1(b)

claims. That section provides that "SSGA will attempt attribution with good faith efforts and will use commercially reasonable efforts to correct omission upon notice from Artist." Master Agreement § 1(b). As an initial matter, that provision necessarily ties back to Section 1(a)—if State Street is not obligated to give attribution to Visbal (because doing so would not be practicable), then there is no 'omission' to correct. And the parties' disputes concerning 'practicability,' moreover, directly relate to whether State Street used commercially reasonable efforts to provide Visbal attribution. *See, e.g.,* Dkt. No. 396 ¶¶ 193–194. As a result, a fact-finder must evaluate whether State Street breached Master Agreement §§ 1(a)–(b), and summary judgment is denied to both parties on those aspects of Visbal's breach of contract claim.

*Failure to Purchase Miniatures.* Summary judgment will also be denied to both parties as to whether State Street breached its obligations under Section 4(d) of the Master Agreement. That section reads, as relevant,

> SSGA hereby commissions Artist, and Artist agrees, to create 300 miniature three-dimensional reproductions of the Artwork. The price and specifications of such reproductions shall be negotiated in good faith between the Parties after the Effective Date.

Master Agreement § 4(d). It is undisputed that this purchase was never completed. *See* Dkt. No. 406 ¶¶ 194–200. But in what should by now be a familiar refrain, the parties dispute the reason why the purchase fell through. Visbal submits evidence to support its argument that State Street was only interested in buying full-size replicas and tried to use Visbal's desire to complete the mini-replica purchase as leverage to get more full-size replicas; she further contends that these actions represented bad faith negotiation that violated Section 4(d). *See* Dkt. No. 404 at 34, Dkt. No. 406 ¶¶ 194–200. State Street, by contrast, submits contrary evidence suggesting that the failure to hammer out pricing for the miniatures was the result of Visbal's delays. *See* Dkt. No. 406 ¶¶ 555–

557.[22]  Whether State Street breached its duty to negotiate the purchase of the 300 miniatures,

therefore, turns on issues of fact disputed by the parties, necessitating the denial of both parties'

motions for summary judgment on this part of Visbal's claim.

Breach of Cure Period and Mediation Provisions.  Finally, State Street's motion for summary

judgment will be partially granted and partially denied as to Visbal's claims that State Street breached

the cure period and mediation provisions in Section 14 of the Master Agreement.[23]  Those

provisions were outlined in detail above when considering their effect on State Street's affirmative

claims.  See supra Part III(1)(b)(i).  As explained in that section, the February 14, 2019 letter from

Visbal's then-counsel made clear that she was going to proceed with the Australian sale, which

rendered any cure period futile.  See Sunshine Steak, 135 A.D.2d at 892; Dkt. No. 375 Ex. 203.  But—

as also explained in more detail above—State Street did not make any attempt to comply with

Section 14's mediation provision, and the parties' disagreement as to whether Visbal was breaching

do not render use of that provision futile.  See A. Raymond Tinnerman, 2012 WL 1191617, at *2; Dkt.

No. 406 ¶ 257.  And the Court has determined, moreover, that the proper remedy for State Street's

breach of the mediation provisions is to permit Visbal to pursue damages from that breach, rather

than to bar State Street's affirmative claims.  See supra Part III(1)(b)(i); see also Dkt. No. 404 at 36

(Visbal alleging damages flowing from the failure to mediate).  So while State Street's motion for

summary judgment is granted as to Visbal's breach claim related to the failure to comply with the

thirty-day Cure Period, the motion is denied as to the failure to comply with the mediation

---

[22] State Street also contends that Visbal's argument—that State Street violated Section 4(d)'s good-faith negotiating requirement—should be rejected as unpleaded.  Dkt. No. 414 at 38–39.  The Court disagrees:  while Visbal did not use the precise words "good faith" in her Amended Counterclaims, her factual assertions put State Street sufficiently on notice of the alleged basis for her Section 4(d)-related contentions.  See Amended Counterclaims ¶ 87 (noting that State Street wrongly breached Section 4(d) "by never placing an order for the 300 miniature three-dimensional reproductions despite Visbal's several requests to do so"); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) ("[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.").
[23] Visbal did not move for summary judgment on this aspect of her breach of contract claim.  See Dkt. No. 370 at 38–39.

provision.

### b. Good Faith and Fair Dealing

State Street has moved for summary judgment as to Visbal's implied covenant of good faith and fair dealing claim.  Dkt. No. 389 at 33–35.  That aspect of State Street's motion will be denied.  As outlined above in considering State Street's analogous claim, "the implied covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Singh*, 2023 WL 3098734, at *2 (N.Y. Apr. 27, 2023) (quoting *511 W. 232nd*, 98 N.Y.2d at 153).  And "[a] claim for violation of the covenant survives . . . only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract."  *JN Contemp. Art*, 29 F.4th at 128.

Visbal alleges that State Street improperly denied her request to use Fearless Girl at the 2019 Los Angeles Women's March.  Dkt. No. 404 at 34–35.  She has provided evidence in support of her view that State Street rejected this request even "though the event focused on 'all aspects of women's rights and empowerment' because it was 'not aligned with [SSGA's] own message around women in corporate leadership roles.'"  Dkt. No. 423 ¶ 400 (quoting Dkt. No. 397 Ex. 81 at 2).[24] And she alleges that this reason to reject the request conflicts with a purpose of the Master Agreement, which is to support "Gender Diversity Goals" at a broader level than State Street's corporate-governance focus.  *See* Master Agreement at 1 ("WHEREAS, the Parties agree to the terms below to further their mutual goals of using the Artwork to support women in leadership positions, empowerment of young women, women's education, gender equality, the reduction of prejudice in the work place through education, equal pay for women, and the general well-being of

---

[24] State Street has provided contrary evidence about their motivations for denying this request, *see* Dkt. No. 423 ¶ 400, but factual disputes must be viewed in Visbal's favor given State Street's status as the movant for summary judgment on this claim.  *See Johnson*, 680 F.3d at 236.

women (collectively, the 'Gender Diversity Goals') . . . ."); *see also* Dkt. No. 423 ¶ 605 (evidence of State Street's internal guidelines, which Visbal argues limit the use of Fearless Girl to only a subset of the Gender Diversity Goals).  Moreover, Visbal has provided evidence—though disputed by State Street—that a reasonable jury could find supports an inference that State Street in fact decided to decline her request on or around December 14, 2018, but did not tell her until January 4, 2019, in order to leverage Visbal into selling them additional full-size replicas.  Dkt. No. 420 ¶¶ 467–468.

It is true, as State Street notes, that 'whereas' clauses cannot create contractual rights. *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001).  But the Master Agreement includes a duty on the part of each party to consider requests by the other "in good faith," without further explaining what constitutes good or bad faith.  Master Agreement § 17(i).  And finding that "good faith" evaluation of a request must at least consider of whether the request would further the Gender Diversity Goals would not contradict any other express language in the contract.  *Cf. Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("The duty of good faith and fair dealing . . . is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship.'" (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983))).  Making reasonable inferences in Visbal's favor, a jury—if it accepted her facts—could find both that a reasonable person in Visbal's position would have understood that State Street was required to consider the Gender Diversity Goals to evaluate requests in "good faith," and that State Street did not adequately comply with the Master Agreement's good-faith language in denying the use at the Women's March—both because of the failure to consider the Gender Diversity Goals and because of the delay in telling Visbal of their decision (if either of those facts are true).

In addition, State Street's allegedly bad-faith refusal to allow Visbal to use Fearless Girl at the Women's March is based on distinct facts from, and seeks different damages than, her breach of contract allegations.  *See JN Contemp. Art*, 29 F.4th at 128.  The remaining aspects of Visbal's breach

of contract claims, as detailed above, involve alleged failures to attribute, purported lost miniature sales, and a breach of the Master Agreement's mediation provision—separate incidents from State Street's decisions to decline Visbal use of Fearless Girl.  And with the inferences made in her favor, Visbal has introduced evidence from which a reasonable jury could find that she lost sales due to State Street's refusal to allow additional use of Fearless Girl and the friction that this created between the parties.  *See* Dkt. No. 404 at 38 (Visbal noting that she seeks "lost sales" allegedly traceable to State Street's rejection of "her requests to use Fearless Girl for the Gender Diversity Goals"); Dkt. No. 423 ¶ 631 (email from Fisher to Visbal noting his discomfort with the disputes between State Street and Visbal, and inquiring about returning the German replica); Dkt. No. 397 Ex. 38 at 7–12 (Visbal listing potential purchasers of full-size Fearless Girl replicas).[25]  In sum, because Visbal has submitted sufficient evidence from which a reasonable jury could find that State Street violated the implied covenant of good faith and fair dealing, State Street's summary-judgment motion on this issue will be denied.[26]

### c.  Wrongful Injunction

Finally, the Court will deny both parties' motions for summary judgment on Visbal's wrongful injunction claim.  *See* Dkt. No. 370 at 40 (Visbal's motion); Dkt. No. 389 at 38–40 (State Street's motion).  "A party has been wrongfully enjoined under Fed. R. Civ. P. 65(c) if it is ultimately found that the enjoined party had at all times the right to do the enjoined act." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1054 (2d Cir. 1990) (cleaned up)).  Visbal asserts that, through the Court's March 7, 2019 order, she was wrongfully enjoined from taking actions with respect to the German replica and from engaging in sales through her website; she seeks actual and

---

[25] At trial, of course, Visbal will have to *prove* that she lost sales traceable to State Street's violation of the implied covenant.  By allowing the claim to proceed at this time, the Court merely recognizes that Visbal *could* prove up this argument.

[26] Because the Court sustains Visbal's implied covenant claim based on the denial of approval for the Los Angeles Women's March, it need not assess Visbal's other allegations in support of this claim.

consequential damages that she asserts flowed from this injunction.  Amended Counterclaims ¶¶ 114–120; *see* Dkt. No. 27 (Court's order); *see also* Dkt. No. 79 (amended preliminary injunction).

State Street first asserts that the wrongful injunction counterclaim should be dismissed because it can only be granted upon a determination, made "in hindsight in light of the ultimate decision on the merits after a full hearing, [that] the injunction should not have issued in the first instance." *Blumenthal*, 910 F.2d at 1054; *see* Dkt. No. 389 at 39–40.  That rule does require denial of Visbal's motion for summary judgment on this claim—she cannot recover for wrongful injunction until after an "ultimate decision" is made in this case.  But it does not require the granting of State Street's motion.  As Visbal notes, she is seeking an ultimate determination on the merits.  Dkt. No. 404 at 39.  And State Street cites no authority to support its theory that the wrongful injunction counterclaim must be severed from Visbal's counterclaims now, only to (potentially) be reasserted after the lawsuit otherwise ends on the merits.  So its summary judgment claim will not be granted on this basis.

Nor will State Street's summary-judgment motion be granted on the basis that, as it argues, Visbal cannot support this claim as a matter of law.  It is true that where—as here—there is no bond issued in connection with an injunction, "a party may not recover for damages sustained by a wrongfully issued injunction, unless the suit was brought maliciously and without probable cause." *Factors, Etc., Inc. v. Pro Arts, Inc.*, 562 F. Supp. 304, 306 (S.D.N.Y. 1983).  But Visbal has submitted evidence and argumentation in support of its claim that State Street misrepresented its knowledge about certain aspects of both the German replica sale and the website sales, which could in turn support findings of maliciousness and lack of probable cause.  *See* Dkt. No. 404 at 40.  Though State Street has submitted contrary facts and arguments, *see* Dkt. No. 429 at 19–20, these material disputes of fact preclude the Court from determining now whether Visbal could prove up her wrongful injunction claim after an "ultimate decision on the merits" here.  *Blumenthal*, 910 F.2d at 1054.  So

both parties' summary-judgment motions as to Visbal's wrongful injunction counterclaim will be denied.

### 3. Visbal's Affirmative Defenses

State Street has moved for summary judgment on nine of Visbal's affirmative defenses. Dkt. No. 389 at 389 at 18.[27] Visbal is no longer asserting two of those defenses (her first and second). Dkt. No. 404 at 29 n.10. And a third defense—copyright misuse—is now moot because, as described above, the Court has granted summary judgment to Visbal on State Street's copyright infringement claims, and copyright misuse is a defense to such claims. *See supra* Part III(1)(e); *Michael Greco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 510–11 (S.D.N.Y. 2018) (noting that the defense is relevant to "infringement claims"). As to the remaining six affirmative defenses on which State Street has moved for summary judgment, its motion will be denied with respect to Visbal's third, tenth, and eleventh defenses, but will be granted as to her twelfth, thirteenth, and nineteenth defenses.

*Visbal's Third Affirmative Defense.* State Street's motion for summary judgment will be denied as to Visbal's third affirmative defense. That defense asserts that "[t]he purported claims for relief in the Second Amended Complaint are barred in whole or part by the doctrine of estoppel, unclean hands, waiver, or any other equitable doctrine." Dkt. No. 243 at 17. In her briefing, Visbal has clarified that she is raising this as an unclean-hands defense in response to State Street's Lanham Act claim. Dkt. No. 404 at 29–30.

To sustain an unclean-hands defense, a defendant must provide evidence to support an

---

[27] In a footnote, State Street suggests that "all" of Visbal's affirmative defenses should be stricken. Dkt. No. 389 at 18 n.21. But that is an insufficient basis to assert an argument. *See, e.g., In re Bernard L. Madoff Inv. Secs. LLC*, No. 22-cv-6561, 2023 WL 395225, at *5 (S.D.N.Y. Jan. 25, 2023) (noting a consensus that arguments made only in a footnote are deemed forfeited); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 218 (S.D.N.Y. 2022) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (cleaned up)). And State Street appears to have affirmatively abandoned this argument in any event. *See* Dkt. No. 429 at 11 n.27 (State Street noting in its reply brief that it did not move on certain of Visbal's affirmative defenses).

argument that the plaintiff has engaged in "inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks." *Laugh Factory Inc. v. Basciano*, 608 F.Supp.2d 549, 560 (S.D.N.Y. 2009).  Visbal has done so.  While State Street owns the Fearless Girl trademark, *see* Dkt. No. 423 ¶ 50, it has exclusively licensed the trademark to Visbal for use in both "three-dimensional copies of the Statue in various mediums and sizes in connection with the offer of goods for sale ('Merchandising')," and "two-dimensional copies of the Statue in various mediums and sizes in connection with Merchandising."  Trademark Agreement § 2(a).  And Visbal alleges (and points to evidence) that State Street may have used the Fearless Girl logo on t-shirts, pins, and other "swag" that may have been offered for purchase.  Dkt. No. 404 at 30; *see* Dkt. No. 406 ¶¶ 180–182.  Given that a consumer might be confused—if State Street in fact used the logo on merchandise and offered products with the logo for sale—into thinking that Visbal's merchandising license did not exist, a reasonable jury could find that State Street's conduct infringed upon Visbal's license in an "inequitable" manner with a "material relation to the equitable relief that plaintiff seeks" through its Lanham Act claim.  *Laugh Factory*, 608 F. Supp. 2d at 560.  As a result, State Street's summary-judgment motion is denied as to Visbal's third affirmative defense.

*Visbal's Tenth and Eleventh Affirmative Defenses.*  State Street's summary-judgment motion will also be denied as to Visbal's tenth and eleventh affirmative defenses.  Those defenses state that "[t]he purported claims for relief in the Second Amended Complaint are barred in whole or in part" both because State Street engaged in "material breach of the Master Agreement, Copyright License Agreement, and Trademark License Agreement" and "because Plaintiff breached the implied covenant of good faith and fair dealing with respect to the Master Agreement, Copyright License Agreement, and Trademark License Agreement."  Dkt. No. 243 at 18.  As discussed above, aspects of Visbal's breach of contract and implied covenant claims will go to trial, which could support this defense.  So State Street's first argument that Visbal's defenses cannot be maintained because State

Street definitively did not breach the Agreements must be rejected.

State Street nonetheless argues that even if the Court permits these claims to go to trial, none of its purported breaches can be considered material.  Dkt. No. 389 at 19–20.  "Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract."  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).  And under New York law, "the question of the materiality of a breach 'is usually a question of fact and should be decided as a matter of law only where the inferences are certain.'"  *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) (quoting *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 380 (S.D.N.Y. 2014)).  Here, it is at least possible that a reasonable jury could find that State Street's purported breaches—failure to provide attribution, failure to allow mediation, failure to complete the sale of miniature replicas, and not allowing use of a full-size replica at the Los Angeles Women's March—represent breaches that "go to the root of the agreement between the parties" and are accordingly material.  *Process Am.*, 839 F.3d at 136 (quoting *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)).  As a result, State Street's motion for summary judgment on Visbal's tenth and eleventh affirmative defenses is denied.

   *Visbal's Twelfth and Thirteenth Affirmative Defenses.*  State Street's motion will be granted as to Visbal's twelfth and thirteenth affirmative defenses.  These defenses assert that "[t]he purported claims for relief in the Second Amended Complaint are barred in whole or in part" either because the Agreements "are indefinite and irreconcilably ambiguous at least because each agreement contains so many vague and ambiguous terms that they are not capable of reasonable interpretation and/or there was no meeting of the minds to create a valid and binding contract," or because the Agreements "contain numerous terms for which the parties have dramatically different

81

interpretations such that there was no sufficient meeting of the minds or mutual assent to create a valid and binding contract." Dkt. No. 243 at 18–19. Neither of these defenses assert that Visbal did not, in fact, accept any of the Agreements. *See* Dkt. No. 396 ¶ 57 (Visbal signed the Agreements and stated: "Terms accepted"). Rather, they both hinge on the contention that "[s]hould the Court find terms and clauses in the MA ambiguous," it should allow Visbal to argue to the jury that there was no meeting of the minds as to one or more of the Master Agreement's material terms. Dkt. No. 404 at 31.

But Visbal has not shown that any of the terms she points to were, in fact, ambiguous. Whether an "agreement is ambiguous" is "an issue of law for the courts to decide." *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008). And "if a contract on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract." *Selective Ins. Co. v. County of Rensselaer*, 26 N.Y.3d 649, 655 (2016) (internal quotation marks and citation omitted). Visbal points to four alleged ambiguities in the Master Agreement: (1) the meaning of "financial institution" in Section 7(c)(i), (2) the meaning of "brand" as used several places in the contract, (3) when attribution was required under Section 1(d), and (4) whether State Street was required to approve uses of Fearless Girl in service of the Gender Diversity Goals. Dkt. No. 404 at 31.

None of these represent actual ambiguities. "Financial institution" has a clear, unambiguous meaning in both legal and practical use that is flatly inconsistent with Visbal's assertion that it included "only SSGA's competitors." *Id.*; *see Financial Institution*, Black's Law Dictionary (10th ed. 2014) (defining "financial institution" as "[a] business, organization, or other entity that manages money, credit, or capital"); *Financial Institution*, Merriam-Webster Dictionary Online (updated Apr. 23, 2023) ("[A] company that deals with money (as a bank, savings and loan, credit union, etc.)."). The term "brand" is not ambiguous because the parties defined it clearly in Exhibit C to the Agreements. *See* Dkt. No. 381 Ex. 30 at 23 (the "No 'Branding' Provision"). The attribution

requirement in Section 1(d) requires attribution at "any promotional or corporate event"; as discussed earlier, these words have widely-understood and ascertainable meanings. *See Promotional*, Merriam-Webster Dictionary Online (updated Apr. 23, 2023) ("[T]he act of furthering the growth or development of something."); *Corporate*, Merriam-Webster Dictionary Online ("[O]f or relating to a corporation."). And Visbal's contention that State Street was *required* to approve events if they furthered the Gender Diversity Goals cannot be reconciled with the discretion provided in Section 17(i) of the contract. *See* Master Agreement § 17(i) (requiring the parties to consider approval requests in "good faith"); *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 480 (S.D.N.Y. 2016) (finding that the term "good faith" is not ambiguous because it "is a legal term that has a well understood meaning").[28]

Tellingly, Visbal does not proffer any evidence or argumentation—beyond her assertions—that these or any other terms are ambiguous. Instead, she urges the Court to find that State Street's "interpretation of the contract" is "entirely at odds with the parties' negotiation." Dkt. No. 404 at 31. But that represents a request for the Court to consider extrinsic evidence of the run-up to the Agreements' signing—and "extrinsic evidence may not be considered unless the document itself is ambiguous." *Consedine*, 12 N.Y.3d at 293. In sum, because Visbal has not shown that any material provision of the contract is ambiguous, State Street will be granted summary judgment on her twelfth and thirteenth affirmative defenses.

*Visbal's Nineteenth Affirmative Defense.* Finally, State Street's motion will be granted as to Visbal's nineteenth affirmative defense.[29] This defense asserts that "[t]he purported claims for relief

---

[28] This conclusion is not at odds with the Court's earlier determination that State Street's motion for summary judgment should be rejected as to Visbal's implied covenant of good faith and fair dealing claim. *See supra* Part III(2)(b). As explained, a reasonable jury could examine whether State Street considered the Gender Diversity Goals in rejecting the Women's March request as part of the jury's broader inquiry about whether State Street's decision was made in good faith. But the parties' dispute on that issue represents their "differing views as to how" the term good faith "should be applied," not an argument that the term itself differs from its "well understood meaning." *Wilder*, 220 F. Supp. 3d at 480.

[29] Visbal has cross-moved with respect to this defense. Dkt. No. 370 at 19. For the reasons provided in this section,

in the Second Amended Complaint are barred in whole or in part because Plaintiff failed to perform conditions precedent, concurrent, or subsequent under the relevant agreements." Dkt. No. 243 at 20. Visbal cites two clauses of the Master Agreement to support this defense. First, she references the Cure Period and mediation provision in Master Agreement § 14. Dkt. No. 404 at 30–31. But as described above, State Street did not breach the Cure Period, and while it did breach the mediation provision, the remedy for that breach is not—as claimed in this defense—barring State Street's affirmative claims. *See supra* Part III(1)(b)(i). So that breach cannot support this affirmative defense.

Second, Visbal points to State Street's duty to exercise good faith in responding to requests for approval articulated in Master Agreement § 17(i) as a basis for this defense. Dkt. No. 404 at 31. But "New York respects a presumption that terms of a contract are covenants rather than conditions." *Sohm v. Scholastic Inc.*, 959 F.3d 39, 46 (2d Cir. 2020) (quoting *Graham v. James*, 144 F.3d 229, 237 (2d Cir. 1998)). And Visbal does not attempt to explain why the language used in Section 17(i) should be construed as a condition precedent. *See* Master Agreement § 17(i) (stating that requests for approval "shall be considered in good faith" and that any responses "shall not be unreasonably delayed"); *Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 204 A.D.3d 72, 86 (1st Dep't 2022) (distinguishing "if," "unless and until," and "null and void"—all of which are "traditional unmistakable forms of conditional language"—from "shall," which is not). So that provision also cannot support this defense, and as to the defense, State Street's summary-judgment motion is granted.

### 4. Damages

Visbal and State Street have both moved for summary judgment concerning whether the opposing party incurred any damages. Dkt. No. 370 at 38 (Visbal's motion); Dkt. No. 389 at 35–38 (State Street's motion). Both motions will be granted in part.

---

Visbal's summary-judgment motion on this affirmative defense is denied.

### a.  State Street's Damages

Visbal has moved for summary judgment concerning State Street's ability to recover consequential damages related to (a) brand dilution traceable to Visbal's purported breaches of contract, and (b) attorneys' fees related to the parties' litigation in Australia.  *See* Dkt. No. 370 at 38; Dkt. No. 422 at 17–19.[30]  Her motion will be granted with respect to State Street's brand-dilution damages theory, but rejected as to the Australian-litigation-fees theory.

In New York, damages resulting from a breach of contract are categorized as either general or consequential damages.  *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000).  "A plaintiff is seeking general damages when he tries to recover the value of the very performance promised."  *Id.* (internal citation omitted).  "[C]onsequential damages, on the other hand, seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach."  *Id.* (quotation marks and internal citation omitted).

The damages that State Street seeks connected to how "Visbal's actions weakened SSGA's association with Fearless Girl" are consequential damages.  *See* Dkt. No. 397 Ex. 213 at 11 (State Street's Rule 26(a) disclosures, noting that it seeks "consequential damages based on the significant damage caused to SSGA's client and business relationships by Ms. Visbal's breaches"); *see also, e.g.*, *Jill Stuart (Asia) LLC v. Sanei Int'l Co., Ltd.*, No. 12-cv-3699, 2013 WL 3203893, at *4 (S.D.N.Y. June 17, 2013) (categorizing degradation to the plaintiff's brand as consequential damages).  To recover consequential damages under New York law, a party must show that "[i] the damages were caused by the breach; [ii] the damages are provable with reasonable certainty; and [iii] the damages were within the contemplation of the parties at the time of contract."  *Abraham v. Leigh*, 471 F. Supp. 3d

---

[30] Although Visbal styles her motion as one concerning *all* of State Street's damages theories, her briefing does not address several theories.  In addition to the categories above, State Street has claimed damages (a) based on Visbal's alleged unjust enrichment and (b) attorneys' fees related to this litigation under the prevailing-party clause in the Master Agreement.  *See* Dkt. No. 397 Ex. 213 at 11 (State Street's Rule 26(a) disclosures); Master Agreement § 17(e) (prevailing party provision); *but see* Dkt. No. 414 at 36 n.46 (State Street clarifying that it does not seek punitive damages).  Because Visbal's briefing does not challenge these categories of damages, her motion is denied with respect to them.

540, 563 (S.D.N.Y. 2020) (quoting *Atlas v. Sedrish*, 133 F. App'x 759, 760 (2d Cir. 2005) (summary order)).  "In addition to proving that the *existence* of damages is reasonably certain . . . a party claiming consequential damages must also prove the *amount* of damage with reasonable certainty." *Id.* (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110–11 (2d Cir. 2007) (emphasis in *Tractebel*)); *see also Tractebel*, 487 F.3d at 111 ("While certainty of amount is not an element of general damages in New York, it is an element of consequential damages.").

Setting aside the first three requirements, Visbal is entitled to summary judgment on this issue because State Street has not introduced evidence from which a jury could find that it has "prove[d] the *amount* of damage" to its brand "with reasonable certainty."  *Tractebel*, 487 F.3d at 110–11.  In its briefing on brand harm, State Street points to paragraphs 491–495 and 532–537 of its Rule 56.1 statement.  *See* Dkt. No. 414 at 35–36 & n.43.  But nowhere in those paragraphs does State Street quantify the amount of harm that Visbal's actions caused to its brand.  *See* Dkt. No. 420 ¶¶ 491–495, 532–537.  The primary evidence, moreover, that State Street seeks to introduce concerning this theory of harm is Dr. Gosline's expert report and testimony.  *See id.* ¶ 532–537.  But Dr. Gosline stated in her report (and confirmed in her later deposition) that she "cannot specifically quantify the harm" from Visbal's actions "to SSGA's intended or existing brand equity."  Dkt. No. 397 Ex. 209 ¶ 46; *see* Dkt. No. 367 Ex. E at 82:4–7 ("Q:  Dr. Gosline, have you done anything to quantify the harm claimed in this case to SSGA's brand equity in Fearless Girl?  A. No.").

As a result, the only estimation that State Street has provided concerning this theory of damages comes from its Rule 26(a) disclosures, where it stated that its brand-related damages are "estimated to reach into the tens of millions of dollars."  Dkt. No. 397 Ex. 213 at 11.  But that unfounded statement, stating alone, is insufficient to "prove the *amount* of damage with reasonable certainty."  *Tractebel*, 487 F.3d at 110–11; *see Abraham*, 471 F. Supp. 3d at 564 (rejecting a claim for lost profits because "no evidence exists that would permit a factfinder to calculate with any certainty

just how great the damages were"). So Visbal is entitled to summary judgment concerning State Street's brand-dilution theory of damages.

Visbal's motion, however, will be denied concerning State Street's alleged damages tied to the Australian litigation. Visbal argues that recovery of damages for attorneys' fees is barred by *Roman Catholic Diocese v. General Reinsurance Corp.*, No. 16-cv-2063, 2016 WL 5793996 (S.D.N.Y. Sept. 23, 2016). But that court applied a New York rule applicable to *insurance policies*: that "an insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle its rights under the policy." *Id.* at *5 (quoting *N.Y.U. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 324 (1995)). Visbal has failed to explain why it should have any bearing on this (non-insurance) dispute.

Instead, the typical consequential-damages rules apply, as these damages also flow not from the contract itself but from "additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld*, 218 F.3d at 175. Therefore, State Street may pursue attorneys' fees for the Australia litigation if it a reasonable factfinder could find that its damages were caused by the breach, that the fact of damages are provable with reasonable certainty, that the damages were contemplated by the parties at the time of contracting, and that State Street could prove the amount of damages with reasonable certainty. *See Abraham*, 471 F. Supp. 3d at 563. Here, if State Street can show it was damaged by having to initiate litigation in Australia, those damages would be caused by Visbal's breaches. There are, moreover, at least triable issues of fact about whether the parties would have contemplated recovery for affirmative litigation brought to enforce the contract. And unlike State Street's brand-damage theory, the Court understands that State Street has evidence that it could use to calculate its attorneys' fees to a reasonable certainty—their bills. So Visbal's motion is denied as to this theory of damages.

### b. Visbal's Damages

State Street has moved for summary judgment concerning Visbal's ability to (a) recover

actual damages, (b) her ability to recover punitive or exemplary damages, and (c) the availability of rescission as a remedy for State Street's alleged breaches. Dkt. No. 389 at 35–38; *see* Dkt. No. 387 Ex. 82 at 5–6 (Visbal's Rule 26(a) damages disclosures). State Street's motion will be granted as to punitive or exemplary damages. That is because Visbal did not respond to State Street's motion concerning—and thereby abandoned—those damages. *See Kovaco*, 834 F.3d at 143. Otherwise, however, State Street's motion is denied.

First, Visbal's counterclaim alleging that State Street breached by not completing the purchase of 300 miniature replicas, *see* Dkt. No. 404 at 37, represents a request for general damages. That is because these damages were "direct and proximate damages which result[ed] from the breach" of contract. *Tractebel*, 487 F.3d at 110 (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (1886)); *see also Schonfeld*, 218 F.3d at, 175 (noting that parties attempt to recover general damages for "the value of the very performance promised"). As a result, Visbal need only (1) establish a reasonable certainty that damage occurred, and (2) provide a "stable foundation for a reasonable estimate of the damage incurred as a result of the breach." *Tractebel*, 487 F.3d at 110–11 (quoting *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974)). Here, as explained above, a reasonable jury could find a breach (and thus could find that damage occurred), and Visbal has adduced sufficient evidence that a fact-finder could use to use to estimate the damages from that breach. *See* Dkt. No. 404 at 37 (referencing the prices that Visbal has previously charged for miniatures). So State Street's motion will be denied as to Visbal's ability to prove damages resulting from State Street's alleged refusal to buy 300 miniature replicas.

The remainder of Visbal's purported damages—(1) attorneys' fees and costs, and (2) lost sales to third parties and profits from those sales—represent consequential damages, because Visbal seeks compensation for "additional losses (other than the value of promised performance) that [was] incurred as a result of [State Street's] breach." *Schonfeld*, 218 F.3d at 176; *see also Tractebel*, 487 F.3d at

109 ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements."). As discussed, to recover those damages, Visbal therefore must provide evidence from which a jury could find that these damages were caused by the breach, that their existence is provable with reasonable certainty, that they were within the contemplation of the parties at the time of contract, and that the amount of damages is provable with reasonable certainty. *See Abraham*, 471 F. Supp. 3d at 563.

Attorneys' fees and costs pursuant to the Master Agreement's prevailing-party provision meet this standard. If Visbal is the prevailing party at trial, she will have suffered damages caused by State Street's breach, and should be able to prove the fee amounts with reasonable certainty. And these damages were plainly within the parties' contemplation at the time of contract—they drafted a prevailing-party provision for precisely this situation. *See* Master Agreement § 17(e).

Nor will State Street's motion be granted as to damages sought from lost sales. Visbal has introduced some evidence to suggest that she lost sales due to State Street's conduct that she alleges breached the Master Agreement (including its allegedly unauthorized creation of Fearless Girl replicas, failure to approve Visbal's requests to use Fearless Girl, and decision to bring this case). *See* Dkt. No. 423 ¶ 631 (email from Fisher to Visbal noting his discomfort with the disputes between State Street and Visbal); Dkt. No. 397 Ex. 38 at 7–12 (Visbal listing potential purchasers of full-size Fearless Girl replicas). And as Visbal notes, given that the Master Agreement envisioned that Visbal would make additional sales to third parties, a reasonable jury could find that loss of those sales was within the contemplation of the parties at the time of contracting. *See* Dkt. No. 404 at 38; *see also* Master Agreement §§ 6–7. Finally, while Visbal has not provided an exact number of lost sales traceable to State Street's alleged misconduct, she has provided evidence that could be used at trial to calculate at least some damages with a reasonable amount of certainty. *See* Dkt. No. 404 at 37 (noting records of past sales of miniatures, which she could use as a basis to calculate lost sales of

miniatures traceable to State Street's alleged misconduct); *Merlite Indus., Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir. 1993) (noting that "past performance" of "established businesses" can provide evidence of damages with "sufficient certainty to make a jury question"); *Schonfeld*, 218 F.3d at 172 (lost profits "must be 'capable of measurement based upon known reliable factors without undue speculation,'" but "need not be proven with 'mathematical precision'" (quoting *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993)).

Finally, State Street's motion will be denied as to whether Visbal may seek recission of the agreements.  Rescission is available as a remedy where a breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980) (quoting *Callanan v. Powers*, 199 N.Y. 268, 284 (1910)).  As discussed earlier in considering Visbal's affirmative defenses, the magnitude and substantiality of State Street's breaches, if any, are questions that a trial (and jury) are better suited to resolve than this Court on summary judgment.  As a result, while State Street will certainly be able to argue in any post-trial motions that rescission is unavailable, the Court declines to so hold at this time.[31]  In sum, State Street's motion for summary judgment concerning Visbal's damages requests is denied in part, but is granted with respect to any request for punitive or exemplary damages.

---

[31] State Street also argues that rescission should be rejected as a potential remedy because "rescission cannot effectively restore the parties to their pre-contract status quo."  Dkt. No. 429 at 19 (quoting *Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*, No. 06-cv-3915, 2008 WL 4179235, at *5–6 (S.D.N.Y. Sept. 10, 2008)).  But the extent to which each party has provided services to the other, and whether those exchanges would make restoring the status quo difficult or impossible, are precisely the types of questions that will become much clearer at trial—and that further support the decision to hold off on making any decisions about the availability of recission now.

**IV. CONCLUSION**

For the foregoing reasons, State Street and Visbal's cross-motions for summary judgment are both GRANTED IN PART.  The Clerk of Court is directed to terminate the motions pending at Dkt. No. 369 and Dkt. No. 379.

SO ORDERED.

Dated: June 16, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge